## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR FIRST NBC BANK,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | **Case No.: _____** |
| **v.** | ) ) | **JURY TRIAL DEMANDED** |
| **ERNST & YOUNG LLP and GLOUCESTER INSURANCE LTD.** | ) ) ) | |
| **Defendants.** | ) | |

## COMPLAINT

Plaintiff, the Federal Deposit Insurance Corporation as Receiver for First NBC Bank ("FDIC-R"), complains as follows against Defendants Ernst & Young LLP ("EY") and Gloucester Insurance Ltd. ("Gloucester"):

## INTRODUCTION

1.     The FDIC-R brings this lawsuit against EY and Gloucester to recover damages of at least $125 million caused by EY's professional negligence in auditing the consolidated financial statements of First NBC Bank ("First NBC" or the "Bank") and its holding company, First NBC Bank Holding Company, Inc. ("Holding Company"), in audit years 2014 and 2015 (the "2014 Audit" and "2015 Audit," respectively, and together the "Audits").

2.     In performing the Audits, EY had a duty to identify material fraud risks and plan and perform audit procedures to address those material fraud risks.  EY breached its very important and fundamental duty to design audit procedures to test for material fraud.  As a result, EY failed to detect repeated fraudulent conduct by First NBC's President and Chief Executive

Officer, Ashton Ryan ("Ryan"), in his material loan and tax credit investment portfolios and to report that misconduct to the Audit Committee.

3.      EY breached professional standards, violated its professional duties owed to the Bank, and negligently issued unqualified opinions on First NBC's consolidated financial statements and, in the 2014 Audit, on First NBC's internal controls over financial reporting.  As a result of EY's malpractice, EY not only failed to detect fraudulent conduct by Ryan, but even when EY identified outright lies by Ryan, EY failed to further investigate them or report management integrity concerns to the Audit Committee as required by professional standards. Because EY failed to do its job, Ryan's misconduct continued, causing at least $125 million in damages.

4.      EY's malpractice allowed Ryan to improperly advance hundreds of millions of dollars to promote his own financial interests and mask the deteriorating financial condition of his lending and tax credit investment portfolios.  In conducting its audits in violation of professional standards, EY failed to exercise professional skepticism or to obtain sufficient appropriate audit evidence to support its opinions that First NBC's financial statements were, in all material respects, presented fairly in accordance with Generally Accepted Accounting Principles ("GAAP") and free from material misstatement due to error or fraud.

5.      During the 2014 Audit, EY failed to identify material weaknesses in internal controls and instead negligently issued an unqualified opinion on internal controls.  EY knew or should have known that Ryan exercised a dominant influence over the Bank's lending and financial statement processes, including personally handling a large portfolio of loans and tax credit investments and recklessly advancing tens of millions of dollars to borrowers without any meaningful controls.  EY also knew that the Bank's General Counsel, Gregory St. Angelo ("St.

Angelo"), exercised significant influence over the Bank's loan workout operations and personally received over $40 million in loans or tax credit investments, which were handled directly by Ryan outside the Bank's normal processes and procedures.  Ryan's dominance and St. Angelo's role at the Bank were both fraud risks and red flags of material weaknesses in internal controls.

6.     EY negligently ignored these fraud risks and failed to design audit procedures to address them in violation of auditing standards.  EY negligently failed to review all of Ryan's material lending portfolio to address the fraud and control risks resulting from his dominance. EY negligently failed to identify St. Angelo as a related party or to review any St. Angelo loans to ensure that the loans had been approved and administered consistent with the Bank's normal processes and procedures.  EY also negligently performed audit procedures related to tax credit investments and loan reviews of other relationships during the 2014 Audit.  As a result, EY failed to detect and report Ryan's clear fraud and material impairments in his loan and tax credit investment portfolios.  EY's failure to detect material weaknesses in internal controls and Ryan's fraud allowed his misconduct to continue, which resulted in substantial damages that could have been avoided.

7.     During the 2015 Audit, EY also negligently performed loan reviews and audit procedures related to tax credit investments and therefore again failed to detect repeated inconsistent and false statements by Ryan in the Bank's records and EY's work papers.  In the 2015 Audit, EY finally recognized that Ryan's dominance was a fraud risk and material weakness in internal controls and that St. Angelo was a related party.  But EY still failed to identify the fraud risk posed by St. Angelo's loan and tax credit investment portfolios.  EY also negligently reviewed Ryan's tax credit investment and loan portfolios and thus again failed to

detect his false representations in the Bank's records regarding collateral, guarantors, and payments received from borrowers. Because EY failed to detect Ryan's misconduct during the 2015 Audit, that misconduct continued causing further damages.

8.     Had EY competently performed the Audits, EY would have detected Ryan's misconduct during the 2014 and 2015 Audits and material weaknesses in internal controls in the 2014 Audit. EY had a duty to report management integrity concerns to the Bank, but because of its negligence EY failed to do so. But for EY's negligence, Ryan's misconduct, including fraudulent and reckless lending, would have been reported to the Bank and stopped, Ryan would have been removed from the Bank, and over $125 million in damages caused by Ryan's misconduct would have been avoided.

## THE PARTIES

### A.     Plaintiff

9.     The FDIC is a corporation and an instrumentality of the United States of America established under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1835a. On April 28, 2017, the Louisiana Office of Financial Institutions closed First NBC and appointed the FDIC as Receiver. *See* 12 U.S.C. § 1821(c). Under 12 U.S.C. § 1821(d)(2)(A)(i), the FDIC-R succeeded by operation of law to all rights, titles, and privileges of First NBC and, among others, the depositors, accountholders, and stockholders of First NBC. In this action, the FDIC-R seeks to recover damages resulting from EY's tortious conduct.

### B.     Defendants

10.     Defendant Ernst & Young LLP is a public accounting firm and limited liability partnership that is the United States affiliate of an international network of member firms providing assurance, audit, tax, and business advisory services. EY maintains offices in this

district at 3900 One Shell Square, 701 Poydras Street, New Orleans, Louisiana 70139, and EY partners reside in this district.  During the Audits, EY provided audit and related services in this district.

11.     Gloucester Insurance Ltd. is a captive insurer of EY that provided $400 million in professional liability insurance to EY during the relevant period.  Gloucester is named in this action as EY's insurer under the Louisiana Direct Action Statute, La. R.S. § 22:1269.

## JURISDICTION AND VENUE

12.     This Court has subject-matter jurisdiction over this case under 12 U.S.C. § 1819(b)(1) and (2) and 28 U.S.C. §§ 1331 and 1345.  The FDIC-R has the power to sue in any court of law.  12 U.S.C. § 1819(a).

13.     Venue is proper in this district under 28 U.S.C. § 1319(b) because a substantial part of the events or omissions giving rise to the claims asserted in this case occurred in this district.

14.     At all relevant times EY was a "licensee," as defined in the Louisiana Accountancy Act.  *See* La. R.S. §§ 37:71-124.  Under La. R.S. § 37:107, EY has permanently and forever waived the use of a public accountant review panel as to any and all claims, demands, or causes of action that have been or may be asserted by the FDIC-R against EY, including all claims in this case.  In a written agreement between the FDIC-R and EY, dated October 3, 2018, EY agreed that it will not argue or assert in any proceeding of any kind, including any judicial proceeding, that any such claims should have been reviewed by a public accountant review panel or that any provision of La. R.S. §§ 37:101-24 is applicable to any such claims.

15.     This Court has personal jurisdiction over Defendants who, at all relevant times, regularly conducted business in, and had substantial contacts with, the State of Louisiana or insured such activity.

## FACTUAL ALLEGATIONS

### C.     First NBC's Rapid Growth Led by Ryan.

16.     First NBC was formed in 2006 with its headquarters in New Orleans.  First NBC underwent rapid growth from its inception.  From 2010 to 2014, First NBC doubled in asset size, growing by approximately $500 million per year.  As of the end of 2014, First NBC had grown to nearly $4 billion in assets.  First NBC fueled this substantial asset growth in part through high-cost, large, uninsured deposits.

