UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR FRIST NBC BANK | * * * * * * * | CIVIL ACTION NO. 20-1259 SECTION: "L" (1) |
| VERSUS | | |
| ERNST & YOUNG LLP & GLOUCESTER INSURANCE LTD | | |

**ORDER AND REASONS**

Before the Court is a Notice Regarding Compliance with the Court's June 15, 2023 Order and Motion to Confirm Scope of Order by Plaintiff Federal Deposit Insurance Corporation as Receiver for First NBC Bank ("FDIC-R"). R. Doc. 129. FDIC-R presents the Court with its plan for the destruction of the impermissibly obtained materials and reports on its efforts to substitute counsel. R. Doc. 129-1 at 2-5. FDIC-R then moves the Court to confirm that the administrative depositions it took are outside of the scope of this Court's June 15, 2023 Order and that it need not destroy such materials. *Id.* at 6.

Defendant Ernst & Young LLP ("EY") opposes Plaintiff's Notice and Motion, arguing that FDIC-R's proposed compliance is insufficient to remove the taint of disqualified counsel and that meaningful relief in this context warrants a more thorough destruction process than FDIC-R proposes. R. Doc. 130. Having considered the briefing and relevant law, the Court rules as follows.

I. **BACKGROUND**

a. **Factual Background**

This case arises out of financial statement audits of First NBC Bank and First NBC Bank Holding Company, Inc. ("First NBC" or "Bank") by Ernst & Young LLP in 2014 and 2015. R.

1

Doc. 1 ¶ 1. Plaintiff, the Federal Deposit Insurance Corporation as Receiver for First NBC Bank ("FDIC-R")[1], filed the instant suit to recover damages from Defendants Ernst & Young LLP ("EY") and Gloucester Insurance Ltd. ("Gloucester")[2], alleging that the audits of First NBC were negligently performed. *Id.* ¶ 2. Specifically, FDIC-R alleges that EY failed to design audit procedures to discover material fraud, and accordingly, failed to discover fraud perpetrated by First NBC's President and Chief Executive Officer, Ashton Ryan. *Id.* 1 ¶ 2. Additionally, FDIC-R contends EY identified false statements made by Ryan but failed to investigate the falsehoods or report them to the Audit Committee. *Id.* ¶ 3. FDIC-R further alleges that EY negligently issued an unqualified opinion regarding First NBC's financial statements and internal controls processes. *Id.* FDIC-R characterizes these actions as a breach of EY's professional duties. *Id.*

FDIC-R alleges that First NBC suffered at least $125 million in losses as a result of Ryan's fraudulent conduct. *Id.* In recounting Ryan's allegedly fraudulent practices, FDIC-R explains that Ryan held formal roles as the Bank's founder and CEO in addition to overseeing the lending department and having unilateral authority to approve tax credit investments. *Id.* ¶ 16–19. FDIC-R argues that Ryan, acting in his own interest, "committed fraud at First NBC by repeatedly causing the Bank to advance money through loans and tax credit investments on false pretenses." *Id.* ¶ 20. He further allegedly "advance[d] hundreds of millions of dollars to promote his own financial interests and mask the deteriorating financial condition of his lending and tax credit investment portfolios." *Id.* ¶ 4. Additionally, FDIC-R contends Ryan made numerous "false statements in loan approval memoranda regarding the condition of collateral, alleged payments by borrowers, and the existence and financial condition of guarantors," which were identified in EY's

---

[1] The State of Louisiana closed First NBC Bank on April 28, 2017, and appointed the FDIC as Receiver. R. Doc. 1 at 4.
[2] Gloucester provided EY with professional liability insurance during the relevant period. R. Doc. 1 ¶ 11.

work papers but not acted upon. *Id.* ¶ 20. The Complaint also identifies several other alleged actors in the scheme, including Jeffrey Dunlap, Kenneth Charity, and Gregory St. Angelo. *Id.* ¶ 21–23. FDIC-R contends that these fraudulent practices, and accordingly the $125 million loss associated with them, could have been discovered and prevented had EY conducted its audits in accordance with its professional responsibilities.

