## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
FIRST NBC BANK,

             Plaintiff,

    v.

ERNST & YOUNG LLP and
GLOUCESTER INSURANCE LTD.

             Defendants.

Case No. 2:20-cv-01259
Section "L" (1)

Judge Eldon E. Fallon
Magistrate Judge Janis van Meerveld

## MEMORANDUM IN SUPPORT OF ERNST & YOUNG LLP'S
## MOTION TO COMPEL ARBITRATION OR, IN THE ALTERNATIVE, TO DISMISS

Steven M. Farina, *pro hac vice*
Stephen J. Fuzesi, *pro hac vice*
Adrienne E. Van Winkle, *pro hac vice*
WILLIAMS & CONNOLLY LLP
680 Maine Avenue S.W.
Washington, DC 20024
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
sfarina@wc.com
sfuzesi@wc.com
avanwinkle@wc.com

Craig Isenberg, 26903
Chloé M. Chetta, 37070
BARRASSO USDIN KUPPERMAN
FREEMAN & SARVER, L.L.C.
909 Poydras Street, Suite 2400
New Orleans, Louisiana 70112
Telephone: (504) 589-9700
Facsimile: (504) 589-9701
cisenberg@barrassousdin.com
cchetta@barrassousdin.com

*Attorneys for Ernst & Young LLP*

## INTRODUCTION

The Federal Deposit Insurance Corporation brings this lawsuit as Receiver for First NBC Bank ("the Receiver"), seeking to make an accounting firm liable for crimes committed by the Bank's own founder, chairman, and chief executive officer as part of a collusive fraud involving the Bank's senior management and borrowers. Before even reaching the fundamental flaws in the Receiver's theory, however, its claim against Ernst & Young LLP ("EY") must be stayed at the outset in favor of arbitration or, if not compelled to arbitration, then dismissed.

*First*, the claim against EY must be arbitrated under the Federal Arbitration Act. Indeed, perhaps recognizing the fragility of its bid to keep this case in court, the Receiver served EY with a notice of arbitration the same day it commenced this action. This lawsuit—brought in the shoes of First NBC Bank (the "Bank")—alleges accounting malpractice in connection with audits conducted pursuant to engagement agreements that mandate arbitration for "any dispute or claim arising out of or relating to the Audit Services." The Complaint correctly notes that EY's audit client was not the Bank itself, but rather the Bank's parent, First NBC Bank Holding Company ("FNBC" or "Holding Company"). But the Receiver's own allegations demonstrate that the arbitration provisions entered into between EY and FNBC are equally applicable to the claim brought on behalf of FNBC's subsidiary. Direct benefits estoppel binds a party that has "embraced" an agreement either by (1) "knowingly seeking and obtaining 'direct benefits' from that contract"; or (2) "asserting claims that must be determined by reference to that contract." *Traders' Mart, Inc. v. AOS, Inc.*, 268 So. 3d 420, 428 (La. Ct. App. 2019) (citing *Noble Drilling Servs., Inc. v. Certex USA, Inc.*, 620 F.3d 469, 473 (5th Cir. 2010); *In re Lloyd's Register N.A., Inc.*, 780 F.3d 283, 291 (5th Cir. 2015)), *writ denied*, 280 So. 3d 1165 (La. 2019). The Receiver,

in the shoes of the Bank, has done both here.  Accordingly, it is bound by the arbitration provisions contained in the agreements.

Not only is the Receiver's claim premised on audits performed pursuant to the engagement agreements, but the Receiver expressly pleads the direct benefits that the Bank knowingly obtained from the audits at the time they were performed.  This includes pleading that the Bank used the EY audit reports "to satisfy the Bank's regulatory audit obligations."  *See, e.g.*, Compl. ¶ 35. Having "during the life of the contract" between EY and FNBC "embraced the contract despite [its] non-signatory status," the Bank (or the FDIC standing in its shoes) cannot now "during litigation, attempt to repudiate the arbitration clause in the contract."  *See Traders' Mart*, 268 So. 3d at 428 (citing, *e.g.*, *Hellenic Inv. Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514, 517 (5th Cir. 2006)).

*Second*, in the alternative—and only in the event that arbitration is not mandated[1]—the Complaint must be dismissed under Rule 12(b)(6) because the Receiver's claim against EY is barred under Louisiana law.  This State has adopted a statutory "privity" requirement to restrict which parties can sue an auditor.  La. Stat. Ann. § 37:91.  Because the Bank was not EY's client, the Receiver may bring an action on its behalf only in very narrow circumstances.  In particular, it may state a claim only if EY was aware that the audited financial statements "were to be made available for use in connection with *a specified transaction by the [Bank]*."  *Id.* § 37:91(B)(2) (emphasis added).  And—further—the Receiver may only pursue a claim here if the Bank was "injured as a result of [its] justifiable reliance" in connection with that "transaction."  *Id.*

---

[1] To the extent the Court does not compel arbitration, EY reserves the right to pursue its statutory right to an immediate interlocutory appeal under the FAA, staying all other proceedings while the appeal is ongoing. *See* 9 U.S.C. § 16(a); *Coinbase, Inc. v. Bielski*, 143 S. Ct. 1915, 1919 (2023) (holding that "a district court must stay its proceedings while the interlocutory appeal on arbitrability is ongoing").

§ 37:91(B).  The Complaint fails plausibly to allege either a "specified transaction" within the meaning of the statute or reliance by the Bank to its detriment in connection with that transaction. As a result, the Receiver's claim fails as a matter of law.[2]

## BACKGROUND

### A.    Ernst & Young's Audits

"EY was the Holding Company's independent external auditor from its inception until August 2016."  Compl. ¶ 27.  As relevant here, EY performed audits of the Holding Company's consolidated financial statements and related internal controls for year-end 2014 and year-end 2015.  *Id.* ¶ 1.  EY issued its audit opinion with respect to the Holding Company's 2014 financial statements on March 31, 2015, and issued its opinion with respect to the 2015 financial statements on August 25, 2016.  *Id.* ¶¶ 32–33.