17.     Ryan dominated the Bank's affairs and spearheaded its rapid growth through concentrated loan positions to a number of large commercial borrowers and tax credit investments.  Ryan was the Bank's founder and became the Bank's Chairman and Chief Executive Officer at its inception.  Ryan was also the Holding Company's Chairman and Chief Executive Officer from its formation in 2007.  In September 2016, the Bank restricted Ryan's formal lending authority and reassigned his lending portfolio, and in December 2016, he was forced to resign as the Chief Executive Officer of the Bank and the Holding Company.  Ryan served on the Holding Company and Bank's Boards of Directors until April 2017, when he resigned shortly before the Bank's failure.

18.     In addition to his formal roles, Ryan oversaw the lending department.  Ryan had ultimate authority to approve loans for submission to the Senior Loan Committee or Board Loan Committee and had personal authority to unilaterally approve extensions of credit up to $1 million and to approve overdrafts.  In handling his own loan portfolio, Ryan routinely exercised

his incremental lending authority and repeatedly advanced funds in $1 million increments throughout 2014 through 2016, effectively avoiding limits on his loan approval authority under the Bank's loan policy.

19.     Ryan also had unilateral authority to approve tax credit investments.  No approval of any committee or independent body was required for Ryan to advance millions of dollars in tax credit investments.  Ryan repeatedly exercised his unilateral authority to increase the Bank's exposure to these investments, including investments in entities controlled by St. Angelo, the Bank's General Counsel and a related party.  These tax credits were a material part of the Bank's investments and constituted a continually increasing portion of the Bank's net income from 2012 forward.

### D.     Ryan's Fraud Against First NBC Bank.

20.     Ryan committed fraud at First NBC by repeatedly causing the Bank to advance money through loans and tax credit investments on false pretenses.  In committing this fraud, Ryan was acting entirely in his own self-interest and contrary to the interests of the Bank, which was a victim of Ryan's fraud.  Rather than recognize losses on existing credits, Ryan concealed the true condition of his loan portfolio by causing the Bank to make advances to his borrowers to cover repeated overdrafts and service debt, all of which magnified the losses on these credits.  In an attempt to justify additional lending, Ryan made false statements in loan approval memoranda regarding the condition of collateral, alleged payments by borrowers, and the existence and financial condition of guarantors.  EY had evidence of Ryan's misconduct in its work papers. Because of EY's accounting malpractice, Ryan's fraud went unchecked for years.

21.     To date, three First NBC borrowers have pleaded guilty to conspiracy to commit bank fraud in coordination with Ryan, who is referred to in the charging documents as "Bank

President A."  On October 17, 2018, Jeffrey Dunlap, the owner of Phoenix Civil Contractors ("Phoenix Civil"), which was a borrower of the Bank, pleaded guilty to conspiracy to commit bank fraud by obtaining loans through false financial information.  Ryan is identified as Dunlap's co-conspirator in the criminal information, which charges that Dunlap and Ryan provided false financial information to the Bank to justify additional extensions of credit.  These additional extensions of credit were intended to allow Dunlap to perform construction services related to Ryan's personal real estate development projects.

22.     On June 28, 2019, St. Angelo, the Bank's General Counsel, pleaded guilty to bank fraud.  According to his criminal information, St. Angelo conspired with Ryan, who served as his loan officer, to fraudulently mask St. Angelo's true financial condition by renewing and increasing loans to cover existing debts and to cover overdrafts.  Ryan and St. Angelo made false statements to the Bank regarding how loan proceeds would be used, misrepresented the existence of collateral, and created fake tax credit investments.

23.     On July 30, 2019, Kenneth Charity ("Charity") pleaded guilty to conspiracy to defraud the Bank.  Ryan was Charity's loan officer.  According to Charity's criminal information, Charity conspired with Ryan to obtain loans on false pretenses by misrepresenting to the Bank the condition of collateral for the loans, the commitment of an alleged guarantor, and how loan proceeds would be used.

24.     Ryan's fraud at First NBC included (a) misrepresenting in Bank records the use of loan proceeds, the existence and availability of cash flow to repay loans, the existence and condition of loan collateral, and the performance of loans, (b) creating fake tax credit investments, and (c) misrepresenting to the Bank the identities and financial condition of guarantors.

25.     Ryan had a strong financial incentive to conceal the true condition of his lending and tax credit investment portfolios.  Ryan had significant personal real estate development investments that he helped finance through fraudulent loans to third parties that provided services for him personally.  For example, according to Ryan's co-conspirator, Ryan made fraudulent loans to Phoenix Civil to obtain construction services for Ryan's personal projects.  In addition, Ryan received large bonuses tied to the reported financial performance of the Holding Company and was a significant Holding Company shareholder.  Ryan also pledged his shares in the Holding Company as security for personal loans from other financial institutions to finance his personal business ventures.

**E.     EY's Negligent Audit Reports.**

26.     First NBC was wholly owned by the Holding Company, which was formed in 2007.  The Holding Company's only material asset was the Bank.

27.     EY was the Holding Company's independent external auditor from its inception until August 2016.

28.     The Holding Company went public in May 2013 through an initial public offering.  As a result, beginning with the 2014 fiscal year, the Holding Company was required under the Sarbanes-Oxley Act to have an "integrated audit," meaning that the auditors must opine on both the financial statements and internal controls over financial reporting.

29.      During the 2014 Audit and the 2015 Audit, EY conducted integrated audits as required under the Sarbanes-Oxley Act.

30.     During the 2014 and 2015 Audits, EY had direct and unfettered access to the Bank's electronic banking systems, including its loan and deposit systems, and was able to

directly search for and obtain Bank records that EY determined were needed for its audit procedures.

31.     The Holding Company's financial statements were consolidated with the Bank's financials because the Bank was the Holding Company's only material asset and virtually all operations occurred at the Bank level.

32.     For the 2014 fiscal year, EY issued its unqualified audit opinion on March 31, 2015.  EY opined that the Holding Company's consolidated financial statements (which included all of the Bank's assets and liabilities) were fairly stated in accordance with GAAP and free from material misstatement whether due to error or fraud.  EY also issued an unqualified opinion that there were effective internal controls over financial reporting and therefore no material weaknesses in internal controls.

33.     For the 2015 fiscal year, EY issued its unqualified audit opinion on the financial statements on August 25, 2016.  EY opined that the Holding Company's consolidated financial statements (which included all of the Bank's assets and liabilities) were fairly stated in accordance with GAAP and free from material misstatement whether due to error for fraud.  In the 2015 Audit, EY identified several material weaknesses in internal controls, including material weaknesses over financial reporting caused by Ryan's dominant influence without adequate controls and material weaknesses in the credit department's monitoring over borrowers' ability to repay credits.  Given the material weaknesses, EY issued an adverse opinion on the internal controls over financial reporting.

**F.     EY Knew that the Bank Intended to Use and Rely Upon Its Audit Reports.**

34.     Federal regulations, including 12 C.F.R. § 363.3(a), required First NBC to be audited by an independent public accountant.

35.    The Bank was not a party to any agreement with EY and did not engage EY to audit its financial statements or internal controls.  Nevertheless, EY knew that First NBC would submit its audit opinions, issued at the Holding Company level, to the FDIC to satisfy the Bank's regulatory audit obligations.  EY's audit reports for the 2014 and 2015 Audits specifically provided that they were performed to comply with these audit and audit-reporting requirements. These two audit reports explicitly stated that EY's audits "were conducted to meet the reporting requirements of Section 112 of the Federal Deposit Insurance Corporation Improvement Act (FDICIA)."

36.    EY also specifically communicated to Bank personnel in separate correspondence its understanding that EY's audit reports would be submitted by the Bank to satisfy the FDIC's audit and audit-reporting requirements.

37.    EY knew that the FDIC, as the Bank's federal regulator, would review and rely upon EY's audit reports in evaluating the safety and soundness of the Bank's operations.

38.    EY also knew that the Bank relied on EY to alert it to material weaknesses in internal controls and any concerns over management integrity, including, but not limited to, potential fraud involving senior management.