FDIC-R alleges that EY was engaged to conduct integrated audits in 2014 and 2015 as required by the Sarbanes-Oxley Act. *Id.* ¶ 28–29. An integrated audit requires an auditor to evaluate a company's financial statements and internal controls over financial reporting. *Id.* ¶ 28. During the audits, EY was allegedly given "direct and unfettered" access to the Bank's internal systems and records *Id.* ¶ 30. EY's audit for the 2014 fiscal year represented that the Bank's consolidated financial statements "were fairly stated in accordance with GAAP and free from material misstatement whether due to error or fraud." *Id.* ¶ 32. The audit also included an unqualified opinion that the Bank's internal controls over financial reporting were effective. *Id.* ¶ 32. As to the 2015 fiscal year, EY issued an unqualified opinion regarding the Bank's consolidated financial statements but identified several material weaknesses in internal controls and accordingly issued an adverse opinion. *Id.* ¶ 33.

FDIC-R identifies a number of alleged failures on EY's part that caused the fraud to remain undiscovered. In particular, FDIC-R alleges that EY failed to exercise professional skepticism while conducting the audits and failed to identify material weaknesses in internal controls despite knowing that Ryan exercised a dominant influence over the Bank's lending and financial statement process, including personally handling a large portfolio of loans and tax credit investments and recklessly advancing tens of millions of dollars to borrowers without meaningful controls." *Id.* ¶ 5. Additionally, FDIC-R argues that EY ignored fraud risks, failed to design audit procedures that

would adequately address those risks, and failed to obtain sufficient information to support its audit opinions, relying instead—erroneously—on management's representations. *Id.* ¶ 6. FDIC-R contends these failures constitute breaches of EY's professional duties to conduct the audits in accordance with Public Company Accounting Oversight Board rules, auditing standards, quality control standards, GAAP and Generally Accepted Auditing Standards, and other professional auditing standards. *Id.* ¶ 39.

Based on the foregoing, FDIC-R brought suit against EY in this Court on April 22, 2020, seeking damages for professional negligence from EY. *Id.* ¶ 133. FDIC-R also brings a direct action against Gloucester, an insurance entity that provided $400 million in professional liability insurance coverage to EY during the relevant period. *Id.* ¶ 138.

On June 1, 2020, the United States filed a Motion to Intervene and Stay the case under Rule 24 of the Federal Rules of Civil Procedure. R. Doc. 21. On July 13, 2020, this Court granted the government's motion to stay the case due to the overlapping facts between the instant case and the criminal cases related to the Bank's failure. *See* R. Doc. 55 at 10-15. The criminal case concluded and the stay in this matter was lifted on March 3, 2023. R. Doc. 85.

### b. The Belcher Suit & PCAOB Materials

While the matter was stayed, EY alleged that counsel for FDIC-R in this case obtained confidential and privileged information from the Public Company Accounting Oversight Board ("PCAOB") relating to PCAOB's investigation into the financial statement audits performed by EY. R. Doc. 58-1 at 2. Specifically, they alleged that counsel received and reviewed materials, including thousands of pages of testimony transcripts, in preparation for a deposition of Daniel Belcher, a former auditor with EY. *Id.* (citing *FDIC v. Belcher*, No. 19-12561). FDIC-R sought to enforce an administrative subpoena of Belcher in a proceeding in another section of this Court.

4

*See FDIC v. Belcher*, No. 19-12561, No. 19-12561, 2019 WL 6728338 (E.D. La. Dec. 11, 2019) (Zainey, J.). In that case, the district court ruled against Belcher and enforced the subpoena after concluding that the materials the PCAOB provided to the FDIC-R were produced pursuant to a statutory authorization,³ and therefore the subpoena was not improper in any manner. *See id.*

On October 26, 2020, the Fifth Circuit issued an opinion concluding that the lower court erred when interpreting 15 U.S.C. § 7215(b)(5)(B) so as to authorize the PCAOB to share the materials with the FDIC-R. *FDIC v. Belcher,* 978 F.3d 959 (5th Cir. 2020). The Fifth Circuit held that none of the confidential and privileged EY materials that the PCAOB had amassed during its investigation into EY should have been provided to the FDIC-R. *Id.* The Fifth Circuit then directed the district court to fashion "some form of meaningful relief," notwithstanding that Belcher had already been deposed, and remanded the case. *Id.* at 961 n.1.