Those two audits were performed pursuant to engagement agreements entered into between EY and the Holding Company.  *Id.* ¶ 35; Ex. 1 (2014 engagement agreement); Ex. 2 (2015 engagement agreement).  The agreements each spanned 16 pages, detailing the relative responsibilities of both EY and FNBC with respect to the audits, the company's financial statements, and its internal controls.  *See* Ex. 1; Ex. 2.  Among other things, the engagement agreements expressly recognized "the possibility that collusion or forgery may preclude the

---

[2] EY notes that there is currently a threshold dispute between the Receiver and the Litigation and Distribution Trustee for the Litigation and Distribution Trust of First NBC Bank Holding Company relating to the ownership of the Receiver's claims that could moot this motion.  The Trustee asserts that it owns the claims brought here and that it would dismiss this action should it be determined that it owns the claims. *See* ECF No. 111; *see also* ECF No. 116.  Meanwhile the Receiver has intervened in the Trustee's separate action against EY and other defendants, currently pending before Judge Africk (19-cv-10341, and consolidated with lead case 22-cv-00009), arguing that it owns the Trustee's claims and that it would dismiss them.  EY also has filed there a motion to compel arbitration or in the alternative to dismiss.  Prior to the case being transferred to Judge Africk, Judge Lemmon determined that the issue of claim ownership would be taken up first as a "threshold issue, and thus [the court] will consider that question first" in the Trustee action.  19-cv-10341, at ECF No. 141.

detection of material error, fraud or illegal acts." Ex. 1 at 2; Ex. 2 at 2. They further required, for example, that management provide EY access to "all information of which management is aware that is relevant" to the audit. Ex. 1 at 8; Ex. 2 at 7.

The engagement agreements additionally contained mandatory arbitration clauses. The contracts require that "any dispute or claim arising out of or relating to the Audit Services . . . shall be resolved by mediation or arbitration," as set forth in an attachment to the engagement agreements. Ex. 1 at 14; Ex. 2 at 13. Those attachments then outlined the specific mediation and arbitration procedures, including emphasizing that "[a]ny issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of any of these procedures, shall be . . . resolved by the arbitrators" and that "[t]he result of the arbitration shall be binding on the parties." Ex. 1 at 15–16; Ex. 2 at 15–16.

## B.   First NBC Bank

First NBC Bank was a subsidiary of the Holding Company. The Bank was wholly owned by the Holding Company and was the Holding Company's "only material asset." Compl. ¶ 26. Both the Bank and the Holding Company were founded by Ashton Ryan, who served as the chairman and chief executive officer of both entities. *Id.* ¶ 17. The Bank and Holding Company also had other officers and directors in common.

The Bank itself "was not a party to any agreement with EY and did not engage EY to audit its financial statements and internal controls." *Id.* ¶ 35. But, the Receiver alleges, "EY knew that First NBC would submit its audit opinions, issued at the Holding Company level, to the FDIC to satisfy the Bank's regulatory audit obligations," as regulations permitted the Bank to utilize a holding company's audit instead of incurring the expense of obtaining a separate audit. *See id.*; 12 C.F.R. §§ 363.1–363.2. In particular, the Receiver alleges that "EY's audit reports for the 2014

and 2015 Audits specifically provided that they were performed to comply with these audit and audit-reporting requirements." Compl. ¶ 35. And "EY also specifically communicated to Bank personnel . . . its understanding that EY's audit reports would be submitted by the Bank to satisfy the FDIC's audit and audit-reporting requirements." *Id.* ¶ 36. It is further alleged that "EY also knew that the Bank relied on EY to alert it to material weaknesses in internal controls and any concerns over management integrity." *Id.* ¶ 38.

## C.    The Bank's Receivership

On April 28, 2017, regulators closed the Bank and appointed the FDIC as its Receiver. Compl. ¶ 9. FNBC declared bankruptcy several days later. *See generally In re: First NBC Bank Holding Co., Debtor*, No. 2:17-bk-11213 (Bankr. E.D. La. May 11, 2017). When serving as Receiver, the FDIC "steps into the shoes of the failed [institution]." *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 86 (1994) (citation and internal quotation marks omitted); *see also, e.g.*, *FDIC v. Ernst & Young*, 967 F.2d 166, 170 (5th Cir. 1992) ("[T]he FDIC is not entitled to special protection when it brings a tort claim against a third party on behalf of a defunct financial entity. No statutory justification or public policy exists to treat the FDIC differently from other assignees . . . ."); *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 627 (6th Cir. 2003) (receiver bound to "arbitration agreements to the same extent that the receivership entities would have been absent the appointment of the receiver").

## D.    Revelations of Criminal Wrongdoing

More than two years after EY issued its last audit opinion, the U.S. Department of Justice announced criminal charges arising out of a collusive fraud at the Bank. The criminal proceedings resulted in guilty pleas or convictions at trial of more than a dozen officers, employees, and Bank

borrowers, including founder and CEO Ashton Ryan.[3]  In the process, the criminal cases showed

that EY was repeatedly lied to and provided false documentation while serving as FNBC's auditor.

**E.     This Litigation**

The Receiver filed this Complaint on April 22, 2020, alleging "malpractice" by EY.  *See,*

*e.g.*, Compl. ¶ 4.  Drawing heavily on filings in the criminal proceedings, the Receiver alleges that

"EY failed to detect repeated fraudulent conduct" by Mr. Ryan related to certain loans and tax

credit transactions.  *Id.* ¶ 2.  The Complaint includes a single count against EY for professional

negligence.  *Id.* ¶¶ 120–134.  The same day the Receiver filed this lawsuit, it also served EY with

a Notice of Arbitration attaching the same Complaint and the operative engagement agreements.

A separate, overlapping lawsuit (and notice of arbitration) was earlier filed on behalf of the

Holding Company against EY and others.  *See Official Committee of Unsecured Creditors of First*

*NBC Bank Holding Co. v. Ryan et al.*, No. 2:19-cv-10341-WBV-DMD ("Trustee Action").  That

litigation also was stayed pending resolution of the criminal proceedings.  The stay has now been

lifted.  EY has filed a motion to compel arbitration or, in the alternative, to dismiss.  *Id*. at ECF

No. 135.  Before addressing EY's motion, however, the Court will resolve the threshold dispute

as to whether the Receiver owns the claims asserted there by the Trustee.  *See supra* note 2.