**G.    EY Had a Duty to Comply with PCAOB Auditing Standards, Including Identification of Fraud Risks and Procedures to Detect Fraud.**

39.    Under federal and state law, EY's integrated audits were required to be performed under Public Company Accounting Oversight Board ("PCAOB") rules, Auditing Standards, Quality Control Standards, and ethical and independence requirements.  *See* 15 U.S.C. §§ 7211(c), 7212(a), 7213(a); 12 C.F.R. 363.3; La. R.S. 37:83(B); PCAOB Rules 3100, 3200. EY also was required to follow GAAP and Generally Accepted Auditing Standards ("GAAS") in performing its audits.

40.    EY had a duty to plan and perform its audits to obtain reasonable assurance about whether the financial statements were free of material misstatements, whether caused by error or fraud.  AU Section 110.  "Reasonable assurance" requires a "high level of assurance" that the financial statements were free of material misstatements due to error or fraud.  AU Section 230.10.

41.    EY had a duty to identify material risks of misstatement, including fraud and internal control risks, in planning its audits and to design and perform audit procedures directed specifically to address those risks.  EY was required to plan and perform audit procedures specifically directed to the detection of a material fraudulent misstatement in the financial statements.

42.    EY had a duty to exercise professional skepticism in its audits by employing "an attitude that includes a questioning mind and a critical assessment of audit evidence" in the audit process. AU Section 230.07.

43.    Auditing standards required that EY obtain sufficient, appropriate evidential matter to support its audit opinions.  EY could not simply rely on management representations as a "substitute for application of those auditing procedures necessary to afford a reasonable basis for an opinion regarding the financial statements under audit." AU Section 333.02.

44.    EY also had a duty to evaluate whether internal controls sufficiently address known fraud risks, including assessing financial pressures or incentives on management, significant related-party transactions, and domination of management by a single person without compensating controls.  AU Section 316.

45.     EY had a duty to exercise particular scrutiny and report concerns to the Audit

Committee if EY identified facts that undermined management's integrity or indicated fraud may

have occurred.  AU Section 316.79.

**H.     EY Repeatedly Violated Professional Auditing Standards in Performing the
2014 and 2015 Audits.**

46.     EY violated applicable PCAOB auditing standards in numerous respects.

47.     EY failed to design its audits to detect material fraud, by failing to either identify

known material fraud risks, to design appropriate procedures to address those risks, or both.

Indeed, contrary to EY's audit responsibilities, EY's lead audit partner expressly admitted to the

Audit Committee during the 2014 Audit and Ryan during the 2015 Audit that EY's audits were

not designed to detect fraud.  EY's breaches of its fundamental duties in planning and

performing the audits contributed to its numerous audit failures.

48.     EY ignored material weakness in internal controls and the fraud risk created by

Ryan's dominant influence at the Bank and his control over related-party transactions with St.

Angelo, the Bank's General Counsel.  As a result, EY failed to test all of Ryan's material loans

and tax credit investments during the 2014 Audit—a failure that allowed fraudulent misconduct

by Ryan to go undetected.

49.     EY also ignored numerous other red flags of material weaknesses in internal

controls, like repeated loan extensions to cover overdrafts, that should have caused it to exercise

professional skepticism rather than rely solely on management representations, and to obtain

competent, evidential matter to obtain reasonable assurance that the consolidated financial

statements were free of material error and fraud.

50.     As to the audit procedures that EY actually performed, EY failed to exercise

ordinary care and blindly accepted management representations about the performance of loans,

the borrowers' financials, cash flow, and collateral value, the existence of guarantees and collateral, and the availability of tax credits.  Even in the 2015 Audit when EY recognized Ryan's dominance and certain loan impairments, EY still failed to select for review or competently analyze all material Ryan-led loans or tax credit investments leaving his fraudulent conduct against the Bank unreported.

51.      Even when EY, in its own correspondence, identified "direct lie[s]" by Ryan, EY failed to report Ryan's dishonesty to the Audit Committee.  In failing to critically evaluate contradictory evidence regarding Ryan's loan and tax credit investment portfolios and report Ryan's fraud to the Audit Committee, EY abdicated its critical role as auditor and caused at least $125 million in damages.

>    **I.      EY Negligently Ignored and Failed to Properly Address Fraud Risks and Control Weaknesses Related to Ryan's Lending.**

52.      EY negligently failed to identify Ryan's dominance as a fraud risk in the 2014 Audit and to design and perform appropriate procedures to address that risk.  In the 2015 Audit, EY recognized that Ryan's dominance was a fraud risk and contributed to material weakness in internal controls, but EY negligently failed to fully or competently review his portfolio of material loans and tax credit investments, thereby allowing Ryan's fraud to continue undetected.

53.      In the 2014 Audit, EY knew that Ryan dominated the Bank's operations in numerous respects.  First, as stated in EY's work papers, Ryan had a "heavier involvement" than normal for a Chief Executive Officer and "very in depth" involvement in the Bank's financial statement procedures.  EY knew that Ryan was personally involved in determining the accounting treatment for Bank transactions.  Ryan's dominance over the accounting department and financial statement close process was a fraud risk due to the risk of override of controls.  Given that management is in a unique position to perpetrate fraud and Ryan had the ability to

directly manipulate the accounting records, EY was required to perform specific audit procedures to address the risk of Ryan's override of controls.  EY failed to do so in the 2014 Audit.

54.     Second, EY knew that Ryan personally managed a lending portfolio in excess of $100 million, which was highly unusual for a Chief Executive Officer of a bank the size of First NBC.  EY also knew or should have known from its review of Bank records that borrowers within Ryan's loan portfolio had repeated intra-month overdrafts that were cleared by the end of the month through Ryan's unilateral extensions of Bank funds.  That fact was a red flag that Ryan was masking problem credits by advancing money to these borrowers to clear their overdrafts.  EY ignored that red flag.

55.     Third, EY knew during the Audits that Ryan repeatedly exercised his incremental lending authority to ultimately transfer tens of millions of dollars to his borrowers through $1 million incremental advances.  EY also knew that the Bank's internal loan review department, which was not independent and ultimately reported to Ryan, rationalized Ryan's excessive loan extensions as "unacceptable" but "understandable," citing his "substantial duties" as President and Chief Executive Officer as an "extenuating circumstance."  This conduct raised an obvious internal control problem that EY ignored during the 2014 Audit.

56.     Fourth, EY knew that Ryan had unilateral authority to approve tax credit investments and personally handled tax credit investments relating to St. Angelo, the Bank's General Counsel, outside of the Bank's normal operations, and unilaterally approved multiple $1 million advances to St. Angelo or his alleged entities.  EY ignored these red flags.

57.     Finally, EY knew that Ryan had a financial motive to mask problem loans. Ryan's incentive compensation was tied to the Holding Company's reported financial

performance—a fact that EY identified in its work papers as a "fraud risk factor" and an "area[]
where fraud can occur."  Furthermore, as set forth in proxy statements that EY reviewed, EY
knew that Ryan pledged his stock in the Holding Company as security for loans to finance his
personal real estate and business ventures.  EY negligently failed to gain an understanding of
Ryan's personal businesses or any connections to Bank borrowers as part of its related party
procedures.

58.     Given all of these red flags, EY violated professional standards in the 2014 Audit
by failing to identify Ryan's dominance as a fraud and internal control risk and by failing to plan
audit procedures to address that risk, including performing a full-scope review of all of Ryan's
material lending relationships.  During a full-scope review, EY was supposed to review the
Bank's complete credit file, including loan documents and appraisals, as well as the borrower's
payment history and financial condition.

59.     In the 2015 Audit, EY breached its duty to comply with professional standards by
failing to review all of Ryan's material lending relationships and, with respect to the Ryan loans
that it did review, by failing to properly perform those loan reviews.  Although EY recognized
Ryan's dominance as contributing to a material weakness in internal controls over the financial
reporting and credit functions at the Bank in 2015, EY negligently responded to this material
weakness and fraud risk by limiting its review of Ryan-led loans to only the three largest Ryan
lending relationships on the Bank's watch list.  This limited review breached professional
standards because EY should have reviewed all Ryan-led material loans (not just the three largest
relationships on the watch list).  And worse yet, EY negligently performed those loan reviews
that it actually undertook, as described below, allowing Ryan's misconduct to continue.