On remand, Judge Zainey, who was handling the subpoena enforcement matter, denied the FDIC-R's renewed motion to enforce, and denied the FDIC-R's request that the Court find that Belcher's deposition was valid. In their motion to enforce, FDIC-R took the position that no further action other than the destruction of the materials was required to address the PCAOB's erroneous production of EY's confidential and privileged materials. Judge Zainey declined to address what specific remedies are now due to Belcher or EY and instead deferred to this Court for determining the appropriate remedy.

On January 25, 2021, FDIC-R alleges, it forwarded EY's counsel a letter it sent to the PCAOB stating that in light of the Fifth Circuit ruling, it intended to destroy the documents it had obtained from the PCAOB. R. Doc. 86-1 at 11. However, FDIC-R did not commit to destroying

---

³ The district court based its decision on the "federal functional regulator" statutory exception. 15 U.S.C. § 7215(b)(5)(B)(ii)(II)

5

all internal documents of FDIC-R counsel reflecting the contents of and documents provided by the PCAOB nor did it intend to recuse any counsel who had reviewed the documents. *Id.*

On January 29, 2021, EY moved for a partial lifting of the stay to address the issues it has raised in this motion. FDIC-R responded by filing a "Renewed Motion to Enforce Administrative Subpoena" in the original *Belcher* matter before Judge Zainey. Judge Zainey rejected the FDIC-R's bid and explained in his ruling that the FDIC-R had "not demonstrated that Belcher's deposition is without taint." Order Denying Renewed Motion to Enforce Administrative Subpoena, *FDIC-R v. Belcher*, No. 19-12561 (E.D. La. Mar. 18, 2021), R. Doc. 134 at 13. This Court then held a hearing on March 31, 2021 regarding EY's request for a partial lift of the stay. R. Doc. 75. This Court ultimately maintained the stay in deference to the criminal proceedings, denying EY's motion without prejudice to EY's ability to file it after the stay of this case was lifted. R. Doc. 76. The court ordered FDIC-R, its counsel, and consultants to preserve any relevant documents in the meantime. *Id.* Upon FDIC-R's unopposed motion following the conclusion of the criminal proceedings, the Court lifted the stay on March 3, 2023. R. Doc. 85.

EY subsequently filed a motion to disqualify counsel and for other relief. R. Doc. 86. Following the parties' briefing on the matter, the Court granted the motion to disqualify and ordered FDIC-R to substitute new counsel and to "return to EY and/or destroy all material provided by the PCAOB." R. Doc. 112. The Court gave FDIC-R until October 31,2023 to comply with the order. R. Doc. 128.

## II. PRESENT MOTION

On September 22, 2023, FDIC-R filed the present Notice and Motion, reporting to the Court on its compliance actions thus far and seeking the Court's confirmation on the scope of the materials to be destroyed. R. Doc. 129. In its Notice and Motion, FDIC-R reports that it is working

to engage new counsel in place of ArentFox Schiff ("AFS") and that it has already substituted new oversight counsel in place of Mr. Conway. R. Doc. 129-1 at 2-4. FDIC-R then represents that it will destroy the PCAOB materials rather than return them to EY, as the materials did not come from EY. *Id.* at 4-5.

> FDIC-R categorizes the materials it received from PCAOB as consisting of:
>
> (1) deposition transcripts taken by PCAOB ("PCAOB depositions"); (2) documents relating to personnel reviews, documents relating to an internal firm review of the audit, and internal firm audit guidance ("Peer Review documents"); (3) emails related to the audit produced by EY to the PCAOB and not included in the Peer Review documents ("EY emails"); and (4) the historical EY work papers and attachments relating to its FNBC audit work ("EY work papers").