## LEGAL STANDARD

It is well-established that this Court has the authority and the obligation to enforce

compliance with arbitration clauses.  The Federal Arbitration Act provides that a "party aggrieved

---

[3] *See United States v. Ryan*, No. 2:20-cr-00065-EEF-KWR (E.D. La.) (four defendants); *United States v. Charity*, No. 2:19-cr-00090-LMA-JVM (E.D. La.); *United States v. St. Angelo*, No. 2:19-cr-00055-CJBDPC (E.D. La.); *United States v. Gibbs*, No. 2:20-cr-00060-JTM-JVM (E.D. La.); *United States v. Dunlap*, No. 2:18-cr-00099-ILRL-JVM (E.D. La.); *United States v. Treme*, No. 2:20-cr-00062-DJP-DPC (E.D. La.); *United States v. Casse*, No. 2:19-cr-00147-CJB-MBN (E.D. La.); *United States v. Diaz*, No. 2:21-cr-00179-JTM-DPC (E.D. La.) (three defendants); *United States v. Vira*, No. 2:20-cr-00053-NJB-KWR (E.D. La.).

by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" may petition a district court that would otherwise have jurisdiction "for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4; *see, e.g.*, *KPMG LLP v. Cocchi*, 565 U.S. 18 (2011) (per curiam).  Likewise, the FAA expressly provides for a stay of the court action pending the arbitration.  9 U.S.C. § 3.  A court may consider documents outside the pleadings on a motion to compel arbitration.  *See, e.g.*, *Ward v. Am. Airlines, Inc.*, 498 F. Supp. 3d 909, 919 (N.D. Tex. 2020).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do," nor will "naked assertion[s] devoid of further factual enhancement."  *Id.* (quotation marks omitted).  A court is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Id.* (quotation marks omitted).  Rather, there must be "well-pleaded factual allegations."  *Id.* at 679.  And those pleaded facts must "nudge[] the[] claims across the line from conceivable to plausible."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## ARGUMENT

## I.    THE RECEIVER'S CLAIM MUST BE ARBITRATED.

It is indisputable that the Receiver's claim here falls within the scope of the arbitration clauses contained in the applicable engagement agreements between EY and the Holding Company, as those clauses cover all claims "arising out of or relating to the Audit Services."  *See* Ex. 1 at 13–14; Ex. 2 at 13.  The Receiver's claim is based on EY's audits.[4]  The only question is

---

[4] Moreover, the arbitration clause refers "[a]ny issue concerning the extent to which any dispute is subject to arbitration" to the arbitrators.  Ex. 1 at 15; Ex. 2 at 15.  Thus, to the extent there was a dispute as to scope,

whether the Receiver, standing in the shoes of the Bank, is bound by those agreements. The direct benefits that the Bank received during EY's audits—including as expressly pleaded in the Complaint—compel the answer. The Receiver's claim must be arbitrated.

### A.    Estoppel Mandates the Arbitration of the Receiver's Claim.

While the Bank was not a party to the engagement agreements with EY, estoppel operates "to bind a non-signatory to an arbitration agreement when the non-signatory knowingly exploits the contract containing the arbitration clause and obtains a direct benefit from that contract." *Noble Drilling Servs., Inc. v. Certex USA, Inc.*, 620 F.3d 469, 473 (5th Cir. 2010); *Traders' Mart, Inc. v. AOS, Inc.*, 268 So. 3d 420, 428 (La. Ct. App. 2019), *writ denied*, 280 So. 3d 1165 (La. 2019). In particular, direct benefits estoppel is designed for situations in which a nonsignatory, "during the life of the contract, ha[s] embraced the contract despite [its] non-signatory status but then, during litigation, attempt[s] to repudiate the arbitration clause in the contract." *Noble Drilling*, 620 F.3d at 473 (quotation marks omitted); *see also Traders' Mart*, 268 So. 3d at 428.[5]

A nonsignatory can "embrace" a contract containing an arbitration clause in two distinct ways: "(1) by knowingly seeking and obtaining 'direct benefits' from that contract; or (2) by seeking to enforce the terms of that contract or asserting claims that must be determined by

---

it would be for the arbitrators to decide. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 528 (2019) ("When the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract.").

[5] State law determines whether a nonsignatory is bound to arbitrate. *IMA, Inc. v. Columbia Hosp. Med. City at Dallas, Subsidiary L.P.*, 1 F.4th 385, 391 (5th Cir. 2021). Even if federal law applied, the outcome would be the same here: Louisiana and federal law both recognize direct benefits estoppel and apply substantially the same analysis. *See, e.g.*, *Traders' Mart*, 268 So. 3d at 428 (citing both federal cases and Louisiana state cases in observing "[t]he courts have applied direct benefits estoppel to bind a nonsignatory to an arbitration agreement when the nonsignatory knowingly exploits the contract containing the arbitration clause and obtains a direct benefit from that contract").

reference to that contract." *Traders' Mart*, 268 So. 3d at 428 (citing *Noble Drilling*, 620 F.3d at 473; *In re Lloyd's Register N.A., Inc.*, 780 F.3d 283, 291 (5th Cir. 2015)).  The Bank did both here.

### 1.    Direct Benefits

The Bank knowingly obtained a direct benefit from a contract containing an arbitration clause.  *See Noble Drilling Servs.*, 620 F.3d at 473.  That alone is sufficient to compel arbitration.

The Receiver acknowledges—and indeed repeatedly invokes in support of its claim—that the Bank utilized EY's audit reports, undertaken pursuant to the engagement agreements, "to satisfy the Bank's regulatory audit obligations."  Compl. ¶¶ 34–35, 122–124.  Under federal law, the Bank was "required . . . to be audited by an independent public accountant."  *Id.* ¶ 34.  But that requirement could be met by an audit of a holding company's financial statements—here EY's opinions with respect to FNBC's financial statements—to avoid the burden and expense of a separate audit of the Bank's standalone financial statements.  *See* 12 U.S.C. § 1831m(d)(3); 12 C.F.R. § 363.1(b).  The Receiver alleges the Bank's use of EY's audits of FNBC for the purpose of meeting the Bank's regulatory requirements (instead of obtaining a separate Bank audit) was specifically contemplated at the time the engagement was undertaken,, and that EY even "specifically communicated to Bank personnel . . . its understanding that EY's audit reports would be submitted by the Bank to satisfy the FDIC's audit and audit-reporting requirements," *id.* ¶ 36; *see also id.* ¶¶ 35, 123–124.