**J.      EY Negligently Ignored Fraud Risks from St. Angelo's Related-Party Transactions.**

60.      EY negligently failed to identify St. Angelo as a related party in the 2014 Audit. In both the 2014 and 2015 Audits, EY had a duty to perform audit procedures regarding the Bank's identification, recording, and disclosure of related-party transactions.  EY also had a duty to test whether related-party transactions were approved on the same terms and through the same processes as normal transactions with arms-length parties.

61.      EY knew or should have known that related-party transactions were a fraud risk given the heightened risk that such transactions may be entered into to mask the true purpose of the transactions.  EY knew that this risk was magnified for St. Angelo's material transactions with the Bank because Ryan personally managed St. Angelo's tax credits outside of the Bank's normal operations for the handling of tax credit investments.  EY knew that Ryan was the only person who could address questions regarding St. Angelo's tax credits, but failed to identify that as a red flag of potential fraud.

62.      During the 2014 Audit, EY knew that St. Angelo was the Bank's General Counsel, and should have identified him as a related party on that basis.  In addition, EY knew that St. Angelo was a member of the Bank's Credit Review Committee who personally influenced the Bank's handling of credit and workout decisions with respect to Bank borrowers.

63.      Despite this knowledge, EY negligently failed to identify St. Angelo as a related party in the 2014 Audit.  The work papers do not reflect any discussion of whether St. Angelo should even be considered as a related party.  EY performed no audit procedures in 2014 to assess whether the Bank was properly identifying related parties, but rather merely checked the clerical accuracy of the Bank's list of related parties.

64.    As a result of EY's negligent failure to identify St. Angelo as a related party and to review Ryan's material loans based upon his dominance, EY did not review St. Angelo's loan portfolio in the 2014 Audit.  Nor did EY test whether St. Angelo's tax credit investment portfolio was approved and administered consistent with the Bank's normal processes.

65.    During the 2015 Audit, EY recognized that St. Angelo was a related party due to his position as General Counsel of the Bank—a position he had held during prior audit years and a fact known by EY.  Yet despite this belated acknowledgment of St. Angelo's related-party status, EY still negligently failed to identify St. Angelo's extensive loan and tax credit investment portfolios with the Bank as a fraud risk.  And EY negligently failed to plan or perform any audit procedures to address that risk.

**K.    By Negligently Auditing St. Angelo's Tax Credit Investments in the 2014 Audit and 2015 Audit, EY Failed to Detect Fraud by Ryan.**

66.    EY negligently failed to detect Ryan's fraud regarding St. Angelo tax credit investments in the 2014 and 2015 Audits.  Had EY done its job, it would have discovered that the tax credit investment was fake.

67.    In the 2014 Audit, EY negligently failed to audit a $3.2 million material increase in the Bank's tax credit investment in an entity called 622 Conti, LLC.  Ryan falsely claimed that St. Angelo owned 622 Conti, LLC.  Because this was a material tax credit investment, EY had to obtain sufficient appropriate evidential matter supporting any material increase in the investment. Instead of obtaining appropriate evidence, however, EY wholly failed to audit the material increase.

68.    According to Ryan, the Bank's investment in 622 Conti, LLC was for a historic property located at 622 Conti Street that St. Angelo allegedly owned through that LLC.  The

Bank's investments in 622 Conti, LLC were intended to generate tax credits for the Bank by funding qualified historic rehabilitation expenses.

69.     In fact, St. Angelo did not own the property at 622 Conti Street.  Nor was St. Angelo ever a member of 622 Conti, LLC.  Instead, St. Angelo had a leasehold interest as a tenant at 622 Conti Street that, given its length, could never be a basis for a legitimate tax credit investment by the Bank.  St. Angelo has since admitted these facts through a guilty plea to a criminal information that charged him with conspiring to commit bank fraud with Ryan.

70.     EY blindly accepted a management assertion that the Bank increased its investment in 622 Conti, LLC because "more tax credits were available than had originally been estimated."  EY did nothing to independently verify this supposed increase in available tax credits or that 622 Conti, LLC (the purported tax credit investment entity) had even received the Bank's money.  EY should have carefully scrutinized this increased investment because, among other things:  (a) St. Angelo was a related party (which EY had negligently failed to identify); (b) Ryan personally managed St. Angelo's tax credit investments instead of allowing the tax credit department to handle the investments; and (c) EY's own audit program required it to "vouch" material changes in tax credit investments by obtaining appropriate audit evidence that the funds were in fact disbursed to the correct tax credit investment entity, which here was 622 Conti, LLC.

71.     Instead of discharging its professional obligations during the 2014 Audit, EY entirely failed to audit the supposed $3.2 million increased investment in 622 Conti, LLC.  EY's work papers reflect no audit procedures to verify who received the money that was disbursed as part of this supposed increased investment.  EY also negligently failed to obtain any appropriate audit evidence that St. Angelo was even a member of 622 Conti, LLC.

72.     Had EY properly audited the 622 Conti tax credit investment during the 2014 Audit, EY would have determined that the entire investment was fraudulent.  St. Angelo did not own the historic property located at 622 Conti Street individually or through 622 Conti, LLC.  So the Bank could not have purchased any tax credits from St. Angelo.

73.     Had EY demanded relevant evidence to vouch the Bank's investments in 622 Conti during the 2014 Audit, EY also would have discovered that the Bank was not disbursing funds to 622 Conti, LLC, as it should have been, but instead to an entirely different purported St. Angelo tax credit investment entity called 616 Girod LLC.  EY would have discovered the funds were used, in part, to pay St. Angelo's rent on 622 Conti to the actual owner of the property, for payroll expenses for yet another unrelated St. Angelo entity, to pay energy bills, and to distribute money to St. Angelo personally and his other companies, all of which were red flags of fraud.

74.     Ryan's fraudulent conduct also would have been detected had EY discharged its professional obligations during the 2015 Audit.  For example, during the 2015 Audit, EY received a property appraisal showing that St. Angelo leased but did not own the 622 Conti property.  This directly contradicted the fundamental premise of this tax credit investment that St. Angelo owned the property through 622 Conti, LLC and could sell tax credits to the Bank. The appraisal identified the true owners of the property, and St. Angelo was not one of them. Had EY simply read the appraisal in its own work papers, it would have discovered that St. Angelo did not own the property and that the tax credit investment was fraudulent.

75.     EY negligently failed to obtain competent evidence of the Bank's ownership interest in the tax credit investment.  EY was purportedly verifying that St. Angelo owned the 622 Conti property through 622 Conti, LLC and that the Bank supposedly was investing in that limited-liability company.  Yet, in the 2015 Audit, EY inexplicably relied on an operating

agreement for a totally different St. Angelo entity, called "St. Angelo Investment Company LLC," which clearly did not establish the Bank's investment in 622 Conti, LLC or St. Angelo's ownership of the property.  The work papers show that EY never questioned why it was given the wrong operating agreement.  And EY issued its unqualified opinion despite never getting the operating agreement for 622 Conti LLC.

76.     In the 2015 Audit, EY also had clear evidence in its work papers that the Bank's funds did not go to 622 Conti, LLC, but EY negligently failed to notice.  EY received documentation showing that Ryan's executive assistant transferred $500,000 of tax credit funds to 616 Girod LLC.  Had EY exercised any professional skepticism, EY would have discovered the money was improperly diverted to enable St. Angelo to buy a completely different property, not for qualified rehabilitation expenses, a clear red flag of fraud.

77.     Had EY actually audited this material tax credit investment increase, EY would have discovered Ryan's fraud and would have had a duty to report that information to the Audit Committee.

**L.     By Negligently Failing to Perform Loan Reviews Targeted to Ryan's Loan Portfolio, EY Failed to Detect Ryan's Fraud During the 2014 Audit.**

78.     EY identified no material weakness or fraud risk during the 2014 Audit from Ryan's dominance over the Bank's credit operations.  As a result, EY did not identify Ryan's lending as a risk factor or review all of Ryan's material loans.  Had EY done so, it would have detected Ryan's fraud.