*Id.* at 3. FDIC-R alleges that many of the EY work papers and EY emails "were duplicative (in whole or part) of EY's separate production of its work papers and emails" and which are not in dispute. *Id.* Therefore, FDIC-R does not plan to destroy documents from those categories "that were common to the separate administrative document production" in this case. *Id.* at 5. FDIC-R then describes its destruction protocols and states that it intends to "destroy any physical data transfer media" as well as "hard copies of the PCAOB materials." *Id.* at 4. FDIC-R will also "permanently delete PCAOB materials uploaded to FDIC-R's litigation document review platform and shared network folder," as well as materials "uploaded to AFS's document management system and shared network folder." *Id.*

FDIC-R avers that, although not explicitly required by the Court's order, it will also search for emails "that attach or incorporate all or parts of the PCAOB-produced deposition transcripts and/or the Peer Review documents (the 'Affected Documents')," noting that these categories of materials were the only categories to provide unique documents not otherwise produced. *Id.* at 4-5. These Affected Documents will be destroyed using a "soft-delete" protocol that "removes user access to the Affected Documents" from both their Outlook and OneDrive accounts. *Id.* at 5.

Notably, these Affected Documents would remain accessible to "system administrators and personnel in similar roles." *Id.* (stating that "no FDIC-R personnel or outside counsel involved in this case would have access to the Affected Documents" under a soft-delete approach). FDIC-R represents that it is exploring a hard delete option, but as it stands, such a protocol is too technologically complex and risks deletion of agency communications on matters unrelated to this litigation. *Id.* They do note that AFS's system does not include the same complexities and a hard delete protocol is being implemented as to the materials on file with them. *Id.* at n.5. In sum, FDIC-R reports the foregoing and asserts it represents compliance with the Court's order to destroy the PCAOB materials.

In addition to this Notice of Compliance, FDIC-R submits a Motion to Confirm Scope as to FDIC-R's administrative depositions specifically. *Id.* at 6. FDIC-R notes that both this Court and the Fifth Circuit were aware that it had undertaken administrative depositions of several EY witnesses and yet neither court specified that these depositions fall within an ordered remedy. *Id.* Therefore, FDIC-R considers these depositions to be outside the scope of the June 15 2023 order to destroy and asks the Court to confirm this understanding. *Id.* In support of its position, FDIC-R argues that (1) these administrative depositions are separate from the PCAOB depositions, which will be destroyed, (2) these administrative depositions "were taken under the administrative authority of the FDIC-R" and do not reference or rely on the PCAOB materials, and (3) barring substitute counsel access to these administrative depositions would be exceedingly harsh a consequence as it would further delay this matter unnecessarily and it would prejudice FDIC-R as it would be unable to "retake" administrative depositions in this matter. *Id.* at 6-7.

EY opposes the Notice and Motion because it considers these administrative depositions incurably tainted, as they were conducted by now-disqualified counsel who had seen and reviewed

these PCAOB materials and accordingly these "depositions were plainly infected by the Receiver's review of those materials." R. Doc. 130 at 1-2. EY notes that "these pre-suit depositions, including the testimony of former EY auditor Daniel Belcher, sparked this entire dispute," as it was upon learning of the PCAOB disclosures that EY contested FDIC-R's right to depose Belcher and others in the first place. *Id.* at 5. Arguing that such materials provided a "roadmap" for tainted counsel to conduct the depositions, and that now-disqualified counsel in fact conducted those depositions, EY believes they are rightfully within the scope of the Court's June order and must be destroyed. *Id.*

EY additionally objects to FDIC-R's proposed compliance actions, arguing that both its attempt to wall off tainted personnel and its document destruction protocols are insufficient. As to the removal of personnel from this matter, EY argues that (1) more FDIC personnel than simply Mr. Conway ought to be walled off to prevent taint, (2) the Notice does not address whether experts or consultants who have reviewed the materials will be removed from this case, and (3) the Notice fails to address whether additional law firms like Stanley Reuters reviewed "information *derived from* those PCAOB materials, including summaries and analyses." *Id.* at 8-10 (emphasis added). As to the destruction protocols, EY argues that FDIC-R's efforts fall short because it does not intend to destroy documents incorporating aspects of the PCAOB materials, including summaries and analyses, as well as other communications between the FDIC-R and the PCAOB. *Id.* at 11-13. Further, EY urges that these materials ought to be hard-deleted, not soft-deleted, because a soft-delete is not truly destruction as contemplated by the Court's order. *Id.*