In short, the Receiver explicitly pleads a direct benefit obtained from EY's engagement. Indeed, the Receiver does so because that benefit is the cornerstone of the legal theory advanced by the Receiver in support of its ability to sue EY at all.  As discussed below, the Receiver relies entirely on the Bank's transmission of EY's audit reports to the Bank's regulator to attempt to satisfy Louisiana's strict privity statute governing what parties may sue an accountant.  *See infra*

Section II. The Receiver expressly asserts that "the Bank met the criteria of La. Rev. Stat. 37:91(B)(2)" because of this use by the Bank of EY's audit reports and that "EY knew the Bank was relying on EY's audit reports to satisfy its regulatory requirements." Compl. ¶¶ 122–124.

This is the prototypical case for the application of direct benefits estoppel. Courts apply direct benefits estoppel when, as here, a nonsignatory has received a direct and substantial benefit from the contract's performance. For instance, in *Hellenic Inv. Fund, Inc. v. Det Norske Veritas*, a ship purchaser was bound by direct benefits estoppel to a forum selection clause in the agreement between the ship's seller and a classification society. 464 F.3d 514, 515–516 (5th Cir. 2006). There, prior to sale, the ship's seller had contracted to have the ship "classed" by the classification society, which issued a "clean class confirmation certificate." *Id.* When the purchaser later sued the classification society, alleging various deficiencies with the classification, the Fifth Circuit affirmed that, even though the purchaser was not a signatory to the agreement, it was bound to the clause requiring the litigation of disputes in Norway. *Id.* at 517, 520. The purchaser had received benefits from the agreement, including the classification that allowed the ship to be "flagged and operate in commerce." *Id.* at 518–19; *see also Vloeibare Pret Ltd. v. Lloyd's Register N. Am., Inc.*, 606 F. App'x 782, 785 (5th Cir. 2015) (per curiam) (nonsignatory was bound under direct benefits estoppel when a classification contract "ensur[ed] compliance with particular regulatory requirements in anticipation of a sale") (quotation marks omitted). In considering the purchaser's benefit, the Fifth Circuit explained in *Hellenic* that "[a]ny lingering doubt whether [the purchaser] garnered a benefit" from the contract between the seller and the classification society was "erased by [the purchaser]'s own statements in its complaint" that the classification society "'knew, or should have known,' that its representations 'were intended for [purchaser]'s guidance and benefit in a business transaction.'" 464 F.3d at 519 (citation omitted).

Similarly, in *Blaustein v. Huete*, an individual member of an LLC was bound to arbitrate because of the clear benefit that the member received from the contractual relationship between his LLC and a law firm. 449 F. App'x 347 (5th Cir. 2011) (per curiam). There, plaintiff sued the law firm with which the LLC had contracted for legal services in connection with a patent application. *Id.* at 348–50. The defendant law firm moved to dismiss, invoking its fee agreement with the LLC that mandated arbitration of disputes between the parties. *Id.* Although the plaintiff had not signed the agreement in his individual capacity, the Fifth Circuit affirmed direct benefits estoppel, reasoning that the plaintiff had "obtained the same sort of benefits from the fee agreement that a client would have received: research, reasoning, drafting, and filing, all informed by the [lawyers'] legal training" and therefore he had "embraced" the contract. *Id.* at 350 (quotation marks omitted). The court noted that had the agreement with the LLC not existed, the plaintiff "would have had to hire his own patent attorney to perform these tasks" and "[t]he only way this benefit could have been any more direct were if [plaintiff] had been an actual party to the fee agreement." *Id.*

Here, the Bank benefited in just the same ways as the parties in *Hellenic* and *Blaustein*, according to the Receiver's own pleading. Had the Bank not utilized EY's audit of FNBC, it certainly would "have had to hire [its] own [auditor] to perform these tasks" in order to meet its regulatory requirements. *Blaustein*, 449 F. App'x at 350. Moreover, "[a]ny lingering doubt" of the Bank's benefit is "erased by [its] own statements in its complaint," *Hellenic*, 464 F.3d at 519, that "EY knew that the Bank was relying on EY's audit reports to satisfy its regulatory requirements" and additionally knew or should have known that if its audit was negligent then harm to the Bank was foreseeable. *See* Compl. ¶¶ 121–125, 132–133 (alleging EY's "breaches of duty" were the "cause-in-fact" and "proximate or legal" cause of the Bank's damages); ¶ 38

(alleging "EY . . . knew that the Bank relied on EY to alert it to material weaknesses in internal controls and any concerns over management integrity.").[6]

Because the Bank "knowingly . . . obtain[ed a] direct benefit[]" from EY's engagements, as pleaded in the Receiver's own Complaint, it is bound to arbitrate this dispute. *Noble Drilling Servs.*, 620 F.3d at 473.

### 2.    Reference to the Contract

The Receiver is additionally bound under the second, independent ground for estoppel because it "assert[s] claims that must be determined by reference" to the engagement agreements. *Traders' Mart*, 268 So. 3d at 428. Here, the Receiver would have no cause of action for professional negligence but for the underlying agreements. There would have been no audit at all without those agreements setting forth the parameters of the audit. The Receiver's suit is bound up with, and requires reference to, the engagement agreements. *See id.* at 428–29.