79.     For example, in addition to tax credit investments, the Bank had over $30 million in loans to St. Angelo and his personal limited liability companies as of the end of 2014.  Even though these loans were intertwined with St. Angelo's tax credit investments, EY failed to review the St. Angelo lending relationship in 2014.  EY knew that one of St. Angelo's accounts

at the Bank, under the name 616 Girod LLC, ran virtually constant overdrafts throughout 2014, a clear red flag of St. Angelo's financial problems.  Moreover, based upon St. Angelo's status as a related party and Ryan's dominance and control over that lending relationship, EY should have reviewed this material lending relationship in the 2014 Audit.

80.     EY's negligent failure to review St. Angelo's loans, including the loan files, allowed Ryan's fraud to continue undetected.  Had EY performed a competent review of St. Angelo's loans, EY would have reviewed mortgages evidencing the existence of the loan's collateral and an appraisal supporting its value.  St. Angelo's loans were supposedly collateralized by a mortgage on the 622 Conti property, but the Bank had no fee simple mortgage in its files for the property because St. Angelo did not own it or have an interest in 622 Conti, LLC.  Similarly, if EY had requested an appraisal for the property, any appraisal would have revealed that St. Angelo did not own the property.  Moreover, had EY scrutinized Ryan's own underwriting memoranda in the loan files, it would have discovered that St. Angelo was a tenant, not an owner, of 622 Conti.   Had EY simply reviewed this collateral description in the loan files, EY would have exposed Ryan's fraud regarding the primary collateral for the St. Angelo loans.

81.     Similarly, EY negligently failed to review the Phoenix Civil relationship during the 2014 and 2015 Audits.  EY should have conducted a full loan review of this relationship because it was a material loan relationship controlled by Ryan that was repeatedly past due with large overdrafts, of which EY was aware, throughout 2014, and because Ryan's dominance, particularly over the lending department, was a fraud risk.  EY also should have known that Ryan unilaterally extended millions in loans to Phoenix Civil to cover these overdrafts.  All of these red flags should have prompted EY to review this loan in both 2014 and 2015.

82.     Had EY reviewed the Phoenix Civil relationship, EY would have found fraud regarding the financial condition of the borrower and its loans.  Phoenix Civil was a construction company with a line of credit from the Bank and other loans.  For the line of credit, the Bank's borrowing base—the amount of credit it agreed to extend to Phoenix Civil—was 80 percent of the customer's account receivables.  Accordingly, EY had to review the reported customer receivables to perform its loan review.

83.     Any loan review by EY would have exposed that the line of credit violated the Bank's Loan Policy, which prohibited lending on accounts receivable that had been overdue for more than 90 days.  The Loan Policy also required monthly documentation and verification for larger receivables through field reviews and verification letters.  This required documentation did not exist in the Bank's records.

84.     On its face, the accounts-receivable statements were not credible and violated the Bank's Loan Policy.  The statements in the Bank's records contained no aging information and many of the accounts receivable remained unchanged from 2013 through 2015.

85.     In fact, the accounts-receivable statements were fraudulent.  Phoenix Civil's owner pled guilty to conspiracy to commit Bank fraud with Ryan, among others.  As set forth in the factual basis for the guilty plea, the accounts-receivable statements contained false and inflated values.

86.     Moreover, had EY reviewed the Phoenix Civil relationship, EY should have detected self-dealing by Ryan.  Phoenix Civil's largest accounts receivables involved two companies owned by Ryan and another Bank borrower, for whom Phoenix Civil was providing construction services.  As set forth in the factual basis for the guilty plea of Phoenix Civil's owner, Ryan advanced funds to Phoenix Civil and continued to cover overdrafts to mask its

inability to repay the Bank and to enable construction services for Ryan's personal business ventures.

87.     Had EY properly reviewed the underlying documents in the Bank's files and exercised professional skepticism, as it was required to do as part of a proper audit, it would have discovered Ryan's self-dealing and uncovered the fraud on this loan.

**M.     EY's Negligent Loan Reviews in the 2014 Audit and the 2015 Audit Failed to Detect Fraud by Ryan and Material Weaknesses in Internal Controls.**

88.     EY negligently reviewed loans in the Audits, failing to detect fraud in numerous Ryan loan relationships.  EY identified loan reviews as substantive audit procedures necessary for EY's auditing of the Bank's Allowance for Loan and Lease Losses.  In performing its loan reviews, EY failed to obtain appropriate audit evidence of the condition of the loans and instead repeatedly and improperly relied solely upon Ryan loan memoranda in the Bank's files that purported to describe the borrowers' financial condition and loan performance.  As a result, EY failed to identify material weaknesses in the Bank's internal controls over its lending portfolio and fraud in Ryan's lending relationships.

**EY's Negligent Auditing of the Charity Lending Relationship**

89.     EY negligently audited the Charity lending relationship in both the 2014 and 2015 Audits and consequently failed to detect lies by Ryan to the Bank regarding the use of loan funds, condition of collateral, the guarantor, and the performance of the loans.  EY violated its own audit plan for the loan reviews, ignored contradictory representations regarding the condition of collateral from Ryan, and failed to investigate the lack of signed guarantees.

90.     Charity was a real estate developer with more than $16 million in loans from the Bank as of the 2014 Audit.  Charity was a troubled borrower for years prior to the 2014 Audit. Lacking financing sources or cash flow, Charity's efforts to develop various commercial real

estate and residential projects had stalled years prior to the 2014 Audit.  Yet EY concluded in the 2014 Audit that the loans were not impaired because Charity's sister, an alleged full guarantor, was making the loan payments and her assets protected the Bank.  EY obtained no audit evidence for that conclusion beyond Ryan's representations to the Bank, and EY ignored evidence that the Bank, not the guarantor, was making Charity's loan payments.

91.    EY violated its own audit plan by failing to conduct a full-scope review of the Charity relationship.  In the 2014 Audit, EY selected the Charity relationship for a full-scope loan review, but performed only a summary review.  In contrast to a full-scope review, EY's summary procedures did not require any review of underlying loan files, including transaction histories, appraisals, and borrower financial statements.  EY would have discovered the fraud if it had competently conducted a full-scope loan review.

92.    EY's negligent loan review missed key information regarding the non-performance of the loan and its inadequate collateral.  For example, EY failed to detect that Ryan was advancing money to Charity to pay interest on other loans, taxes, and other debts because Charity and the guarantor were unable to make payments and had repeated overdrafts.  EY obtained no audit evidence regarding how loan advances, purportedly for construction on Bank collateral, were actually spent.  Nor did EY obtain any audit evidence, aside from Ryan's description, regarding the condition of the Bank's collateral.  As a result, EY failed to detect that Ryan was providing false information to the Bank regarding the purpose of the loans, status of construction, and condition of the collateral.

93.    During the 2014 Audit, for example, EY reviewed no appraisals on the Bank's collateral as it should have under its audit plan.  Had EY done so, it would have detected Ryan's false statements to the Bank regarding the Robert E. Lee shopping center ("Center"), part of

Charity's collateral.  EY blindly accepted in its loan review that the Center was under construction and near completion with an anchor tenant under contract.  EY failed to obtain any appropriate audit evidence of ongoing construction, the lease, or evidence of Charity's ability to finance the millions needed for construction.  EY already knew from its 2013 audit that the property had been cited for blight and that no construction had begun at the time of that audit. Yet during the 2014 Audit, EY performed no audit procedures and collected no appropriate audit evidence to verify the progress of the construction.  Had EY required proof of the collateral's condition and value by reviewing an appraisal, it would have learned that no construction had occurred.  EY violated auditing standards and its audit plan by failing to obtain sufficient audit evidence regarding the condition of this collateral and, as a result, failed to detect Ryan's fraud.

94.     EY also failed to obtain any audit evidence that Charity's sister had fully guaranteed all Charity loans and was financing loan payments through her cash flow.  EY knew that Ryan repeatedly extended Charity's loans throughout 2014 purportedly because he was waiting on updated financial statements from Charity.  Charity's inability to produce financial statements should have been a red flag to EY to investigate.  EY's work papers contain no 2013, let alone 2014, financial statements for Charity or the purported full guarantor.  The guarantor's 2012 financial statements in EY's work papers showed a negative net worth and insufficient income to finance Charity's debt.  EY negligently concluded that the Charity guarantor's cash flow supported the loan without evidence of either her unlimited guarantee or sufficient cash flow.