In its reply brief, FDIC-R argues that such drastic measures as proposed by EY would be disproportionately harsh considering the lack of misconduct in the underlying document production. R. Doc. 133 at 2. FDIC-R argues that EY's proposed relief is overly broad and borders

on punitive, which is inappropriate in an action without misconduct. *Id.* at 2-3. FDIC-R maintains that it has continued to screen for individuals who have "substantially reviewed" the documents in question and that EY's concerns regarding additional law firms is unfounded. *Id.* at 3-5. Further, the soft-delete protocols were developed in conjunction with Microsoft technicians and FDIC-R explains that it goes beyond the conventional soft-delete that EY appears to oppose. *Id.* at 5-7. As for the administrative depositions, FDIC-R reiterates that the Fifth Circuit did not direct the Belcher deposition's destruction, nor the destruction of other depositions. *Id.* at 8. Importantly, FDIC-R argues, it conducted six administrative depositions total, only two of which were of individuals who were also deposed by PCAOB, and destroying these additional four depositions of witnesses PCAOB never deposed would exceed the scope of any meaningful or reasonable remedy. *Id.* Lastly, it argues that the destruction of these depositions would irreparably prejudice FDIC-R, as memories fade and the testimony contained therein represents the most accurate reflection of those individuals' recollections at the time of the audits. *Id.* at 8-9. For these reasons, FDIC-R maintains that these administrative depositions fall outside the scope of this Court's June order.

## III. DISCUSSION

It is important to keep in mind the Fifth Circuit's mandate to the District Court: to fashion "some form of meaningful relief." *Belcher,* 978 F.3d at 961 n.1. This was notwithstanding the fact that Belcher had already been deposed. *See id.* First, the Court will address FDIC-R's compliance as to the disqualification of counsel and the destruction of the materials obtained from PCAOB. Then, the Court will turn to the administrative depositions.

### A. Disqualification

EY's objections to FDIC-R's proposed disqualification actions can be categorized in three

buckets: (1) concerns that other FDIC personnel, beyond Mr. Conway, are not sufficiently disqualified or removed from this litigation; (2) that experts, consultants, or other third parties with whom FDIC-R is working on this matter are not mentioned as subjects for compliance; and (3) that FDIC-R fails to mention if other law firms, besides AFS and Stanley Reuter, have obtained PCAOB materials and to the extent that other law firms have, they should be disqualified from this litigation as well. R. Doc. 130 at 9-10. In response, FDIC-R argues that what EY proposes here is overbroad and "EY provides no authority for its presumption that the Court's Order applies beyond the parties or this case," noting that the Order was to ensure the "*litigation* continues free of any taint" and that the Court referenced the issue being "a *party's* attorneys viewed documents they were not supposed to view." R. Doc. 133 at 2 (quoting the Court's June Order, R. Doc. 112 at 12) (emphasis added by FDIC-R).

The efforts FDIC-R has described pertaining to disqualification satisfy this Court's June Order. FDIC-R has satisfactorily removed counsel that reviewed the materials, it continues to screen and monitor and will remove anyone it later discovers has reviewed these materials, and it sufficiently addresses EY's concerns with other law firms, stating that Stanley Reuter has never received the materials or summaries/analyses derived from them. *See* R. Doc. 133 at 3-5. Additionally, as FDIC-R is a separate legal entity from FDIC Corporate, and the efforts to remove FDIC-R individuals complies with the June Order, the Court is satisfied that FDIC-R has complied as to disqualification.

### B. Destruction

Next, EY's described five concerns with FDIC-R's proposed document destruction protocols: (1) FDIC-R does state its intent to destroy emails that address or include all PCAOB documents, only the ones that are unique to PCAOB production; (2) summaries, analyses, or other

documents incorporating aspects of the PCAOB materials should be destroyed as well; (3) FDIC-R should destroy all communications with PCAOB; (4) materials that might exist beyond FDIC-R but within the FDIC more broadly should be destroyed; and (5) FDIC-R's soft delete protocol is insufficient as it leaves these materials recoverable in some instances and therefore they should undertake a hard delete protocol. R. Doc. 130 at 11-14. FDIC-R responded to these concerns in its reply brief, noting that it in fact will be destroying summaries, analyses, and documents that contain information derived from the PCAOB materials, and further that they are also scanning emails for all PCAOB materials and not only the ones that were unique to PCAOB production. R. Doc. 133 at 5. FDIC-R also avers it will be destroying communications with PCAOB, reiterates its separate entity status from other branches of the FDIC. *Id.* at 5-6.