Courts have applied direct benefits estoppel when a nonsignatory's claims "must be determined, at least in part, by reference to that agreement," even if claims are not asserted under

---

[6] This is also not the only litigation in which the Receiver has insisted that the Bank benefited from EY's audits of FNBC undertaken pursuant to the engagement agreements. As part of the *FDIC v. Belcher* litigation, No. 19-12561 (E.D. La. 2019), relating to the Receiver's receipt of privileged and confidential materials from the PCAOB that the Court is familiar with from the parties' prior disqualification briefing, the Receiver repeatedly stressed that "EY's Audit Reports . . . were filed with the FDIC to satisfy [the Bank's] statutory requirements to be an FDIC-insured and regulated bank," and therefore "the audit reports were 'for' the Bank as well as FNBC Holding." *Belcher*, FDIC Opp. (ECF #49) at 9; *see also FDIC v. Belcher*, 978 F.3d 959, 963 & n.4 (5th Cir. 2020) (explaining that the FDIC's position is that "EY's audit reports were 'for' the Holding Company and the Bank," and noting that "[a]lthough the Holding Company is the entity that engaged EY to complete the audit reports, they were completed on a consolidated basis, and the Bank later submitted the same reports to the FDIC to comply with various reporting requirements"); *Belcher*, FDIC Opp. (ECF #49) at 10 ("The Bank, as an FDIC-insured and regulated institution, needed an audit report on its financial statements and internal controls, and that audit report was required to be filed with the FDIC."); *FDIC v. Belcher*, No. 19-31023 (5th Cir.) ("*Belcher* Appeal"), FDIC Opp. to Mot. to Stay, at 7 (arguing that the Bank submitted EY's reports "to the FDIC to fulfill its statutory reporting obligations"); *Belcher* Appeal, FDIC Appellee Br. at 29–30 ("[T]he audit reports were prepared to permit the Bank to meet its FDICIA and Part 363 requirements.").

the agreement itself.  *Blaustein*, 449 F. App'x at 350; *Traders' Mart*, 268 So. 3d at 429.  For instance, in *Blaustein*, the Fifth Circuit rejected the plaintiff's argument that estoppel should not apply because his professional misconduct claims were based on an attorney-client relationship "separate from the written fee agreement."  449 F. App'x at 350–51.  It concluded, instead, that the claim "invite[d] [the court] to reference the fee agreement," as it referenced work done for the entity named in the fee agreement.  *See id.*; *see also Blaustein v. Huete*, 2010 WL 5437284, at *4 (E.D. La. Dec. 22, 2010) ("Huete cannot reap the benefits under the Agreement, and then completely disavow the Agreement in its entirety and, at the same time, claim he suffered damages as a result of a violation of the Agreement."); *ERG Enters., LLC v. Green Coast Enters., LLC*, 299 So.3d 1194, 1200 (La. Ct. App. 2020) ("[A] nonsignatory cannot litigate to reap benefits from a contract and then attempt to avoid an arbitration provision contained therein."); *Donelon v. Shilling*, 2019 WL 993328, at *9 (La. Ct. App. Feb. 28, 2019), *rev'd on other grounds*, 340 So.3d. 786 (La. 2020) ("Apart from the Agreement, there would have been no performance . . . and no alleged breach of professional standards and negligent misrepresentation.  As such, the [nonsignatory's] claims against [the defendant] for professional negligence and negligent misrepresentation, like the claim for breach of contract, are associated with the enforcement of the Agreement, making direct-benefit estoppel applicable.").

Although this basis for estoppel will not apply when a party's claims exist wholly "separate and apart" from the terms of an agreement, simply attempting to plead around a breach-of-contract action does not allow a party to dodge application of estoppel.  *Jones v. Singing River Health Services Foundation*, 674 F. App'x 382, 387 (5th Cir. 2017); *Traders' Mart*, 268 So. 3d at 429.  Thus, the Receiver's careful (though transparently strategic) effort to avoid invoking the engagement agreements cannot hide that its cause of action "rel[ies] on the same duty of the

Auditors created in the first instance by the Engagement Agreement[]." *See 2004 Parker Fam. LP v. BDO USA LLP*, 2020 WL 2844578, at *5 (N.Y. Sup. Ct. May 29, 2020) (holding plaintiff was bound to arbitrate fiduciary duty and negligence claims—not just contract claims—under direct benefits estoppel when "all three causes of action rely on the same duty of the Auditors created in the first instance by the Engagement Agreements to properly audit the . . . Funds").

The auditing standards themselves specifically require an auditor to "establish an understanding of the terms of the audit engagement" and to "record the understanding of the terms of the audit engagement in an engagement letter and provide the engagement letter to the audit committee annually." *See* PCAOB AS 16 (effective Dec. 15, 2012) (cited at Compl. ¶ 127(r)). And the duties cited by the Receiver, primarily under PCAOB standards, do not exist in the abstract—they apply *because* there is an audit agreement setting forth the parameters of the audit. *See id.*; Ex. 1 at 1 (providing EY "will conduct the integrated audit in accordance with the standards of the Public Company Accounting Oversight Board"); Ex. 2 at 2 (same).

While the Fifth Circuit denied an accounting firm's motion to compel under this prong of estoppel in *Jones v. Singing River*, that case involved multiple factors not present here. There, the plaintiff was an individual participant in a pension plan who brought class action claims against the plan's auditor (KPMG) and had "no knowledge of the engagement letters" between the plan and KPMG at all before filing suit. 674 F. App'x at 385; *see also id.* at 386 (plaintiff "did not know about the Engagement Letters"). That plaintiff plainly could not have "embraced the contract" during the "life of the contract." *Id.* at 385 (citation omitted). Moreover, the plaintiff affirmatively "disclaim[ed] any reliance on the [audit] agreements containing the arbitration clause as a source of KPMG's obligations," *id.* at 387, and the Court found that KPMG had failed to

explain "why [plaintiff's] claims inevitably involve the terms of the Engagement Letters," *id*.[7]  The Bank bears no resemblance to the individual plaintiff there.  The Receiver has not affirmatively disclaimed any reliance on the engagement agreements, nor could it.  And the claim here clearly does inevitably involve the terms of the engagement agreements.