95.     EY also knew from Bank records that Charity's company ran repeated overdrafts on a monthly basis.  EY ignored this red flag of the borrower's troubled financial condition.

Instead, EY's 2014 Audit concluded that the Charity lending relationship was not impaired due to the guarantor's financial support without any supporting evidence.

96.     Had EY exercised any professional skepticism, it would have questioned whether Ryan was masking this impaired loan by extending maturity dates and advancing new loans to cover Charity's interest payments to the Bank.  EY ignored this common fraud risk in its planning for the 2014 Audit and disregarded clear evidence of it in reviewing the Charity loan.

97.     Had EY obtained evidence of where the Bank's 2014 loan advances went, it would have detected Ryan's fraud.  The loan file, which EY was supposed to review under its audit plan, reflects Ryan's repeated overdraft approvals to pay interest, taxes, and insurance for Charity's properties, which plainly contradict Ryan's claim that the guarantor's cash flow covered Charity's obligations.

98.     Had EY reviewed the Charity loan file as required by its audit plan, EY also would have detected Ryan's false statements to the Bank that loan advances were upgrading collateral.  For example, Ryan falsely represented in an August 2014 Bank memorandum that a $980,000 loan would be used in part to renovate a restaurant, thereby substantially increasing Charity's cash flow and the value of collateral securing his loans.  In fact, no Bank funds were spent to renovate the restaurant.  Ryan then used the same false justification to advance more money allegedly for the same restaurant renovations in 2015.  During the 2015 Audit, EY received an appraisal for the restaurant confirming that no renovations had taken place.  Despite two loan advances for the exact same construction costs, EY never questioned why loan funds were not used for their intended purpose or where the money actually went.

99.     The Charity relationship reflects a broader lack of controls over construction loans in Ryan's personal loan portfolio that EY failed to detect in the 2014 Audit.  In order to

cover overdrafts or pay interest on other loans at the Bank, thereby masking the true financial condition of the borrower, Ryan repeatedly advanced money for the falsely stated purpose of financing construction-related expenses.  These advances had no budget, no construction draw schedule, and no other funding controls.  Had EY applied any professional skepticism or required audit evidence about the use of funds, EY would have detected Ryan's misrepresentations to the Bank and these control deficiencies.

100.    EY's 2014 loan review also contains clearly false or unsupported statements about the Charity loans.  EY stated that there were no loan modifications and the relationship involved no troubled debt restructuring despite repeated loan extensions and modifications to advance additional money to this distressed borrower in 2014.

101.    In the 2015 loan review, EY also ignored red flags of fraud and negligently failed to detect fraud by Ryan regarding performance of the loans and the collateral.  In the 2015 Audit, EY finally acknowledged that Ryan was simply extending maturity dates and advancing funds to cover overdrafts and that the loan was impaired despite his false claim that Charity's sister provided ample financial support for the loan.  However, EY ignored critical red flags of fraud. EY's 2015 work papers contains repeated examples where the alleged guarantor's signature is missing on notes and mortgages or where Ryan had approved funding even though the guarantor had failed to execute all of the necessary documents.  If important documents are missing or incomplete, that fact is a risk factor for fraud under the auditing standards.  Ryan's loan approvals in the absence of proper documentation also demonstrated that internal controls over his loan portfolio were ineffective.  Yet EY never investigated these red flags of fraud.

102.    EY's 2015 loan review also ignored evidence of fraud regarding the Bank's collateral.  For example, EY's work papers refer to a current appraisal for the Center, which

showed that the property had not been developed at all.  This audit evidence directly contradicted EY's conclusion in its 2014 work papers that the project was near completion in early 2015.  In reality, the property had been vacant and undeveloped for years, and EY would have known that if it had simply read the appraisal or visited the property.

103.    Had EY not performed negligent loan reviews of the Charity lending relationship in 2014 and 2015, EY would have detected repeated false statements to the Bank by Ryan regarding the performance of the loans, the use of loan funds, and the condition of the collateral.

**EY's Negligent Auditing of the GG Lending Relationship**

104.    By negligently auditing the GG lending relationship during the 2014 Audit, EY failed to identify material weaknesses in internal controls over Ryan's lending portfolio and Ryan's masking the true purpose and condition of loans to GG.[1]

105.    GG was a commercial real estate developer and one of the largest customers of the Bank.  Loans to GG and his related businesses totaled approximately $123 million at the Bank's closure.  During 2014 and 2015, the Bank, at Ryan's direction, repeatedly extended credit to allow GG and his businesses to cure large overdrafts, pay operating expenses, and service existing debt.  Despite the borrowers' demonstrated inability to repay existing obligations, Ryan in 2014 extended eighteen $1 million incremental advances and one $500,000 incremental advance to GG's businesses (representing a 26 percent increase in the loans outstanding), and then in 2015 extended 26 additional $1 million incremental advances.  All of these advances under Ryan's incremental lending authority, which exceeded $44 million, were for the stated purpose of providing "working capital," a false characterization that Ryan used to conceal the

_____

[1] Initials are used to identify certain individuals until the entry of an appropriate protective order.

true purpose of these advances—to mask overdrafts and pay interest on other loans issued by the Bank.

106.    EY conducted loan reviews of the GG relationship as part of the 2014 and 2015 Audits.  In both audit years, EY negligently concluded that the GG loans were appropriately risk rated and not impaired, thereby enabling Ryan to continue his improper funding of this relationship.  EY reviewed one of the largest lending relationships at the Bank, which had repeated overdrafts and required many infusions of more than $1 million a month for the vague purpose of supplying "working capital," yet found that the loans were performing and not impaired, even though Ryan was using these "working capital" advances to pay interest due on other loans.  And EY had no appropriate audit evidence of the borrowers' cash flow or the condition or value of the Bank's collateral.

107.    EY's loan reviews of this lending relationship were negligent in multiple ways.  First, during both the 2014 and 2015 Audits, EY's audit plan required that it conduct full-scope loan reviews of the GG loans, but EY improperly conducted only summary reviews just as EY improperly did with the Charity lending relationship.  As a result, EY missed key information, including, for example, transaction histories for large loans to GG's businesses revealing that the loans were not paying as agreed.

108.    Second, EY knew from its loan reviews that the majority of the loans to GG were for pre-development or in-process construction projects.  Yet none of the credit memoranda that EY reviewed contained funding controls to track the progress of construction or otherwise tie funding draws to specific construction-related expenditures.  In 2014 and 2015, Ryan extended over $44 million to GG through his incremental lending authority, yet EY's work papers contain no audit evidence showing where those funds went or what they were used for.  Despite the

absence of funding controls, EY negligently failed to identify a material weakness in internal controls over Ryan's lending portfolio or to expand its audit procedures to obtain appropriate audit evidence of the condition of collateral or adequately test these loans for impairment.

109.     Third, EY failed to obtain appropriate audit evidence to substantiate the borrowers' cash flow, the debt-service coverage for the loans, or the condition or value of the collateral.  During the 2014 Audit, for example, EY relied exclusively on schedules purporting to show GG's cash flow and collateral that EY knew or should have known were unreliable on their face and inconsistent with other documents contained in its work papers, including the borrowers' unaudited financial statements.  EY negligently failed to question this information and obtained no appropriate audit evidence addressing GG's cash flow or the value of collateral for the loans.  Ultimately, when the Bank reevaluated the relationship in 2017, the Bank found a $38.29 million collateral shortfall as of year-end 2014.

110.     Fourth, EY negligently failed to treat three consolidation loans made in September 2014 as a troubled debt restructuring.  These loans totaled $41.3 million and consolidated seventeen existing loans, dramatically cut GG's interest obligations, and extended another $1 million to the borrower under Ryan's incremental lending authority.  EY should have recognized that GG was experiencing financial difficulties, that these loan consolidations were a concession, and that this lending relationship had to be evaluated for impairment.  Any such impairment analysis would have exposed the absence of cash flow or collateral to support further lending to GG.