The Court is satisfied by FDIC-R's proposed document destruction process as outlined in its motion and reply brief. Not only is FDIC-R undertaking to destroy the PCAOB materials themselves, as ordered, but it is also conducting a thorough scan of emails as well as documents that contain information derived from those materials. Further, the Court is unconvinced by EY's soft-delete concerns: as FDIC-R describes, it consulted with Microsoft to ensure a more thorough soft-delete process, preventing access from the Recoverable Items folder, contrary to EY's assertions otherwise. Id. at 6. The Court acknowledges that a hard-delete option as EY urges would be complex to FDIC-R and risk the deletion of unrelated information beyond the scope of this litigation and finds that in this context, FDIC-R has satisfactorily complied with this Court's June Order commanding document destruction.

### C. Scope

Last, the Court turns to the administrative depositions that FDIC-R undertook and whether they fall within the scope of the June Order. The Court does not take lightly EY's concern that

tainted counsel conducted these administrative depositions. EY's primary argument for destroying these depositions is that tainted counsel were immeasurably influenced by their review of the PCAOB materials such that the materials provided an "investigatory playbook" for the administrative depositions. R. Doc. 130 at 5. The Court does not take the risk of taint lightly. However, in this instance, the Court confirms that the administrative depositions are beyond the scope of its June Order and therefore FDIC-R does not need to destroy them. Several facts inform this finding.

First, FDIC-R undertook six administrative depositions, only two of which were of witnesses also deposed by PCAOB. A finding that these six depositions are to be destroyed is too far beyond the scope of the June Order. It might be different if all six depositions were of witnesses also deposed by PCAOB. The threat of impermissible taint would be more palpable in such a circumstance. Here, however, the Court is persuaded that these depositions, while conducted by counsel who did review the PCAOB materials, do not reference or rely upon any of those materials. FDIC-R represents that it relied only upon materials produced by EY during these depositions, and absent a specific showing by EY that the PCAOB materials were used, the Court will not order their destruction.

Second, the Court reserves the right to strike deposition testimony should it be shown that any portions of the testimony did in fact result from the PCAOB materials or upon a showing that the testimony is prejudicial or otherwise impermissible. This Order is not a mandate that the administrative depositions are appropriate and shall be used by FDIC-R; if EY can point to portions of the depositions that resulted from the PCAOB materials, or can otherwise identify admissibility issues with the deposition testimony, the Court will entertain such concerns through motion practice.

Third, to order the destruction of the administrative depositions would be highly prejudicial to FDIC-R because, as it points out, the testimony in these depositions represents the most accurate recollections of the individuals deposed. The testimony addresses actions these individuals undertook in 2014 and 2015 and memories fade. *See* R. Doc. 133 at 8-9 ("The testimony provided by witnesses in these FDIC-R administrative depositions provides an irreplaceable record of their testimony at a time when events from many years ago were fresh in their minds."). To preclude FDIC-R from using this information, when FDIC-R avers that it does not get a "second chance" to retake them, see R. Doc. 129-1 at 7, would severely prejudice FDIC-R's case.

Last, the Court finds it important that the underlying facts of this dispute did not arise out of misconduct or bad faith. The FDIC-R interpreted 15 U.S.C. § 7215(b)(5)(B) incorrectly, as did another section of this Court. Only upon the Fifth Circuit's decision did the parties have confirmation that this document production was in error and that FDIC-R's statutory interpretation was incorrect. Balancing this lack of misconduct with the other facts in this case, ordering the destruction of these administrative depositions is too harsh a consequence. The Court is satisfied that the option to strike testimony upon a showing that it resulted from the PCAOB materials constitutes meaningful relief while balancing the prejudice faced by each party in the context of this errant document production dispute.

Accordingly, the Court grants FDIC-R's motion to confirm scope as outlined in this Order, and in doing so confirms that the administrative depositions are beyond the scope of the June Order and that the proposed disqualification and destruction actions comply with that June Order.

New Orleans, Louisiana, this 31st day of October, 2023.

_____
**UNITED STATES DISTRICT JUDGE**