Indeed, the allegations here make the engagement agreements especially pertinent.  The Receiver's claim is that EY "failed to detect fraudulent conduct by Ryan," Compl. ¶ 3, and that "[h]ad EY properly planned and performed" the audits, "it would have discovered that information" and exposed Ryan's fraud.  Compl. ¶ 129.  But the engagement agreements expressly recognize "the possibility that collusion or forgery may preclude the detection of material error, fraud or illegal acts" and that accordingly "there is some risk that a material misstatement of the financial statements or a material weakness in internal control . . . would remain undetected."  Ex. 1 at 2; Ex. 2 at 2.  They further required management—including Ryan and Calloway—to give EY access to "all information of which management is aware that is relevant" to the audit, Ex. 1 at 8; Ex. 2 at 7; provided that "[m]anagement is responsible for apprising [EY] of all allegations involving financial improprieties received by management," Ex. 1 at 7; Ex. 2 at 7; and made clear that "[m]anagement is responsible for adjusting the consolidated financial statements . . . to correct material misstatements," Ex. 1 at 7; Ex. 2 at 6.  This case simply cannot be litigated without "reference" to the engagement agreements.  *See Traders' Mart*, 268 So. 3d at 428.

In sum, the Receiver is bound to arbitrate under either prong of direct benefits estoppel.  The Court should compel arbitration on both independent grounds.[8]

---

[7] Importantly, *Singing River* also only addresses the *second* theory of direct benefits estoppel—that a claim "must be determined by reference to" an agreement.  674 F. App'x at 385–86 ("KPMG only meaningfully addresses the second alternative identified by *Noble Drilling*.").  It does not address the separate first theory, discussed above.

[8] To the extent raised, we note that the Court's ruling on EY's motion to compel arbitration is not affected by the fact that the Complaint also includes a count against EY's insurer, Gloucester Insurance Ltd., under

## II.   IN THE ALTERNATIVE, THE RECEIVER'S CLAIM SHOULD BE DISMISSED UNDER LOUISIANA'S PRIVITY STATUTE.

If arbitration is not compelled, the Court should dismiss the Receiver's Complaint for failure to state a claim.  The Receiver is barred from asserting a claim against EY under Louisiana law because it does not satisfy the statutory privity standard required to bring a claim against an auditor.

Under the Louisiana Accountancy Act, an accountant owes a duty "only to persons who engage the licensee to provide services" or "to persons who meet the criteria of La. R.S. 37:91(B)(2)."  *Solow v. Heard McElroy & Vestal, L.L.P.*, 7 So. 3d 1269, 1278 (La. Ct. App. 2009), *writ denied*, 17 So. 3d 961 (La. 2009).  If the plaintiff does not satisfy these criteria, then "[n]o action based on negligence may be brought."  La. Stat. Ann. § 37:91(B).  "Whether a duty is owed is a question of law."  *Solow*, 7 So. 3d at 1278 (citing *Barrie v. V.P. Exterminators, Inc.*, 625 So. 2d 1007, 1015 (La. 1993)).

Here, as the Receiver concedes, the Bank "did not engage EY to audit its financial statements or internal controls" and was not EY's client.  Compl. ¶ 35.  As such, it can only bring suit if it satisfies La. Stat. Ann. § 37:91(B)(2).  The Receiver again acknowledges as much in its Complaint.  *See, e.g.*, Compl. ¶¶ 121–122, 125.  La. Stat. Ann. § 37:91(B)(2) provides:

> B. No action based on negligence may be brought against any defendant licensee, or any employee or principal of a defendant licensee, unless the plaintiff claims to have been injured as a result of their justifiable reliance upon financial statements or other information examined, compiled, reviewed, certified, audited, prepared

the Louisiana Direct Action Statute.  The claim against Gloucester is entirely derivative of the substantive claim against EY*, see, e.g.*, *Descant v. Adm'rs of Tulane Educ. Fund*, 639 So. 2d 246, 249 (La. 1994), and should thus be stayed pending the arbitration of EY's claim, for the reasons explained in Gloucester's separate motion to stay.  *See Francisco v. Stolt-Nielsen, S.A.*, 2002 WL 31697700, at *6–7 (E.D. La. Dec. 3, 2002) (staying direct action against insurer during pendency of arbitration between plaintiff and insured defendant, as otherwise plaintiff would "circumvent [the] arbitration agreement").  Regardless, a court must compel the arbitration of arbitrable claims no matter whether the arbitration only encompasses certain parties in an action, or even certain claims against the same party.  *See, e.g.*, *KPMG LLP v. Cocchi*, 565 U.S. 18, 19 (2011) (per curiam).

pursuant to a preparation of financial statement engagement, or otherwise prepared, reported, or opined on by the defendant licensee or in the course of the defendant licensee's engagement to provide other services and at least one of the following conditions apply:

. . .

> (2) The defendant licensee was aware at the time the engagement was undertaken that the financial statements or other information were to be made available for use in connection with a specified transaction by the plaintiff who was specifically identified to the defendant licensee, was aware that the plaintiff intended to rely upon such financial statements or other information in connection with the specified transaction, and had direct contact and communication with the plaintiff and expressed by words and conduct the defendant licensee's understanding of the reliance on such financial statements or other information.

The Receiver has not satisfied, and cannot satisfy, this deliberately "restrictive" standard. *See Barrie*, 625 So. 2d at 1013. Indeed, in adopting the Louisiana Accountancy Act in 1999, the Legislature specifically rejected standards applicable in many states that provide more expansive bases of liability to non-clients and selected a test based on the "restrictive minority view." *See generally id.*; *see also First Nat'l Bank of Com. v. Monco Agency Inc.*, 911 F.2d 1053, 1060 (5th Cir. 1990). Louisiana endorsed, as the title of the State's statute reflects, a "privity" test. *See* HB 1810 Overall Digest (June 18, 1999); *see also Solow*, 7 So. 3d at 1277.[9]

In particular, the Receiver here fails to meet the strict requirements of § 37:91(B)(2) for two reasons: First, the Receiver fails to plead that the audited financial statements were utilized "in connection with a specified transaction by the [Bank]" within the meaning of the statute. La.

---

[9] La. Stat. Ann. § 37:91 mirrors the standard in the Uniform Accountancy Act, which "embodies the common law rule that only persons in a relationship of privity of contract (i.e., a direct contractual relationship), or a relationship so close as to approach that of privity, may sue an accountant for negligence." *See* Uniform Accountancy Act Standards for Regulation § 20-1 cmt. (Am. Inst. of Certified Pub. Acct. & Nat'l Ass'n of St. Bd. of Acct., 8th. Ed., revised Jan. 2018) (noting this approach is derived from the "seminal decision[s]" *Ultramares Corporation v. Touche*, 174 N.E. 441 (N.Y. 1931) and *Credit Alliance v. Arthur Andersen & Co.*, 483 N.E.2d 110 (N.Y. 1985)). This "restrictive minority view . . . extends liability for economic loss only to those persons with whom defendant is in a relationship 'akin to privity'" and stands in contrast to the more permissive Restatement and foreseeability tests. *Barrie*, 625 So. 2d at 1013 & n.11.