111.     Fifth, EY failed to investigate whether the new "working capital" loans extended under Ryan's incremental lending authority were improperly being used to cure overdrafts and mask delinquencies.  During both the 2014 and 2015 Audits, Bank records in EY's work papers

reflect that GG-related loans were repeatedly past due. EY, however, negligently accepted management's representation that neither "[GG] nor his entities have ever been on the past due report" without investigating whether new extensions of credit, purportedly for "working capital," were actually being used to remove these loans from the past-due report. Similarly, during both the 2014 and 2015 Audits, EY reviewed Bank records showing that GG-related entities had substantial intra-month overdrafts of demand deposit accounts at the Bank. Yet despite these large intra-month overdraft balances, neither GG nor his related entities appeared on the Bank's month-end overdraft reports (which included any overdraft in excess of $1,000 and outstanding for more than 10 days at month end). EY negligently failed to expand its audit procedures or otherwise investigate whether Ryan was improperly using his incremental lending authority to cure the intra-month overdrafts, keep GG and his businesses off the month-end overdraft reports, or otherwise mask the true condition of this lending relationship.

112.  Had EY audited the GG lending relationship in accordance with applicable auditing standards, it would have determined (among other things) that (a) management should have classified the loans as impaired; (b) Ryan's incremental lending authority extensions were being improperly used to mask this impairment, the past due status of existing loans, and frequent overdrafts of demand deposit accounts; (c) Ryan's stated purpose for these extensions—to provide "working capital"—was false; and (d) the cash flow amounts and collateral values used to support these loans were false. EY's failure to properly audit the GG relationship enabled Ryan to cause further damage through advances to GG that would not have occurred had EY fulfilled its professional obligations.

**EY's Negligent Auditing of the RL Relationship**

113.   EY negligently failed to identify a material weakness in internal controls over the Bank's oil-and-gas lending.  At the time of the 2014 Audit, the Bank had no underwriting guidelines or loan policies regarding oil-and-gas lending.  Despite the glaring lack of any lending standards for oil-and-gas loans, EY failed to identify this internal control weakness.

114.   In the 2014 Audit, EY also negligently conducted a loan review of almost $50 million in oil-and-gas loans to borrowers affiliated with RL.  In reviewing this loan relationship, EY not only failed to identify the lack of underwriting standards as a material control weakness, but also negligently concluded that the RL loans were performing.  EY should have classified the these loans as impaired because (a) there were critical operational problems with the wells; (b) crude oil prices had dropped 53 percent in 2014; (c) the Bank had grossly overstated the collateral values by failing to account for non-producing wells; (d) unaudited borrower-prepared financial statements showed a negative net worth exceeding $60.5 million; (e) Ryan had repeatedly extended the loans and advanced new money to cover interest payments; and (f) regulatory guidance required discounting of the borrowers' asserted reserves.

115.   Had EY properly audited the RL relationship, EY would have identified a material weakness in internal controls over lending based on the absence of any Bank policies governing oil-and-gas lending and Ryan's repeated, unilateral extensions of millions of dollars throughout 2014 to borrowers with no ability to repay their loans.  EY should have also identified that the RL relationship was impaired, given the borrowers' inability to repay their loans and inadequate collateral, and that Ryan's additional advances were being used to pay the borrower's interest obligations, which masked the true condition of the loans.

**N.     EY's Audit Failures Caused Substantial Damages.**

116.    In conducting the 2014 and 2015 Audits, EY violated professional standards by failing to properly plan and perform its audit procedures based upon known audit risks at the Bank.  As a result of these audit failures, EY negligently issued unqualified opinions in 2014 and 2015 that the financial statements were free from material misstatement due to error or fraud.  EY also failed to identify material weaknesses in internal controls in 2014.  In both the 2014 and 2015 Audits, EY negligently failed to detect material fraud at the Bank.

117.    Had EY competently performed its 2014 or 2015 Audits, material weaknesses in internal controls over Ryan's lending and Ryan's fraud regarding his loan and tax credit investment portfolios would have been exposed and reported to the Audit Committee.  As a result, Ryan's ability to advance Bank funds would have been eliminated and Ryan would have been removed from the Bank, and additional losses from his misconduct would have been avoided.  Ryan was the driving force behind hundreds of millions of dollars in improper and reckless loan advances to troubled borrowers and tax credit investments.  By removing Ryan, his misconduct and the resulting losses would have ceased.

118.    Instead, EY's audit failures allowed Ryan's misconduct, including his improper lending and tax credit investments, to continue and expand, which resulted in at least $125 million in losses from the 2014 Audit forward that would have been avoided if EY had done its job.  By failing to properly perform its audits, EY caused these damages.

**O.     The FDIC-R's Claims Against EY Are Timely.**

119.    All of the claims in this Complaint are timely.  Under 12 U.S.C. § 1821(d)(14), the FDIC-R has at least three years from April 28, 2017, the date of its appointment as Receiver, to file the claims asserted in this action so long as the claims could have been brought on that

date under applicable state law.  None of the claims asserted in this action were time-barred under La. R.S. § 9:5604(A) on April 28, 2017 because the FDIC-R asserts no claims that arise from alleged acts, omissions, or neglect that occurred before April 28, 2014 or that the Bank had discovered or reasonably should have discovered before April 28, 2016.  No information possessed by the Bank on or before April 28, 2016 put the Bank on actual or constructive notice of EY's negligence in failing to detect Ryan's fraud or, with respect to the 2014 Audit, the existence of material weaknesses in internal controls over Ryan's lending and overdraft authorities.

**COUNT ONE**
**(Professional Negligence Against EY)**

120.    The FDIC-R re-alleges and incorporates by reference each of the allegations contained in Paragraphs 1 through 119 of this Complaint as though fully set forth herein.

121.    Accountants have a duty to a party who has not engaged the accountant if the party meets the criteria of La. R.S. § 37:91(B)(2).

122.    At all relevant times, the Bank met the criteria of La. Rev. Stat. § 37:91(B)(2). Among other things, federal law required that the Bank have annual audits of its financial statements and internal controls performed by an independent public accountant in accordance with procedures that met or exceeded GAAS, applicable PCAOB auditing standards, and section 37 of the Federal Deposit Insurance Act.  *See* 12 U.S.C. § 1831m; 12 C.F.R. Part 363.  Federal law also required that the Bank submit to the FDIC a copy of each audit report and any qualification to such report, any management letter, and any other report within 15 days of receipt of any such report, qualification, or letter from the Bank's independent auditors.  *See* 12 U.S.C. § 1831m(h)(2)(A); 12 C.F.R. § 363.4.

123.    Throughout the 2014 and 2015 Audits, EY knew (among other things) that the audited consolidated financial statements and its audit reports and attestations on internal controls would be made available to and used by the Bank as its own independently audited financial statements, audit reports, and attestations on internal controls and to satisfy the Bank's audit and audit-reporting requirements to the FDIC.

124.    EY knew that the Bank was relying on EY's audit reports to satisfy its regulatory requirements.  EY specifically stated in its 2014 and 2015 audit reports that the audits "were conducted to meet" the Bank's independent audit and audit-reporting requirements under the Federal Deposit Insurance Corporation Improvement Act.  EY also stated in communications to the Bank its understanding that EY's audit reports would be used to satisfy the Bank's audit and audit-reporting requirements.

125.    Because the Bank met the criteria of La. Rev. Stat. § 37:91(B)(2), EY owed the Bank a duty to perform its audits with that degree of skill and competence reasonably expected of accounting and auditing professionals in the community.  By definition, an auditor owes a duty to conduct an audit in accordance with applicable professional standards, which in this case include GAAS and PCAOB rules, Auditing Standards, Quality Control Standards, and ethical and independence requirements.