Stat. Ann. § 37:91(B)(2).  Second, the Receiver fails to plead facts establishing that the Bank itself "reli[ed]" to its detriment upon those audited financial statements "in connection with the specified transaction"—that the Bank was "injured as a result of [its] justifiable reliance."  *Id.* § 37:91(B).  As a result, "[n]o action based on negligence may be brought," and the Receiver's claim must be dismissed.  *See id.*; *see also Solow*, 7 So. 3d at 1278.

### A.    There Is No "Specified Transaction."

La. Stat. Ann. § 37:91(B)(2) requires that, in order to bring suit, the audited "financial statements or other information" must have been "made available for use in connection with *a specified transaction by the plaintiff*."  *Id.* (emphasis added).  It is plain that the drafters envisioned a specific business transaction, in which the plaintiff relied on audited financial information to its detriment.  The plaintiff proceeded with a specified deal, for instance, that it never would have otherwise undertaken.  *See, e.g.*, *In re FoodServiceWarehouse.com, LLC*, 601 B.R. 396, 402 (E.D. La. 2019) (company's reliance on audit in deciding to increase its guarantee of a loan by $5 million).  Here, the only alleged "transaction" identified by the Receiver is far removed from anything like that:  It is the Bank's submission of EY's audit report to its regulator to meet regulatory requirements.  *See, e.g.*, Compl. ¶¶ 121–125.  Transmitting an audit report to a regulator as part of a plaintiff's normal course of operations is not a "specified transaction by the plaintiff" within the meaning of the statute.

A "transaction" is commonly understood to involve "[t]he act or an instance of conducting business or other dealings; esp., the formation, performance, or discharge of a contract" or "[s]omething performed or carried out; a business agreement or exchange."  *Transaction*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see United States v. Radley*, 632 F.3d 177, 184 (5th Cir. 2011) (explaining that "[b]eyond the law itself, dictionary definitions inform the plain meaning of a

statute," and using Black's Law Dictionary definition in interpreting statutory meaning of "transaction" for 7 U.S.C. § 2(a)(1)(A), concluding that bidding activity is covered).[10]

The Receiver's allegations here with respect to EY's audits do not involve any business agreement or exchange.  The Bank simply alleges that it forwarded EY's audit report to the regulator as part of a periodic regulatory filing for the routine purpose of "[e]arly identification" by the regulator (the FDIC) "of needed improvements in financial management."  12 U.S.C. § 1831m; *see also, e.g.*, 70 Fed. Reg. 44293 (Aug. 2, 2005) (reporting requirements "are generally intended to facilitate early identification of problems in financial management at insured depository institutions with total assets above a certain threshold").

Not only is this not a "transaction," but it is not a "specified transaction."  At best it represents the use of an audit report as part of the Bank's general operations.  But that is not sufficient.  Indeed, in *E. Dickerson & Son, Inc. v. Ernst & Young, LLP*, the New Jersey Supreme Court held under a nearly identical statute that "[g]eneral reliance by . . . individual corporate stockholders" on an audit in connection with "individual store operations" and "their continued participation" in an audited cooperative "fail[ed] to allege any specific transaction" within the meaning of that statute.  846 A.2d 1237, 1239–41 (N.J. 2004) (quotation marks omitted) (discussing N.J. Stat. Ann. § 2A:53A-25b(2)(b), stating, *inter alia*, that a non-client "rely upon the professional accounting service in connection with that specified transaction").  If this does not satisfy the requirement of a "specified transaction," then surely the inclusion of an audit report in a regulatory filing does not.

---

[10]    *See also* Merriam-Webster, https://www.merriam-webster.com/dictionary/transaction (visited Oct. 25, 2023) ("[S]omething transacted especially: an exchange or transfer of goods, services, or funds."); *Transaction*, Cambridge English Dictionary, https://dictionary.cambridge.org/us/dictionary/english/transaction (visited Oct. 25, 2023) ("[A]n occasion when someone buys or sells something" or "when money is exchanged.").

Connection to a *specific transaction* is essential to address the concern originally expressed in *Ultramares Corp. v. Touche*, 174 N.E. 441 (N.Y. 1931)—and then embraced in La. Stat. Ann. § 37:91—that otherwise accountants would be exposed to "liability in an indeterminate amount for an indeterminate time to an indeterminate class." *Ultramares Corp.*, 174 N.E. at 444. This requirement ensures that the auditor will only be liable with respect to a particular, concrete "transaction." It is a critical requirement of the test adopted by the Louisiana legislature. *See also E. Dickerson & Son, Inc.*, 846 A.2d at 1241 (explaining that a third party "specifically could have indicated . . . reliance on an annual audit *for a particular loan or investment transaction* and secured an engagement letter or other understanding to that effect," allowing the accountant to "calculate the risk and exposure from the transaction" (emphasis added)).

Had it wished to, the Bank could have obtained its own audit opinion. Then it would have been in privity under La. Stat. Ann. § 37:91(B)(1), and would not have needed to identify a "specified transaction" in order to assert a claim. *See id.* (a party who "has engaged the defendant licensee" may bring a claim). Here, instead, the Bank chose to take advantage of a statutory and regulatory convenience allowing it to use the Holding Company's audit to meet its own audit requirements under federal law. *See* 12 U.S.C. § 1831m(d)(3); 12 C.F.R. § 363.1(b). This approach was not required—instead, it is an *optional* avenue by which subsidiary banks can fulfill their own financial reporting requirements. *See* 12 C.F.R. § 363.1(b) (providing that the subsidiary of a holding company "may" submit the holding company's audited financials in order to satisfy its own reporting requirements); *see also* 12 U.S.C. § 1831m(d)(3). But this permissive statutory shortcut does not rewrite Louisiana's privity requirement.