126.    As alleged more fully above, EY breached its duty to the Bank, by among other things,:

(a)     Failing to design its audits to detect material fraud and failing to design audit procedures to address known fraud risks, including, but not limited to, specifically ignoring information showing that Ryan was a dominant Chief Executive Officer with personal financial incentives to commit fraud, that the Bank lacked adequate controls over Ryan's lending and overdraft authorities, and that there was a substantial fraud risk from related-party transactions between St. Angelo and the Bank that were personally managed by Ryan outside of the Bank's normal procedures;

(b)     Failing to identify in the 2014 Audit the existence of material weakness in the Bank's internal controls over Ryan's lending, tax credit investments and overdraft authority, over related-party transactions with St. Angelo that Ryan personally managed outside of the Bank's normal procedures, and over construction and oil-and-gas lending due to the absence of controls over disbursements of construction funds and lending standards;

(c)     Ignoring numerous red flags of fraud, including, but not limited to, missing executed loan documents, repeated extensions of credit on a monthly or semi-monthly basis to cover overdrafts, and inability to provide financial statements, any of which should have triggered professional skepticism regarding the financial condition of many borrowers;

(d)     Failing to review the St. Angelo lending relationship during the 2014 Audit and to conduct a loan review of the Phoenix Civil relationship during the 2014 and 2015 Audits;

(e)     Failing to identify St. Angelo as a related party in the 2014 Audit, to exercise heightened scrutiny of his transactions with the Bank, to properly audit his tax credit investment transactions, to discover that these transactions were fraudulent, and to classify the failure to identify St. Angelo as a related party as a material weakness in the Bank's related-party controls;

(f)     Failing to detect fraud in lending and tax credit relationships overseen by Ryan regarding such things as the collateral and payment histories for the Charity, St. Angelo, and Phoenix Civil relationships;

(g)     Failing to take appropriate steps to verify management representations by obtaining corroborating audit evidence;

(h)     Failing to competently review the Charity lending relationship, including, but not limited to, obtaining audit evidence to verify the existence of guarantees and condition and value of collateral and to show how the Bank's funds were being used and, as a result, failing to detect fraud by Ryan regarding the Bank's collateral, use of funds, and performance of the loan;

(i)     Failing to properly audit the GG relationship, including, but not limited to, obtaining appropriate audit evidence to verify cash flow and the condition and value of collateral and to show how the Bank's funds were being used and, as a result, failing to identify material weaknesses in internal controls over Ryan's lending portfolio and that Ryan was repeatedly extending credit to mask the true condition of GG's loans;

(j)     Failing to identify in the 2014 Audit that the RL lending relationship was impaired and reflected a material weakness in internal controls over lending or that Ryan was repeatedly using incremental lending advances to repay the loans or to make the loans appear current, which masked the borrower's inability to pay; and

(k)     Failing to report Ryan's dishonesty to the Audit Committee or to properly investigate Ryan's repeated misstatements to the Bank.

127.     EY's audit failures violated one or more of the following applicable professional standards, among others:

(l)     AU Section 110: Responsibilities and Functions of the Independent Auditor;

(m)     AU Section 230: Due Professional Care in the Performance of Work;

(n)     AS No. 8: Audit Risk;

(o)     AS No. 14: Evaluating Audit Results;

(p)     AS No. 15: Audit Evidence;

(q)     AS No. 3: Audit Documentation;

(r)     AS No. 16: Communications with Audit Committees;

(s)     AS No. 9:  Audit Planning;

(t)     AS No. 12:  Identifying and Assessing Risk of Material Misstatement;

(u)     AS No. 5:  An Audit of Internal Control over Financial Reporting That Is Integrated with An Audit of Financial Statements;

(v)     AS No. 13: The Auditor's Response to the Risk of Material Misstatement;

(w)     AU Section 316:  Considerations of Fraud in a Financial Statement Audit;

(x)     AU Section 334 and AS No. 18:  Related Parties;

(y)     AU Section 322:  Consideration of the Internal Audit Function; and

(z)      AU Section 333:  Management Representations.

128.    The Bank justifiably relied on EY to conduct the Audits in accordance with professional standards and to identify in its audit reports any material weakness in internal controls or fraud that could cause a material misstatement of the consolidated financial statements.  As a result of its justifiable reliance on EY's unqualified opinions on the 2014 and 2015 consolidated financial statements and its attestations regarding internal controls in the 2014 Audit, Ryan was able to continue engaging in misconduct that caused damages in an amount to be proven at trial.

129.    Among other things, EY's 2014 and 2015 unqualified audit opinions on the consolidated financial statements and its attestations on internal controls in the 2014 Audit were unfounded and wrong.  Had EY properly planned and performed the 2014 and 2015 Audits, it would have discovered that information in the consolidated financial statements with respect to the Bank was materially misstated and concealed Ryan's misconduct, including fraudulent loans and tax credit investments and repeated violations of the Bank's loan policies.  Had EY properly planned and performed the 2014 and 2015 Audits, Ryan's misconduct would have been disclosed to the Audit Committee or the Bank's regulators (or both), resulting in the termination of his lending authority and employment at the Bank.

130.    EY's unqualified audit opinions on the consolidated financial statements and unfounded attestations as to internal controls in the 2014 Audit allowed Ryan to continue his fraudulent lending activities and advances to nonperforming borrowers to mask their troubled condition.

131.    Had EY fulfilled its duties, the FDIC-R would have avoided losses from further advances of cash on loans and tax credit investments caused by Ryan.  These losses include, but

are not limited to, additional cash advances to St. Angelo, Charity, Phoenix Civil, GG, and RL, among others, which would not have been made if Ryan's misconduct had been exposed by EY.

132.    EY's breaches of duty were a cause-in-fact and substantial factor in bringing about damages.  Had EY performed its audits in accordance with professional standards, Ryan's misconduct would have been uncovered, leading to a termination of his lending authority and removal from the Bank.

133.    EY's breaches of duty were the proximate or legal cause of damages.  It was a reasonably foreseeable and easily associated consequence of EY's failure to properly design and perform audit procedures to detect Ryan's fraud and material control weaknesses caused by Ryan's dominance that Ryan's misconduct would continue.  Accordingly, the risk of harm and harm actually caused by Ryan's continued additional cash advances was within the scope of protection afforded by EY's duty to perform its audits in accordance with professional standards.

134.    EY's negligence in performing the 2014 Audit and 2015 Audit caused damages to the FDIC-R in an amount to be proven at trial.

### COUNT TWO
### (Direct Action Against Gloucester)

135.    The FDIC-R re-alleges and incorporates by reference each of the allegations contained in Paragraphs 1 through 134 of this Complaint as though fully set forth herein.

136.    Gloucester provided $400 million in professional liability insurance coverage, with a $100 million deductible, to EY during the relevant period.

137.    As a result of EY's tortious acts described above, the FDIC-R sustained damages within the State of Louisiana in an amount to be proven at trial.

138.    Gloucester's policies issued to EY provide coverage for the acts of professional negligence by EY asserted in this case.

139.     Under the Louisiana Direct Action Statute, La. R.S. § 22:1269, the Bank had, and the FDIC-R now has, a right of direct action against Gloucester as EY's insurer to recover damages suffered up to any applicable policy limits.

140.     Under the Direct Action Statute, a judgment may be awarded directly against Gloucester, and payment must be made directly to the FDIC-R.

141.     As a result of EY's professional negligence, Gloucester is directly and solidarily liable to the FDIC-R for damages up to any applicable policy limits.

WHEREFORE, the FDIC-R requests that the Court award a judgment against EY and Gloucester for:

A.     Actual damages in an amount to be proven at trial;

B.     Prejudgment and post-judgment interest as allowed by law; and

C.     Such further relief allowed by law that the Court deems appropriate.

### JURY DEMAND

The FDIC-R demands a jury trial in this matter.

/s/ Bryan C. Reuter
Bryan C. Reuter, 23910
Thomas P. Owen, Jr., 28181
Stanley, Reuter, Ross, Thornton & Alford, L.L.C.
909 Poydras Street, Suite 2500
New Orleans, LA 70112
Telephone:  (504) 523-1580
Facsimile:  (504) 524-0069
bcr@stanleyreuter.com

Lawrence H. Heftman
Antony S. Burt
David C. Giles
Schiff Hardin LLP
233 South Wacker Drive, Suite 7100
Chicago, IL 60606
Telephone:  (312) 258-5500
Facsimile:  (312) 259-5600

lheftman@schiffhardin.com
aburt@schiffhardin.com
dgiles@schiffhardin.com
(*Pro Hac Vice* to be filed)

**Attorneys for the Federal Deposit Insurance**
**Corporation as Receiver for First NBC Bank**