A Louisiana "statute should be construed in a manner that is logical and consistent with its express terms, its presumed purpose, and the intent of the legislature in enacting it." *Solow*, 7 So.

3d at 1276.  Allowing the submission of an audit report to a regulator in the normal course of business to serve as the "specified transaction" is incompatible not only with the express terms of the Louisiana Accountancy Act, but also with its clear purpose and the intent of the legislature in enacting such a precise and exacting privity standard.  The Receiver has not alleged a "specified transaction," and thus its claim is barred.

### B.    There Was No Detrimental Reliance by the Bank.

In addition to its failure to identify a cognizable "specified transaction," the Receiver has not alleged any facts establishing that the Bank itself relied on the audited financials, let alone was injured as a result of such reliance, in connection with an asserted "specified transaction."  *See* La. Stat. Ann. § 37:91(B).  Nor could the Receiver allege that.  Its claim therefore fails for this separate reason.

In order to bring a claim against an auditor, the plaintiff must "have been *injured as a result of their justifiable reliance* upon financial statements or other information examined."  *Id.* (emphasis added).  And the plaintiff's reliance must have been "*in connection with a specified transaction*."  *Id.* § 37:91(B)(2) (emphasis added) (the auditor must be "aware that the plaintiff intended to rely . . . in connection with the specified transaction").

Here, there was no "injury" suffered by the Bank as the result of its "reliance" on the audit "in connection with the specified transaction."  What the Receiver alleges is that the Bank simply forwarded the audit opinion to the Bank's regulator in order to meet its regulatory requirements.  *See* Compl. ¶ 35 (alleging that "EY knew that First NBC would submit its audit opinions, issued at the Holding Company level, to the FDIC to satisfy the Bank's regulatory audit obligations"); *see also id*. ¶¶ 122–123 (alleging that the Bank "met the criteria of La. Rev. Stat. § 37:91(B)(2)" because EY knew that the Bank would submit the Holding Company's audit reports "to the

FDIC"). The Bank did not detrimentally rely on the audit report in connection with a transaction—there is no allegation that the Bank relied on the audit report to enter into a deal or make a business decision to its detriment.[11]

If anything, the Complaint alleges that "EY knew that *the FDIC, as the Bank's federal regulator, would review and rely upon EY's audit reports* in evaluating the safety and soundness of the Bank's operations." Compl. ¶ 37 (emphasis added). Not only is that not in connection with a specified transaction, but the detrimental reliance required is by *the party bringing suit*, not a separate third party. *See* La. Stat. Ann. § 37:91(B) ("No action based on negligence may be brought against any defendant licensee . . . unless *the plaintiff* claims to have been injured as a result of their justifiable reliance . . . ." (emphasis added)). And it is indisputable that the FDIC sues here in the shoes of the Bank—"as Receiver for First NBC Bank ('FDIC-R')." Compl. ¶ 1. It is *not* suing in the FDIC's separate corporate capacity as a regulator. *See, e.g.*, *DeCell & Assocs. v. FDIC*, 36 F.3d 464, 469 (5th Cir. 1994) (explaining that the Receiver acts in a "separate and legally distinct" capacity from other functions of the FDIC).

Likewise, to the extent the Receiver seeks to argue that the Bank was harmed by the FDIC's failure to take regulatory action in response to the audit report, that theory is nowhere expressed in the Complaint. And for good reason: It is untenable as a matter of law. Again, the Louisiana statute requires reliance by "*the plaintiff*" itself, not a third party. La. Stat. Ann. § 37:91(B) (emphasis added). And the statute requires reliance "in connection with the specified transaction." *Id*. § 37:91(B)(2). Such a theory thus could not be reconciled with the statutory text. Moreover, even without that unambiguous text, courts have rejected reliance theories premised on losses

---

[11] Nor, in any event, was the Bank "injured" as a result of transmitting the report to the regulator. La. Stat. Ann. § 37:91(B)(2). Far from it. Providing the audit report to the regulator allowed the Bank to *meet* its regulatory obligations, benefiting the Bank.

caused "because had the audits been accurate, someone, such as . . . government regulators, would have 'rescued'" the audited company.  *See FDIC v. Ernst & Young*, 967 F.2d 166, 171 (5th Cir. 1992) (interpreting Texas law); *In re NM Holdings Co., LLC*, 622 F.3d 613, 625 (6th Cir. 2010) (adopting "the reasoning of the Fifth Circuit" and "and hold[ing] that third-party reliance of this type is insufficient to establish causation in a professional-negligence action").  The Receiver asserts its claim against EY standing in the shoes of the Bank—it may not establish causation through purported reliance on the company's financial statements by third parties.

Because the Receiver has not met the demanding requirements under the Louisiana privity statute, its claim is barred.

## CONCLUSION

For the foregoing reasons, arbitration should be compelled and the Receiver's claim against EY should be stayed pending the arbitration.  In the alternative, if arbitration is not compelled, the Complaint should be dismissed for failure to state a claim under Rule 12(b)(6).

November 2, 2023                                  Respectfully submitted,

                                                 */s/ Craig Isenberg*
                                                 Craig Isenberg, 26903
Steven M. Farina, *pro hac vice*                 Chloé M. Chetta, 37070
Stephen J. Fuzesi, *pro hac vice*                BARRASSO USDIN KUPPERMAN
Adrienne Van Winkle, *pro hac vice*              FREEMAN & SARVER, L.L.C.
WILLIAMS & CONNOLLY LLP                           909 Poydras Street, Suite 2400
680 Maine Ave S.W.                               New Orleans, Louisiana 70112
Washington, DC 20024                             Telephone: (504) 589-9700
Telephone: (202) 434-5000                        Facsimile: (504) 589-9701
Facsimile: (202) 434-5029                        cisenberg@barrassousdin.com
sfarina@wc.com                                   cchetta@barrassousdin.com
sfuzesi@wc.com
avanwinkle@wc.com

*Attorneys for Ernst & Young LLP*

23

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 2, 2023, the foregoing memorandum was filed using the Court's ECF System, which constitutes services on all parties that have appeared of record in this proceeding.

*/s/ Craig Isenberg*
Craig Isenberg
