## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR FIRST NBC BANK,** | **Case No. 2:20-cv-01259** |
| **Plaintiff,** | **Section "L" (1)** |
| **v.** | **Hon. Eldon E. Fallon. USDJ** |
| **ERNST & YOUNG LLP and GLOUCESTER INSURANCE LTD.,** | **Hon. Janis van Meerveld, USMJ** |
| | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

**PLAINTIFF FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR FIRST NBC BANK'S MEMORANDUM IN OPPOSITION TO ERNST & YOUNG LLP'S MOTION TO COMPEL ARBITRATION OR, IN THE ALTERNATIVE, TO DISMISS**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ................................................................................................ 2

LEGAL STANDARDS APPLICABLE TO MOTION TO COMPEL ARBITRATION ............. 4

ARGUMENT ON MOTION TO COMPEL ARBITRATION ................................................ 5

    A.    Federal Law Bars EY From Compelling FDIC-R to Arbitrate. ....................................... 5

        1.    Compelled Arbitration Would Violate the Administrative Dispute Resolution Act.... 5

        2.    The FAA Does Not Apply to Federal Agencies with Authority to Choose Their Forum. ......................................................................................................................... 6

            a.    FDIC-R is a Federal Agency that, Like the EEOC, Serves an Important Public Function. ................................................................................................................ 7

            b.    As in *Waffle House*, Forcing FDIC-R to Arbitrate Would Undermine Congressional Purposes. ........................................................................................................... 10

    B.    Equitable Estoppel Cannot Override Federal Law. ..................................................... 15

    C.    Equitable Estoppel is Inapplicable Under State Law as Well. .................................... 16

        1.    Under State Law, Public Agencies' Authority to Sue Trumps Estoppel. .................. 16

        2.    EY's "Direct Benefits" Theory Would Fail Even if FDIC Were Subject to Estoppel........................................................................................................................ 20

            a. FDIC-R Has Not Invoked the Engagement Letters. ..................................................... 21

            b. The Engagement Letters Did Not Expressly Benefit the Bank. ................................. 24

LEGAL STANDARDS APPLICABLE TO MOTION TO DISMISS ........................................ 26

ARGUMENT ON MOTION TO DISMISS ......................................................................... 26

    A.    The Complaint Alleges "Specified Transactions" Within the Meaning of the Act. ......... 27

        1.    The Submission of EY's Audits to FDIC to Satisfy the Bank's Regulatory Obligation Constitutes a "Specified Transaction." ..................................................................... 27

        2.    FDIC-R Has Alleged that EY Committed Malpractice with Regard to a Series of Specified Loan Transactions. ........................................................................................ 31

    B.    The Complaint Adequately Alleges Detrimental Reliance Within the Meaning of the Accountancy Act. ............................................................................................................ 33

CONCLUSION................................................................................................................ 34

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Adair v. Lease Partners, Inc.*,
   587 F.3d 238 (5th Cir. 2009) ..............................................................................11

*Anglo Am. Ins. Grp., P.L.C. v. CalFed Inc.*,
   940 F. Supp. 554 (S.D.N.Y. 1996) .......................................................................17

*Arizona v. United States*,
   567 U.S. 387 (2012).............................................................................................16

*Arthur Andersen LLP v. Carlisle*,
   556 U.S. 624 (2009).............................................................................................16

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).............................................................................................26

*Beiser v. Weyler*,
   284 F.3d 665 (5th Cir. 2002) ................................................................................6

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).............................................................................................26

*Belzberg v. Verus Invs. Holdings Inc.*,
   999 N.E.2d 1130 (N.Y. 2013)........................................................................20, 24

*Bilyeu v. Johanson Berenson LLP*,
   809 F. Supp. 2d 547 (W.D. La. 2011)..................................................................22

*Blaustein v. Huete*,
   449 F. App'x 347 (5th Cir. 2011) .........................................................................23

*Caton v. Leach Corp.*,
   896 F.2d 939 (5th Cir. 1990) ...............................................................................17

*Charter Commc'ns, Inc. v. Derfert*,
   510 F. Supp. 3d 8 (S.D.N.Y. 2021) ......................................................................18

*Charter Commc'ns, Inc. v. Jewett*,
   573 F. Supp. 3d 742 (S.D.N.Y. 2021)...................................................................17

*Citizens Bank v. Alafabco, Inc.*,
   539 U.S. 52 (2003).................................................................................................4

*Citizens Central Bancorp v. United States*,
No. 15-1539C, 2017 WL 10544024 (Fed. Cl. Sept. 7, 2017)...................................................8

*Cohen v. Viray*,
622 F.3d 188 (2d Cir. 2010).........................................................................................7

*Collins v. Yellen*,
141 S. Ct. 1761 (2021)................................................................................................13

*Colonial Bancgroup Inc. v. PriceWaterhouseCoopers LLP*,
No. 2:11-CV-746-BJR, 2016 WL 9687002 (M.D. Ala. Aug. 1, 2016) ....................................9

*Colonial BancGroup Inc. v. PriceWaterhouseCoopers LLP*,
No. 2:11-CV-746-BJR, 2017 WL 4175029 (M.D. Ala. Aug. 18, 2017) ...............................15

*Colonial BancGroup Inc. v. PriceWaterhouseCoopers LLP*,
No. 2:11-CV-746-BJR, 2018 WL 6430827 (M.D. Ala. Mar. 27, 2018) ..........................21, 22

*Conway v. CitiMortgage, Inc.*,
438 S.W.3d 410 (Mo. 2014) ....................................................................................33

*Cooper v. Meridian Yachts, Ltd.*,
575 F.3d 1151 (11th Cir. 2009) .................................................................................17

*Crawford Pro. Drugs, Inc. v. CVS Caremark Corp.*,
748 F.3d 249 (5th Cir. 2014) .....................................................................................16

*Credit Alliance Corp. v. Arthur Andersen & Co.*,
483 N.E.2d 110 (N.Y. 1985)...........................................................................28, 29, 30, 31

*People ex rel. Cuomo v. Coventry First LLC*,
915 N.E.2d 616, 619 (N.Y. 2009) .........................................................................17, 18

*Dalton v. F.D.I.C.*,
987 F.2d 1216 (5th Cir. 1992) ..............................................................................11, 19

*Donelon v. Shilling*,
340 So.3d 786 (La. 2020) ....................................................................................18, 19, 20

*E. Dickerson & Son, Inc. v. Ernst & Young, LLP*,
846 A.2d 1237 (N.J. 2004)........................................................................................31

*E.E.O.C. v. Ralphs Grocery Co.*,
300 F. Supp. 2d 637 (N.D. Ill. 2004) ...........................................................................7

*E.E.O.C. v. Waffle House, Inc.*,
534 U.S. 279 (2002).......................................................................................... *passim*

iv

*E.I. DuPont de Nemours v. Sawyer*,
    517 F.3d 785 (5th Cir. 2008) ........................................................................15

*F.D.I.C. v. Hulsey*,
    22 F.3d 1472 (10th Cir. 1994) ......................................................................15

*F.D.I.C. v. Loyd*,
    955 F.2d 316 (5th Cir. 1992) ........................................................................11

*F.D.I.C. v. O'Melveny & Myers*,
    61 F.3d 17 (9th Cir. 1995) ......................................................................14, 15

*F.D.I.C. v. RBS Sec. Inc.*,
    798 F.3d 244 (5th Cir. 2015) ........................................................................14

*F.D.I.C. v. Royal Park No. 14, Ltd.*,
    2 F.3d 637 (5th Cir. 1993) ............................................................................15

*F.D.I.C. v. S&I 85-1, Ltd.*,
    22 F.3d 1070 (11th Cir. 1994) ......................................................................11

*F.D.I.C. v. Shain, Schaffer & Rafanello*,
    944 F.2d 129 (3d Cir. 1991)..........................................................................16

*F.D.I.C. v. Van Dellen*,
    No. CV 10-4915 DSF SHX, 2012 WL 4815159 (C.D. Cal. Oct. 5, 2012)............15

*F.D.I.C. v. Wentz*,
    55 F.3d 905 (3d Cir. 1995)............................................................................10

*F.D.I.C. v. Wright*,
    942 F.2d 1089 (7th Cir. 1991) ......................................................................10

*Gater Assets Ltd. v. AO Moldovagaz*,
    2 F.4th 42 (2d Cir. 2021) ..............................................................................25

*Global Oil Tools v. Barnhill*,
    Civ. No. 12–1507, 2012 WL 4928912 (E.D. La. Oct. 16, 2012)...........................22

*Hellenic Inv. Fund, Inc. v. Det Norske Veritas*,
    464 F.3d 514 (5th Cir. 2006) .................................................................. *passim*

*Commonwealth ex rel. Herring v. Net Credit Fin. Sols. of Utah, LLC*,
    102 Va. Cir. 114 (Va. Cir. Ct. 2019)................................................................18

*Howard Trucking Co., Inc. v. Stassi*,
    485 So.2d 915 (La. 1986) ..............................................................................21

*Irving Indep. School Dist. v. Packard Props.*,
    970 F.2d 58 (5th Cir. 1992) ........................................................................16

*Jones v. Singing River Health Servs. Found.*,
    674 F. App'x 382 (5th Cir. 2017) ...............................................................21

*In re Katrina Canal Breaches Litig.*,
    495 F.3d 191 (5th Cir. 2007) ......................................................................26

*LaRoss Partners, LLC v. Contract 911, Inc.*,
    874 F. Supp. 2d 147 (E.D.N.Y. 2012) ........................................................24

*MAG Portfolio Consult, GMBH v. Merlin Biomed Group LLC*,
    268 F.3d 58 (2d Cir. 2001)..........................................................................25

*McAllister v. McDermott Inc.*,
    No. 18-cv-361, 2020 WL 4745743 (M.D. La. Aug. 14, 2020)...............17

*In re Meyerland Co.*,
    960 F.2d 512 (5th Cir. 1992) ........................................................... *passim*

*Mobile Real Est., LLC v. NewPoint Media Grp., LLC*,
    460 F. Supp. 3d 457 (S.D.N.Y. 2020)........................................................21

*Morgan v. Sundance, Inc.*,
    596 U.S. 411 (2022)......................................................................................5

*Moss v. State*,
    925 So.2d 1185 (La. 2006) ..........................................................................27

*Nat'l Credit Union Admin. Bd. v. Goldman, Sachs & Co.*,
    775 F.3d 145 (2d Cir. 2014)........................................................................12

*Nat'l Union Fire Ins. Co. v. Beelman Truck Co.*,
    203 F. Supp. 3d 312 (S.D.N.Y. 2016)........................................................24

*Niemuller v. Nat'l Union Fire Ins. Co.*,
    No. 92 Civ. 0070 (SS), 1993 WL 546678 (S.D.N.Y. Dec. 30, 1993)
    (Sotomayor, J.)............................................................................................10

*O'Melveny & Myers v. F.D.I.C.*,
    512 U.S. 79 (1994)........................................................................12, 13, 14

*Overland Leasing Group, LLC v. First Financial Corporate*,
    No. 06–05850(SDW), 2007 WL 3349491 (D.N.J. Nov. 7, 2007)....................28, 31

*People v. Maplebear Inc.*,
    297 Cal. Rptr. 3d 652 (Cal. Ct. App. 2022) ..............................................18

*Quicksilver Res., Inc. v. Eagle Drilling, LLC*,
    792 F. Supp. 2d 948 (S.D. Tex. 2011) ...................................................................17

*Scalia v. CE Security LLC*,
    No. 21-CV-00057, 2021 WL 3774198 (E.D.N.Y. Aug. 25, 2021) .........................7

*Solow v. Heard McElroy & Vestal, L.L.P.*,
    7 So. 3d 1269 (La. Ct. App. 2009)..........................................................................31

*Story v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    427 F. Supp. 3d 822 (E.D. La. 2019) ......................................................................17

*Taylor v. Ernst & Young, LLP*,
    958 N.E.2d 1203 (Ohio 2011)...........................................................................18, 19

*Todd v. Steamship Mut. Underwriting Ass'n, Ltd.*,
    No. CIV.A. 08-1195, 2011 WL 1226464 (E.D. La. Mar. 28, 2011) ......................17

*Traders' Mart, Inc. v. AOS, Inc.*,
    268 So. 3d 420 (La. Ct. App. 2019).......................................................................23

*Transitional Learning Cmty. at Galveston, Inc. v. U.S. Office of Pers. Mgmt.*,
    220 F.3d 427 (5th Cir. 2000) ..................................................................................16

*Trina Solar US, Inc. v. Jasmin Solar Pty Ltd*,
    954 F.3d 567 (2d Cir. 2020).......................................................................20, 21, 24

*In re Uber Techs. Wage & Hour Cases*,
    313 Cal. Rptr. 3d 867 (Cal. Ct. App. 2023), *review filed* (Nov. 7, 2023)................7

*Ultramares Corporation v. Touche*,
    174 N.E. 441 (N.Y. 1931) (Cardozo, J.) .....................................................29, 30, 31

*United States v. Bloom*,
    112 F.3d 200 (5th Cir. 1997) ..................................................................................15

*United States v. Sweeney*,
    226 F.3d 43 (1st Cir. 2000).......................................................................................9

*Vloeibare Pret Ltd. v. Lloyd's Register North America, Inc.*,
    606 F. App'x 782 (5th Cir. 2015) ...........................................................................23

*Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*
    489 U.S. 468 (1989)..................................................................................................5

*Walsh v. Ariz. Logistics, Inc.*,
    998 F.3d 393 (9th Cir. 2021) ....................................................................................7

*Zucker v. Rodriguez,*
  919 F.3d 649 (1st Cir. 2019) .................................................................10

**Statutes**

12 C.F.R. § 360.1 *et seq.* ........................................................................9

12 C.F.R. § 363.1(b) ...............................................................................34

12 C.F.R. § 363.3(a) ...............................................................................27

5 U.S.C. § 551(1) .....................................................................................5

5 U.S.C. § 571(1) .....................................................................................5

5 U.S.C. § 575 ........................................................................1, 2, 5, 15, 16

5 U.S.C. § 575(a)(1) .................................................................................5

5 U.S.C. § 575(a)(2) .................................................................................5

12 U.S.C. § 1819(b) .......................................................................8, 10, 11

12 U.S.C. § 1819(b)(1) .................................................................11, 16, 19

12 U.S.C. § 1821(c)(2)(C) ........................................................................9

12 U.S.C. § 1821(d)(1) .............................................................................9

12 U.S.C. § 1821(d)(2)(I) .........................................................................9

12 U.S.C. § 1821(d)(2)(A)(i) ....................................................................8

12 U.S.C. § 1821(d)(2)(C) ........................................................................9

12 U.S.C. § 1821(d)(2)(E) ........................................................................8

12 U.S.C. § 1821(d)(2)(G) ........................................................................9

12 U.S.C. § 1821(d)(4)(A) ........................................................................9

12 U.S.C. § 1821(d)(9) .............................................................................9

12 U.S.C. § 1821(d)(13)(E) .......................................................................8

12 U.S.C. § 1821(d)(13)(E)(v) ..................................................................8

12 U.S.C. § 1821(d)(14) ...........................................................................9

12 U.S.C. § 1821(e) .................................................................................8

12 U.S.C. § 1821(e)(1) ...............................................................................................9

12 U.S.C. § 1821(e)(1)(A) .......................................................................................12

12 U.S.C. § 1821(e)(1)(B) .......................................................................................12

12 U.S.C. § 1821(e)(3) ...............................................................................................9

12 U.S.C. § 1821(h)(1) ...............................................................................................8

12 U.S.C. § 1821(h)(4)(a) ...........................................................................................8

12 U.S.C. § 1821(j) .....................................................................................................9

12 U.S.C. § 1821(k) ....................................................................................................9

12 U.S.C. § 1821(n) ....................................................................................................8

12 U.S.C. § 1821(s) ....................................................................................................8

12 U.S.C. § 1823(c)(2) ...............................................................................................9

12 U.S.C. § 1823(e) ....................................................................................................9

12 U.S.C. § 1831(m) .................................................................................................34

12 U.S.C. § 1831(n) ..................................................................................................27

28 U.S.C. § 1345 .......................................................................................................11

42 U.S.C. § 2000e-5(f)(3) .........................................................................................11

Civil Rights Act Title VII ...........................................................................................7

Federal Arbitration Act ...................................................................................... *passim*

Federal Deposit Insurance Act, Section 37 ..............................................................27

Federal Deposit Insurance Corporation Improvement Act, Section 112 ..............3, 27

Financial Institutions Reform, Recovery, and Enforcement Act ........................ *passim*

La. Civ. Code Ann. art. 3540 ....................................................................................16

La. Stat. Ann. § 37:91(B)(2) ...........................................................................2, 26, 31

Louisiana Accountancy Act ................................................................................ *passim*

N.Y. Exec. Law § 63(12) ...........................................................................................17

Sarbanes-Oxley Act ................................................................................................2, 25

U.S. Const. art. VI, cl. 2 ...............................................................................................15

Uniform Accountancy Act ............................................................................................28

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ...............................................................2, 26

**Dictionaries**

*Transaction*, Black's Law Dictionary (11th ed. 2019) .................................................28

*Transaction*, Merriam-Webster, https://www.merriam-
     webster.com/dictionary/transaction (last visited Jan. 1, 2024) ...............................28

## INTRODUCTION

Through this professional malpractice lawsuit, Plaintiff Federal Deposit Insurance Corporation as Receiver for First NBC Bank ("FDIC-R") seeks to recover at least $125 million in damages to First NBC Bank ("Bank") caused by Defendant Ernst & Young LLP's ("EY") failure to detect repeated fraudulent conduct by the Bank's President and Chief Executive Officer, Ashton Ryan, in its audits of the consolidated financial statements of the Bank and its holding company, First NBC Holding Company ("Holding Company"). In an attempt to avoid this public federal forum and a resulting jury trial, EY now invokes its engagement letters with the Holding Company (although neither the Bank nor FDIC-R are signatories to those letters) to request that this Court compel FDIC-R into a private arbitration.

This is an extraordinary request. Arbitration "is a matter of consent, not coercion," *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002), such that nonsignatories may be compelled to arbitrate only in "rare circumstances," *Hellenic Inv. Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514, 517 (5th Cir. 2006). EY argues that this case presents one of those "rare circumstances." EY is wrong, for two distinct reasons.

**First**, federal law prohibits EY from compelling FDIC-R to arbitrate. The Administrative Dispute Resolution Act ("ADR Act"), 5 U.S.C. § 575, sets forth specific requirements under which a federal agency can arbitrate a matter, and those requirements are not met here. Moreover, as the Supreme Court made clear in *Waffle House*, the Federal Arbitration Act ("FAA") does not apply to federal agencies that have their own statutory authority to choose their forum in federal court. 534 U.S. at 294. FDIC-R has a statutory right to a federal judicial forum under the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"). EY cannot deprive FDIC-R of that right by invoking the state law doctrine of estoppel because under the Supremacy Clause, state

law equitable doctrines cannot override federal law as set forth in the ADR Act, FIRREA, and *Waffle House*.

**Second**, even if state law applied, and the Court applies the New York choice-of-law provision in the EY engagement letters or Louisiana law as the law of the situs jurisdiction, the result is the same: FDIC-R cannot be compelled to arbitration. Both states (and others) recognize the same principle as *Waffle House* and have concluded that public agencies like FDIC-R cannot be compelled to arbitrate when they have authority to choose their forum. And even if FDIC-R were somehow subject to estoppel, EY's motion would still fail because neither the Bank nor FDIC-R have invoked the engagement letters between EY and the Holding Company, nor have they received a benefit expressly provided by those engagement letters.

EY's alternative motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) should also be denied. EY seeks dismissal on the ground that FDIC-R's complaint fails to allege either a "specified transaction" within the meaning of the Louisiana Accountancy Act or detrimental reliance by the Bank. ECF No. 145-1 ("Mem.") at 3. EY is wrong on both counts. By identifying numerous "specified transactions" in its Complaint and showing how the Bank relied on EY's audits to its detriment, FDIC-R has more than sufficiently pled a claim for professional negligence under the Louisiana Accountancy Act. *See* La. Stat. Ann. § 37:91(B)(2).

## STATEMENT OF FACTS

Prior to its failure, the Bank was wholly owned by the Holding Company, and the Holding Company's only material asset was the Bank. ECF No. 1 ("Compl.") ¶ 26. As such, the financial statements of the Bank and the Holding Company were consolidated. *Id.* ¶ 31. After the Holding Company went public in 2013, it was required under the Sarbanes-Oxley Act to have an annual "integrated audit," which required its auditors to opine on both the financial statements and internal

controls over financial reporting. *Id.* ¶ 28.

The Holding Company engaged EY, a public accounting firm, to conduct the statutorily required audits in 2014 and 2015. *Id.* ¶¶ 10, 27–29. The engagement letters for both audits were signed by the Holding Company and EY and contain a provision that the letters "shall be governed by, and construed in accordance with, the laws of New York." ECF No. 145-3 ¶ 40 (2014 engagement letter) ¶ 40; ECF No. 145-4 ¶ 40 (2015 engagement letter).

EY issued opinions for the 2014 and 2015 audits that the Holding Company's consolidated financial statements—which included all of the Bank's assets and liabilities—were fairly stated in accordance with Generally Accepted Accounting Principles and free from material misstatement whether due to error or fraud. Compl. ¶¶ 32, 33.[1] EY issued these opinions despite the fact that the Bank's CEO and President, Ashton Ryan, had been engaged in fraudulent conduct, causing the Bank to incur at least $125 million in damages. *Id.* ¶ 3.

Even though the Bank was not a party to any agreement with EY and did not engage EY to audit its financial statements or internal controls, EY knew that the Bank would submit its audit opinions to satisfy the Bank's own regulatory audit requirements. *Id.* ¶¶ 34, 35, 122, 123. EY's 2014 and 2015 audit reports stated that the audits "were conducted to meet the reporting requirements of Section 112 of the Federal Deposit Insurance Corporation Improvement Act (FDICIA)," and EY also separately acknowledged in correspondence with Bank personnel that its reports would be submitted by the Bank to satisfy FDIC's audit and audit-reporting requirements. *Id.* ¶¶ 35, 36, 124. EY further knew that the Bank relied on EY to alert it to material weaknesses

---

[1] For the 2014 audit, EY also issued an unqualified opinion that there were effective internal controls over financial reporting and therefore no material weaknesses in internal controls. Compl. ¶ 32. For the 2015 audit, EY identified several material weaknesses in internal controls and issued an adverse opinion on the internal controls over financial reporting. *Id.* ¶ 33.

in internal controls and any concerns over any potential fraud by senior management. *Id.* ¶¶ 38, 128. In addition, EY understood that FDIC would review and rely on EY's audit reports in evaluating the soundness of the Bank's operations. *Id.* ¶ 37.

In April 2017, the Louisiana Office of Financial Institutions closed the Bank and appointed FDIC as receiver. *Id.* ¶ 9. FDIC-R subsequently filed this suit against EY for professional negligence, alleging that EY breached its duty to the Bank to design audit procedures to test for material fraud, which resulted in EY's failure to detect Ryan's repeated fraudulent conduct and to report that conduct to the Bank's Audit Committee. *Id.* ¶¶ 2, 126. FDIC-R also brought suit against EY's insurer, Gloucester Insurance Ltd., under Louisiana's direct-action statute. *Id.* ¶¶ 11, 135–41. The same day FDIC-R filed its lawsuit, it sent a protective notice of arbitration and reservation of rights to EY "to ensure that its claims are timely for purposes of the applicable statute of limitations and not because any of the claims can be decided in an arbitration forum, which they cannot." Ex. 1 (Notice of Arbitration and Reservation of Rights by Petitioner FDIC as Receiver for First NBC Bank) at 2. In that notice, FDIC-R stated that its "accounting malpractice claims against EY properly belong with the federal district court" and further asserted that it "does not waive and instead expressly reserves all of its rights to contest the existence of any agreement to arbitrate claims against EY." *Id.* at 1–2.

In the instant motion, EY moves to compel arbitration of FDIC-R's professional negligence claim based on EY engagement letters with the Holding Company, or, in the alternative, to dismiss the complaint. ECF No. 145.

## LEGAL STANDARDS APPLICABLE TO MOTION TO COMPEL ARBITRATION

Contracts affecting interstate commerce are ordinarily governed by the FAA. *See Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003). The purpose of the FAA is "to make arbitration

agreements as enforceable as other contracts, but not more so." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022) (quotation omitted). Therefore, the FAA "does not require parties to arbitrate when they have not agreed to do so." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.* 489 U.S. 468, 478 (1989). And where the FAA is trumped by another statute governing federal agency litigation and thus does not apply at all, there is no basis for overriding a party's choice of forum and compelling arbitration. *See Waffle House*, 534 U.S. at 294.

## ARGUMENT ON MOTION TO COMPEL ARBITRATION

### A. Federal Law Bars EY From Compelling FDIC-R to Arbitrate.

There is no agreement to arbitrate between the parties to this dispute. The engagement letters that require arbitration are solely between EY and the Holding Company. *See* ECF Nos. 145-3, 145-4. Indeed, the letters do not even mention the Bank. And, of course, they do not mention FDIC-R. EY does not dispute these crucial facts. As a matter of federal law, the absence of FDIC-R consent requires denial of EY's motion twice over.

### 1. Compelled Arbitration Would Violate the Administrative Dispute Resolution Act.

First, Congress has set forth specific and narrow conditions under which a federal agency (broadly defined to include "each authority of the Government of the United States," *see* 5 U.S.C. §§ 551(1), 571(1)), can arbitrate a matter, and the letters between EY and the Holding Company do not meet those conditions. Under the ADR Act, "[a]rbitration may be used as an alternative means of dispute resolution *whenever all parties consent.*" 5 U.S.C. § 575(a)(1) (emphasis added). Here, neither the Bank nor FDIC-R ever "consent[ed]" to arbitration. *Id.* To the contrary, EY seeks to coerce FDIC-R to arbitrate against its will on terms dictated by EY. Moreover, any agreement under which a federal agency proceeds to arbitration "shall specify a maximum award," 5 U.S.C. § 575(a)(2), but the agreements between EY and the Holding Company do not, *see generally* ECF

Nos. 145-3, 145-4. Any arbitration here would therefore contravene federal law governing federal agency arbitration. EY cites no authority for the proposition that state-law principles of estoppel can override this federal statute.

> **2. The FAA Does Not Apply to Federal Agencies with Authority to Choose Their Forum.**

Second, the FAA does not apply and thus, as a matter of federal law, arbitration cannot be compelled here. The U.S. Supreme Court has explained that federal agencies like FDIC-R that have a right to sue, and to choose their forum when they sue, are not subject to the FAA.

In *Waffle House*, the Supreme Court held that, where the Equal Employment Opportunity Commission ("EEOC") sought to vindicate the rights of an individual claimant by bringing an action in federal court on behalf of that claimant, the existence of a mandatory arbitration agreement signed by the claimant did not bar the EEOC from pursuing its case in court. 534 U.S. at 297. In so ruling, the Supreme Court emphasized that the FAA's purpose is "to make arbitration agreements as enforceable as other contracts, *but not more so*." *Id*. at 294 (citation omitted) (emphasis added). The FAA, the Court recognized, "is a matter of consent, not coercion," *id.*, and cannot itself be the basis for forcing a nonsignatory into an arbitration it never agreed to: "No one asserts that the EEOC is a party to the contract or that it agreed to arbitrate its claims . . . Accordingly, the pro arbitration policy goals of the FAA do not require the agency to relinquish its statutory authority *if it has not agreed to do so*." *Id.* (emphasis added); *see also Beiser v. Weyler,* 284 F.3d 665, 667 n.4 (5th Cir. 2002) (stating that in *Waffle House*, "the Supreme Court emphasized that non-parties to an arbitration agreement may not be compelled to arbitrate").

*Waffle House* further observed that the EEOC's "public function" makes it improper to bind the federal agency to an arbitration agreement entered into by two private parties, because "whenever the EEOC chooses from among the many charges filed each year to bring an

enforcement action in a particular case, the agency may be seeking to vindicate a public interest, not simply provide make-whole relief for the employee." 534 U.S. at 294–95. The Court held that binding the EEOC to arbitration "would undermine the detailed enforcement scheme created by Congress simply to give greater effect to an agreement between private parties that does not even contemplate the EEOC's statutory function." *Id*. at 295; *see also Cohen v. Viray*, 622 F.3d 188, 195 (2d Cir. 2010) ("[A]greements of private parties cannot frustrate the power of a federal agency to pursue the public's interests in litigation." (citing *Waffle House*, 534 U.S. at 296)).[2] Thus, the FAA, which generally permits compelled arbitration against private parties, was inapplicable to the EEOC, an agency serving the public interest with specific statutory authority under Title VII of the Civil Rights Act to sue in federal court. *Waffle House*, 534 U.S. at 294.

    *Waffle House*'s holding applies here for several reasons.

### a. FDIC-R is a Federal Agency that, Like the EEOC, Serves an Important Public Function.

    FDIC-R, like EEOC, is not acting in a "merely derivative" capacity when it steps in as receiver for a failed financial institution. *See Waffle House*, 534 U.S. at 297–98. Rather, FDIC-R, again like EEOC, is a federal agency operating pursuant to an extensive statutory scheme designed to further important public goals. *Id*. Specifically, in FIRREA, Congress conferred special

---

[2] *Waffle House* is not an outlier. Indeed, the inapplicability of arbitration clauses to nonsignatory government agencies has been broadly recognized. *See, e.g.*, *Walsh v. Ariz. Logistics, Inc.*, 998 F.3d 393, 395–97 (9th Cir. 2021) (holding that U.S. Secretary of Labor not subject to arbitration provision in employment agreements when he or she brings enforcement actions); *Scalia v. CE Security LLC*, No. 21-CV-00057, 2021 WL 3774198, at *3 (E.D.N.Y. Aug. 25, 2021) (same); *EEOC v. Ralphs Grocery Co.*, 300 F. Supp. 2d 637, 639–40 (N.D. Ill. 2004) (holding that state agency as agent of EEOC not required to arbitrate); *In re Uber Techs. Wage & Hour Cases*, 313 Cal. Rptr. 3d 867, 878 (Cal. Ct. App. 2023) ("[A] government body exercising express statutory authority to seek judicial relief . . . cannot be barred from doing so on the ground the agency is supposedly a mere 'proxy' of an individual employee who entered an arbitration agreement."), *review filed* (Nov. 7, 2023).

responsibilities and powers on FDIC-R that are not shared by private litigants.

As for its responsibilities, FDIC-R—like EEOC—is "the master of its own case" and commands the litigation process from beginning to end. *Id*. at 291. FDIC-R succeeds to the interests not only of the institution, but also of "any stockholder, member, accountholder, depositor, officer, or director of such institution." 12 U.S.C. § 1821(d)(2)(A)(i). FDIC-R is obligated to maximize its recoveries, including the filing of lawsuits to collect for damages to the institution *and* loss to the insurance fund. *See* 12 U.S.C. § 1821(d)(13)(E). FDIC-R also must act with "due regard" for the credit needs of the community and consider the affordability of housing when it liquidates receivership assets, *see* 12 U.S.C. §§ 1821(d)(2)(E), (d)(13)(E)(v); it must consider the impact of its actions on other insured banks and on local businesses, *see* 12 U.S.C. §§ 1821(h)(1), (h)(4)(a); and it acts to preserve the stability of the banking system by creating bridge institutions to carry on failed banks' business, *see* 12 U.S.C. § 1821(n). Purely private businesses are not, by definition, given statutory duties of this type.[3]

In keeping with these broad responsibilities, FDIC-R also possesses a wide range of powers not possessed by banks or non-governmental receivers. *See Citizens Central Bancorp v. United States*, No. 15-1539C, 2017 WL 10544024, *6 (Fed. Cl. Sept. 7, 2017) (noting that FDIC-R "has a number of special powers that are not provided to non-government receivers" and further stating that "[t]he FDIC-R is too inundated in governmental control mechanisms to conclude it is not acting 'on behalf of the United States' or 'on authority of the United States'"). These include: the right to remove most cases to federal court, *see* 12 U.S.C. § 1819(b); the right to repudiate contracts with limited damages remedies, *see* 12 U.S.C. § 1821(e); the right to transfer assets not ordinarily

---

[3] Moreover, unlike private litigants, FDIC-R is prohibited from entering into a confidential settlement agreement in an action seeking damages. *See* 12 U.S.C. § 1821(s).

transferable under state law, *see* 12 U.S.C. § 1823(c)(2); and the right to transfer assets without consent even if statutory or contractual provisions says otherwise, *see* 12 U.S.C. § 1821(d)(2)(G).

FDIC-R is free from court orders that would "restrain or affect" the exercise of its functions, 12 U.S.C. § 1821(j), and agreements not reflected in the bank's books and records are unenforceable against FDIC-R, *see* 12 U.S.C. §§ 1821(d)(9), 1823(e). Moreover, FDIC-R investigates claims against various parties by issuing administrative subpoenas, *see* 12 U.S.C. § 1821(d)(2)(I), and issues regulations regarding the administration of receiverships, 12 U.S.C. §§ 1821(d)(1), (d)(2)(C), (d)(4)(A); 12 C.F.R. § 360.1 *et seq.*

FDIC-R is also immune from "the direction or supervision of any other agency or department of the United States or any State," 12 U.S.C. § 1821(c)(2)(C), and, unlike a private litigant, FDIC-R is given protection from a number of state and common law constraints, *see* 12 U.S.C. § 1821(d)(14) (extending statute of limitations beyond period that might exist under state law); 12 U.S.C. §§ 1821(e)(1), (3) (precluding state-law claims against FDIC-R under certain contracts it is authorized to repudiate); 12 U.S.C. § 1821(k) (permitting claims against directors and officers for gross negligence, regardless of whether state law would require greater culpability).

In all these ways (and more), FDIC-R is equipped with congressionally conferred federal powers to carry out its statutory mandate. Courts have broadly recognized that FDIC-R's statutory responsibilities to depositors, shareholders, and other interested parties make it different from an ordinary receiver and mean that FDIC-R does not simply provide "make whole" relief for individual financial institutions. *See, e.g.*, *United States v. Sweeney*, 226 F.3d 43, 45–46 (1st Cir. 2000) (explaining how, "in acting as receiver of failed banks, the FDIC fosters important public policies relating to the avoidance of a national banking crisis" (collecting cases)); *Colonial*

*Bancgroup Inc. v. PriceWaterhouseCoopers LLP*, No. 2:11-CV-746-BJR, 2016 WL 9687002, at *1 n.1 (M.D. Ala. Aug. 1, 2016) (noting that "[a]s the governmental entity charged with the duty of recovering funds, . . . FDIC-R's counsel represent the public interests of the taxpayers and the private interests of the failed bank"); *Niemuller v. Nat'l Union Fire Ins. Co*., No. 92 Civ. 0070 (SS), 1993 WL 546678, *4 (S.D.N.Y. Dec. 30, 1993) (Sotomayor, J.) (noting that FDIC-R has "greater standing than ordinary successors-in-interest because [it], empowered by statute, represent[s] the bank as well as the creditors, depositors and shareholders of the bank").[4] Accordingly, just as the EEOC in *Waffle House*, when FDIC-R brings an action pursuant to its statutory powers under FIRREA, it seeks to vindicate a public interest. *See* 534 U.S. at 296.

### b. As in *Waffle House*, Forcing FDIC-R to Arbitrate Would Undermine Congressional Purposes.

Compelling arbitration of this case would directly undermine FDIC-R's ability to effectuate the goals underlying FIRREA.[5] Under FIRREA, FDIC-R has a statutory right to a federal judicial forum. *See* 12 U.S.C. § 1819(b). As the Fifth Circuit has observed, FIRREA was designed to "giv[e] the FDIC broad power to gain access to federal courts in actions to which it is a party," including unique jurisdictional and removal provisions. *In re Meyerland Co*., 960 F.2d

---

[4] *See also, e.g.*, *FDIC v. Wentz*, 55 F.3d 905, 909 (3d Cir. 1995) (stating that there is "a significant public interest in promptly resolving the affairs of insolvent banks on behalf of their creditors and depositors"); *FDIC v. Wright*, 942 F.2d 1089, 1096 (7th Cir. 1991) (holding that an action involving FDIC as receiver is not "simply a private case between individuals [but one that] involves a federal agency appointed as a receiver of a failed bank in the midst of a national banking crisis" and noting that "the circumstances leading to the enactment of FIRREA involved matters of great national concern") (footnote omitted).

[5] For an overview of FIRREA's origins and purpose, *see generally Zucker v. Rodriguez*, 919 F.3d 649, 654–56 (1st Cir. 2019); *see also id*. at 661 (noting that "[t]he long history of extensive federal involvement in the savings and loan industry reveals that the protection of depositors and the stability of thrift institutions are paramount among congressional concerns. A strong and solvent deposit insurance fund and an FDIC well-equipped to recover funds to address the needs of failed banks are essential to achieving those goals.").

512, 513 (5th Cir. 1992).

The Fifth Circuit has repeatedly recognized that, in section 1819(b), "Congress used very strong language to afford the FDIC every possibility of having a federal forum within the limits of Article III." *Id*. at 519 (internal quotation marks and citation omitted); *see also Adair v. Lease Partners, Inc.*, 587 F.3d 238, 242 (5th Cir. 2009) (same); *F.D.I.C. v. Loyd*, 955 F.2d 316, 328 (5th Cir. 1992) (noting FDIC's "right to a federal forum"). Specifically, Congress has deemed FDIC, in all of its capacities, an agency of the United States for purposes of 28 U.S.C. § 1345, which confers on federal courts original jurisdiction over any action commenced by the United States or federal agencies without regard to whether the matter independently presents federal questions. *See also* 12 U.S.C. § 1819(b)(1). FDIC-R brought this action in federal court, consistent with congressional intent.

Congress did not stop there; it conferred on FDIC-R a "unique and powerful right to remove to federal court virtually any case to which it is or becomes a party." *Dalton v. F.D.I.C.*, 987 F.2d 1216, 1220 (5th Cir. 1992). That removal power is so strong that it allows FDIC-R the right to remove cases on appeal, *see Meyerland*, 960 F.2d at 516–17, and to remove in cases where it is a plaintiff, *see F.D.I.C. v. S&I 85-1, Ltd.*, 22 F.3d 1070, 1073 (11th Cir. 1994). Notably, the EEOC-suit jurisdictional provision cited in *Waffle House* does not go nearly as far as FIRREA in ensuring the right to a federal forum, *compare* 42 U.S.C. § 2000e-5(f)(3), *with* 12 U.S.C. § 1819(b); thus, if the EEOC has the right to proceed in federal court notwithstanding an arbitration clause, FDIC-R does as well. *See also Waffle House*, 534 U.S. at 286 (reasoning that the statutes "specify the judicial districts in which [the EEOC's] actions may be brought" but "do not mention arbitration proceedings").

Compelling arbitration would therefore be fundamentally inconsistent with Congress's

11

clear intent to afford FDIC-R the right to litigate in federal court. As the Fifth Circuit explained in *Meyerland*, "[a]ccess to federal courts in all actions to which it is a party allows the FDIC to develop and rely on a national and uniform body of law, consistent with eliminating the problems identified by Congress in having less rigorous state standards coexisting with federal ones." 960 F.2d at 515. Not only would compelling arbitration deprive FDIC-R of its right to a federal forum, but FDIC-R's appellate rights would also be severely limited in arbitration, unlike in court. *See Nat'l Credit Union Admin. Bd. v. Goldman, Sachs & Co.*, 775 F.3d 145, 152 (2d Cir. 2014) (noting that "arbitration awards are reviewed on an extremely deferential standard and are generally upheld so long as the award draws its essence from the agreement and does not manifestly disregard the governing law or exhibit bias or corruption"). This cannot be squared with FIRREA's broad grant of authority to FDIC to bring its claims, unfettered, in a federal forum.

Supporting this conclusion is the fact that FIRREA also grants FDIC the right to "disaffirm or repudiate any contract . . . to which such institution is a party" that the receiver "determines to be burdensome." 12 U.S.C. §§ 1821(e)(1)(A), (e)(1)(B). Under these provisions, FDIC-R has discretion to determine whether resolution of claims in court would be more efficient and less burdensome than arbitration. *See Nat'l Credit Union Admin. Bd.*, 775 F.3d at 152. Thus, if the Bank had been a signatory to the engagement letters, FDIC-R could have simply repudiated them. *Id*. It would indeed be an incongruous result if FDIC-R were forced to arbitrate under a contract that it never signed and under which it is not suing when, as a party, it could have repudiated that same contract. That does not accord with FDIC-R's broad repudiation powers or, more generally, the sweeping powers conferred in FIRREA.

*O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79 (1994), is not to the contrary. There, the Supreme Court declined to create on behalf of FDIC new federal common-law rules of decision,

holding that under FIRREA, the receiver is generally subject to the same defenses that would be available against the failed bank. *See id.* at 86. *O'Melveny* then qualified its holding by stating that FDIC stands "in the shoes of the insolvent S & L . . . *except where some provision in the extensive framework of FIRREA provides otherwise.*" *Id.* at 87 (emphasis added); *see also id.* at 85 (acknowledging that, "[i]n answering the central question of displacement of California law, we of course would not contradict an explicit federal statutory provision").[6]

This case falls outside the scope of *O'Melveny* because, as explained above, the "extensive framework of FIRREA" *does* "provide otherwise," including by granting FDIC-R a broad right to litigate in federal court, along with various other powers not available to private litigants that would be rendered null and void in arbitration. As the Fifth Circuit has explained, the "procedural advantages bestowed by Congress [via FIRREA's broad removal authority] tremendously increase the FDIC's ability to carry out its regulatory and enforcement responsibilities under FIRREA and with the underlying goal of promoting uniform federal, as opposed to state, regulation and supervision of thrift institutions." *Meyerland*, 960 F.2d at 520.

This is in sharp contrast to *O'Melveny*, where the Supreme Court emphasized that FDIC had "identified no significant conflict with an identifiable federal policy or interest," not even "the interest in uniformity." 512 U.S. at 88 (emphasis omitted). This was so, the Supreme Court explained, because "[t]he rules of decision at issue here do not govern the primary conduct of the

---

[6] The Supreme Court recently recognized the limited holding of *O'Melveny* in *Collins v. Yellen*, 141 S. Ct. 1761, 1786 n.20 (2021). In *Collins*, the Supreme Court rejected the argument that when a federal agency "steps into the shoes of a regulated entity as its conservator or receiver, it takes on the status of a private party and thus does not wield executive power." *Id.* at 1785–86. It held that a federal agency acting as a conservator or receiver is not a private party even if it steps into the rights and obligations of a failed regulated entity, because the agency's "authority stems from a special [federal] statute, not the laws that generally govern conservators and receivers." *Id.*

United States or any of its agents or contractors, but affect only the FDIC's rights and liabilities, as receiver, with respect to primary conduct on the part of private actors that has already occurred." *Id*. But the issue before this Court is not about the rules of decision, and when it comes to *where* FDIC-R litigates, there *is* a strong federal interest in uniformity, as *Meyerland* explains. *See* 960 F.2d at 520.[7] As a result, any argument that *Waffle House* has no application to this case on the ground that FDIC-R, unlike EEOC, has no federal interests that would be undermined in arbitration must be rejected. *See F.D.I.C. v. RBS Sec. Inc.*, 798 F.3d 244, 264 n.13 (5th Cir. 2015) (rejecting argument that *O'Melveny* precludes application of a provision of FIRREA that extends the statute of limitations).[8]

Thus, just as the EEOC in *Waffle House* was "not merely a proxy" and "does not stand in the employee's shoes," 534 U.S. at 288, 297 (citations omitted), FDIC-R does not simply stand in the shoes of the failed bank. Like the EEOC, it has powers and responsibilities that the failed bank never had, including "exclusive authority over the choice of forum." *Id.* at 297. The arbitration

---

[7] *Waffle House* is on point here as well, because the Court there distinguished the special forum rules from the rules of decision, noting that the EEOC may be subject to defenses like failure to mitigate based on the employee's conduct, but that does not mean the EEOC must arbitrate the matter. 534 U.S. at 297–98. Likewise, that FDIC-R may sometimes be subject to defenses based on a failed bank's conduct does not mean it is bound by the bank's choice of forum, let alone the holding company's choice of forum.

[8] Notably, on remand from the Supreme Court's decision in *O'Melveny*, the Ninth Circuit held that even though, as a general matter, "any defense good against the original party is good against the receiver," this "rule is subject to exceptions; defenses based on a party's unclean hands or inequitable conduct *do not* generally apply against that party's receiver." *F.D.I.C. v. O'Melveny & Myers*, 61 F.3d 17, 19 (9th Cir. 1995) (citations omitted) (emphasis added). This is because "[a] receiver, like a bankruptcy trustee and unlike a normal successor in interest, does not voluntarily step into the shoes of the bank; it is thrust into those shoes." *Id*. "Also significant," in the Ninth Circuit's view, "is the fact that the receiver becomes the bank's successor as part of an intricate regulatory scheme designed to protect the interests of third parties who also were not privy to the bank's inequitable conduct. That scheme would be frustrated by imputing the bank's inequitable conduct to the receiver, thereby diminishing the value of the asset pool held by the receiver and limiting the receiver's discretion in disposing of the assets." *Id*. (citations omitted).

provision is just as inapplicable here as it was in *Waffle House*; and just as the FAA did not override

Title VII's provisions authorizing EEOC suits in federal court, it does not override FIRREA.

### B. Equitable Estoppel Cannot Override Federal Law.

EY mentions neither the ADR Act nor *Waffle House*. Instead, it seeks to force FDIC-R to

arbitrate based on the state-law equitable doctrine of "direct-benefits estoppel." *See* Mem. at 1.

That attempt is unavailing, however, because equitable estoppel principles are virtually never

available against the government. *See, e.g.*, *United States v. Bloom*, 112 F.3d 200, 205 (5th Cir.

1997) (noting that "[c]ourts have applied estoppel to the federal government in only the narrowest

of circumstances" that involve "affirmative misconduct" by the government). That includes FDIC.

*See, e.g.*, *F.D.I.C. v. Royal Park No. 14, Ltd.*, 2 F.3d 637, 641 (5th Cir. 1993) (stating that a "private

individual asserting estoppel against the government has a very heavy burden to bear" (quoting

*Jones v. Dep't of Health & Human Servs.*, 843 F.2d 851, 853 (5th Cir. 1988))); *see also F.D.I.C.*

*v. Hulsey*, 22 F.3d 1472, 1489 (10th Cir. 1994) (noting that "[c]ourts generally disfavor the

application of the estoppel doctrine against the government and invoke it only when it does not

frustrate the purpose of the statutes expressing the will of Congress or unduly undermine the

enforcement of the public law").[9] EY identifies no affirmative misconduct justifying estoppel here.

Moreover, under the Supremacy Clause, *see* U.S. Const. art. VI, cl. 2, federal law displaces

state-law equitable remedies, *see, e.g.*, *E.I. DuPont de Nemours v. Sawyer*, 517 F.3d 785, 797 (5th

---

[9] Courts have also specifically held that equitable defenses are not available against the FDIC as
receiver. *See, e.g.*, *O'Melveny*, 61 F.3d at 19 (concluding, on remand, that under California law,
defenses based on a party's unclean hands would not apply against FDIC-R); *Colonial BancGroup*
*Inc. v. PricewaterhouseCoopers LLP*, No. 2:11-CV-746-BJR, 2017 WL 4175029, at *6 (M.D. Ala.
Aug. 18, 2017) (concluding that "imputation-based equity defenses" may not be asserted against
FDIC as receiver); *FDIC v. Van Dellen*, No. CV 10-4915 DSF SHX, 2012 WL 4815159, at *9
(C.D. Cal. Oct. 5, 2012) (noting that "equitable defenses good against the Bank [cannot] be raised
against the FDIC as receiver").

Cir. 2008), and indeed courts have so construed FIRREA, *see, e.g.*, *Irving Indep. School Dist. v. Packard Props.*, 970 F.2d 58, 61 (5th Cir. 1992); *FDIC v. Shain, Schaffer & Rafanello*, 944 F.2d 129, 133–34 (3d Cir. 1991); *see also Arizona v. United States*, 567 U.S. 387, 399 (2012) (preempting state law when it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress") (citations omitted); *Transitional Learning Cmty. at Galveston, Inc. v. U.S. Office of Pers. Mgmt.*, 220 F.3d 427, 431 (5th Cir. 2000) ("Because the Plan is administered by a federal agency, the federal common law pertaining to the construction of contracts is applicable."). The ADR Act's specific conditions on federal agency arbitration, *see* 5 U.S.C. § 575, and FIRREA's broad authorization of FDIC-R suits in federal court, *see* 12 U.S.C. § 1819(b)(1), override the equitable principles invoked by EY and make it unnecessary even to consider state law.

### C.  Equitable Estoppel is Inapplicable Under State Law as Well.

Even if federal law permitted federal agencies generally or the FDIC, in particular, to be compelled to arbitrate against their will—and it does not, as shown above—it would not matter. Even under state law, only in exceedingly "rare circumstances" can a nonsignatory be bound by an arbitration agreement to which it never consented. *Hellenic*, 464 F.3d at 517. These circumstances are not met here under either New York or Louisiana law.

### 1.  Under State Law, Public Agencies' Authority to Sue Trumps Estoppel.

EY claims that FDIC-R is bound by engagement letters that state they "shall be governed by, and construed in accordance with, the laws of New York."[10] Mot. Ex. 1 ¶ 40 (2014 engagement

---

[10] It is appropriate to apply the law chosen by the contract (New York's) in construing the operation of a contractual provision, namely the arbitration clause. *See Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630–31 (2009)  (reasoning state law governs dispute between private parties over arbitration clause, "including the question of who is bound by them"); *Crawford Pro. Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 257 (5th Cir. 2014) (same); *see also* La. Civ. Code Ann.

letter) ¶ 40; Mot. Ex. 2 ¶ 40 (2015 engagement letter). New York courts apply *Waffle House* in denying motions to compel government agencies to arbitrate. In *People ex rel. Cuomo v. Coventry First LLC*, the New York Court of Appeals held that the Attorney General, when suing on behalf of life insurance policyowners, is not bound by an arbitration clause in the policies, as a government agency need not "give up its statutory enforcement authority in favor of arbitration if it has not consented to do so." 915 N.E.2d 616, 619 (N.Y. 2009). Just as the EEOC in *Waffle House* was authorized to bring suit in court on behalf of injured employees, the Attorney General was entitled to bring suit in "the supreme court of the state of New York," N.Y. Exec. Law § 63(12), for restitution of fraudulently or illegally obtained funds, and an "arrangement between private parties cannot alter the Attorney General's statutory role or the remedies that he is empowered to seek," *Cuomo*, 915 N.E.2d at 619. Federal New York courts have reached similar conclusions. *See, e.g.*, *Charter Commc'ns, Inc. v. Jewett*, 573 F. Supp. 3d 742, 757 (S.D.N.Y. 2021) (holding that an arbitration agreement between private parties does not "bar the [New York State Division of Human Rights], which is not a party to the Agreement, from acting in accordance with its

---

art. 3540 (mandating that contractual choice of law applies absent public policy conflict); *e.g.*, *Story v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 427 F. Supp. 3d 822, 828 (E.D. La. 2019) ("Louisiana generally accepts parties' contractual choice of law."); *Todd v. Steamship Mut. Underwriting Ass'n, Ltd.*, No. CIV.A. 08-1195, 2011 WL 1226464, at *5 (E.D. La. Mar. 28, 2011) ("Louisiana courts have held that the validity of an arbitration agreement is determined by the law selected in the agreement itself."). However, FDIC-R does not concede that New York law applies to the substance of its tort claims. Contract nonsignatories are not generally bound by contractual choice-of-law clauses. *See, e.g.*, *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1169 (11th Cir. 2009); *Quicksilver Res., Inc. v. Eagle Drilling, LLC*, 792 F. Supp. 2d 948, 954 n.5 (S.D. Tex. 2011); *Anglo Am. Ins. Grp., P.L.C. v. CalFed Inc.*, 940 F. Supp. 554, 558 (S.D.N.Y. 1996). That is all the more true for nonparties like FDIC-R that sue in tort and do not seek to enforce the contract. *See, e.g.*, *McAllister v. McDermott Inc.*, No. 18-cv-361, 2020 WL 4745743, at *8 (M.D. La. Aug. 14, 2020) ("[W]hile it makes sense to allow the parties to a contract to control which law applies to their agreement, it does not follow that the contract provisions should control an inquiry that, by its nature, looks beyond the contract."); *see also Caton v. Leach Corp.*, 896 F.2d 939, 943 (5th Cir. 1990) ("[C]laims for relief [that] involve the tort duty of good faith and fair dealing and a claim for restitution under quantum meruit . . . as such, do not arise out of the contract.").

statutory authority to prosecute the complaint Jewett filed through to a final determination by the Commissioner"); *Charter Commc'ns, Inc. v. Derfert*, 510 F. Supp. 3d 8, 17 (S.D.N.Y. 2021) ("[T]he FAA does not supersede an agency's authority to act as a prosecutor to pursue enforcement in its own name or review a discrimination charge.").

Similarly, the Louisiana Supreme Court has held that equitable remedies (like estoppel) are available against a receiver only in the "absence of legislation and custom." *Donelon v. Shilling*, 340 So.3d 786, 793 (La. 2020). *Donelon* specifically held that the Louisiana Commissioner of Insurance acting as a receiver could not be compelled to arbitrate professional liability claims against an actuarial consultant under a theory of "direct-benefits estoppel" because the Commissioner had a statutory right to sue in court. *Id.* The Louisiana Supreme Court explained that "to the extent the [arbitration] agreement seeks to alter a statutory right granted to the Commissioner, the parties' intent is not determinative. Where the legislature, through positive law, empowers the Commissioner to bring an action in court, private parties cannot contract to deprive him of that right." *Id.*[11]

*Cuomo* and *Donelon* are squarely applicable here. As explained above, just as the New York Attorney General was "authorized by statute to bring an enforcement action" in New York's courts to remedy fraudulent business practices, *Cuomo*, 915 N.E.2d at 619, and just as the

---

[11] Other state courts have reached similar conclusions. *See, e.g.*, *Taylor v. Ernst & Young, LLP*, 958 N.E.2d 1203, 1211–12 (Ohio 2011) (following *Waffle House* and denying a motion to compel arbitration as to a nonsignatory insurance liquidator that "does not stand in the shoes as a mere successor in interest of the insolvent insurer" and that "has the exclusive choice of forum;" liquidator acts for "the benefit of insureds, policyholders and creditors" and hence carries out "public protection" functions); *People v. Maplebear Inc.*, 297 Cal. Rptr. 3d 652, 660 (Cal. Ct. App. 2022) (holding city attorneys seeking penalties for labor code violations not bound by employees' arbitration agreements); *Commonwealth ex rel. Herring v. Net Credit Fin. Sols. of Utah, LLC*, 102 Va. Cir. 114 (Va. Cir. Ct. 2019) (denying motion to compel arbitration: "The Commonwealth is not merely a proxy for individuals' claims, and it maintains control over its own cases.").

Louisiana Insurance Commissioner had a statutory "right to choose the forum for his action," *Donelon*, 340 So.3d at 792, FDIC-R has a "unique and powerful right to remove to federal court virtually any case to which it is or becomes a party," *Dalton v. F.D.I.C.*, 987 F.2d 1216, 1220 (5th Cir. 1992); *see also Meyerland*, 960 F.2d at 519–20; *Taylor*, 958 N.E.2d at 1209 ("[F]orum selection belongs to the liquidator and the liquidator alone.").

If FDIC-R has sweeping power to override another party's choice of forum—including the choice of its predecessor, the Bank, as plaintiff—by virtue of its removal authority, it necessarily has an equally broad power to choose where it litigates in the first place. Thus, just as the New York Attorney General and the Louisiana Insurance Commissioner could not be compelled to arbitrate in view of statutes giving them discretion to choose state courts as the forum for certain disputes, FDIC-R cannot be forced to arbitrate this matter. As Louisiana law does for the Louisiana Insurance Commissioner, Section 1819(b)(1) "permits the [FDIC] to choose where and how to litigate an action," *see Donelon*, 340 So.3d at 790, and in this case FDIC-R has chosen a federal court.[12] Thus, under both New York and Louisiana law, FDIC-R could not be compelled to arbitrate against its will.

Indeed, just as in *Waffle House*, *Cuomo*'s, and *Donelon*'s facts—where policyholders and a failed insurer actually *signed* the arbitration contract—presented a stronger case for compelling arbitration than the present matter. Here, in contrast, the Bank was not even a signatory to the

---

[12] Moreover, it is irrelevant whether the Bank could have been prevented by direct-benefits estoppel from contesting the arbitration provision. As set forth above, FDIC-R is no mere successor to the Bank; it has powers and responsibilities that the Bank never held, and any application of equitable principles is subject to those powers. Consistent with *Waffle House*, and as the *Donelon* Court recognized, direct-benefits estoppel and similar equitable remedies cannot override an "express grant of authority . . . in favor of" an agency's right to choose its forum. *Donelon*, 340 So.3d at 793. The Bank itself could not override that statutory right, and Holding Company could not either. *Id*. at 792.

engagement letters between EY and the Holding Company. If estoppel could not be applied to the successor of a signatory in *Cuomo* and *Donelon*, then surely it cannot be applied to the successor of a nonsignatory like FDIC-R. *See Waffle House*, 534 U.S. at 294 ("It goes without saying that a contract cannot bind a nonparty.").

FIRREA grants FDIC-R the right to litigate in federal court. Under state law, just as under federal law, a public agency with authority to bring suit in court cannot be compelled under equitable theories to arbitrate.

### 2. EY's "Direct Benefits" Theory Would Fail Even if FDIC-R Were Subject to Estoppel.

Even if this Court could consider it, EY's estoppel argument would also fail on the merits. Again, to whatever extent *Waffle House* does not settle the question outright based on the presence of a federal agency, New York law is the law chosen by EY in its engagement letters with the Holding Company. *See* Mot. Ex. 1 ¶ 40 (2014 engagement letter); Mot. Ex. 2 ¶ 40 (2015 engagement letter).

Under New York law, "[t]he guiding principle is whether the benefit gained by the nonsignatory is one that can be traced directly to the agreement containing the arbitration clause." *Belzberg v. Verus Invs. Holdings Inc.*, 999 N.E.2d 1130, 1136 (N.Y. 2013). "The mere existence of an agreement with attendant circumstances that prove advantageous to the nonsignatory would not constitute the type of direct benefits justifying compelling arbitration by a nonparty to the underlying contract," nor can direct-benefits estoppel be shown "absent the nonsignatory's reliance on the agreement itself for the derived benefit." *Id.* Rather, "[t]he nonsignatory beneficiary must actually invoke the contract to obtain its benefit, or the contract must *expressly* provide the beneficiary with a benefit." *Trina Solar US, Inc. v. Jasmin Solar Pty Ltd*, 954 F.3d 567, 572 (2d Cir. 2020) (emphasis added). Neither of those has occurred here. The result is the same under

Louisiana law. *Howard Trucking Co., Inc. v. Stassi*, 485 So.2d 915, 918 (La. 1986) (citation omitted) (describing estoppel as a "doctrine of last resort" because, "[i]n Louisiana, no statutory material and no body of jurisprudence justifies its use").

### a.  FDIC-R Has Not Invoked the Engagement Letters.

First, FDIC-R has not "invoke[d]" or seek to enforce any obligation under the engagement letters. *Trina Solar*, 954 F.2d at 572. Rather, the complaint solely alleges that EY conducted its audits in violation of professional accounting standards. *See* Compl. ¶¶ 120–34 (alleging Professional Negligence). Because FDIC-R is not suing for breach of any contractual obligation imposed by the engagement letters, it cannot be compelled to arbitrate. *See Mobile Real Est., LLC v. NewPoint Media Grp., LLC*, 460 F. Supp. 3d 457, 479 (S.D.N.Y. 2020) (nonparty invokes an agreement by "bringing suit under that agreement" (collecting cases)); *see also Jones v. Singing River Health Servs. Found.*, 674 F. App'x 382, 386–87 (5th Cir. 2017) (rejecting KPMG's contention that claims for aiding and abetting and conspiracy "must be determined by reference" to its engagement letters where the letters were not cited or relied upon as the source of its legal obligations to the plaintiff).

*Colonial BancGroup Inc. v. PricewaterhouseCoopers LLP*, No. 2:11-CV-746-BJR, 2018 WL 6430827, at *1 (M.D. Ala. Mar. 27, 2018), directly supports this conclusion. That case arose "out of a massive bank fraud centered in Colonial Bank ('Colonial') that lasted many years and caused billions of dollars in damages before it was finally discovered." *Id.* Colonial was the wholly owned subsidiary of Colonial BancGroup, Inc. ("CBG"). *Id.* CBG had retained an accounting firm, Crowe Horwath LLP ("Crowe"), to act as its internal auditor. *Id.* Like EY here, Crowe argued the FDIC as receiver was bound by the engagement letter between Crowe and CBG. *Id.* The district court rejected this argument, stating: "Crowe's argument would have merit if the FDIC was suing

Crowe for breach of contract, but it is not. The FDIC's claims are based in tort. Indeed, it is precisely because the FDIC is not a party to the contract, neither as a signatory nor as a third-party beneficiary, that the FDIC must bring tort claims against Crowe." *Id*.

The same is true here: just as in *Colonial Bank*, FDIC-R is only suing in tort. FDIC-R cannot be bound by the engagement letters' arbitration provisions because FDIC-R is not suing for breach of contract.

The cases cited by EY on this point, even assuming *arguendo* that they are consistent with New York law, are not to the contrary. In *Hellenic*, for example, a ship owner was deemed to be bound, via direct-benefits estoppel, by a forum selection provision in an agreement between the prior ship owner and a classification society, Det Norske Veritas ("DNV"), that had certified the ship as seaworthy. 464 F.3d at 517. In so ruling, the Fifth Circuit emphasized that all of the plaintiff's claims were premised upon DNV's failure to follow its own Rules—the same Rules that contained the forum selection clause. 464 F.3d at 519–20. Here, in contrast, FDIC-R's claims are premised on EY's violation of professional accounting standards, which bind all accountants, not just EY. *See* Compl. ¶¶ 120–34. This fact alone renders *Hellenic* inapposite here. *See Global Oil Tools v. Barnhill*, Civ. No. 12–1507, 2012 WL 4928912, at *6 (E.D. La. Oct. 16, 2012) (refusing to compel nonsignatory to arbitrate and distinguishing *Hellenic* on ground that "the [*Hellenic*] plaintiff's claims were premised on the Rules that contained the forum selection clause" and "without DNV's Rules, the plaintiff had no claim against DNV"); *Bilyeu v. Johanson Berenson LLP*, 809 F. Supp. 2d 547, 554 (W.D. La. 2011) (refusing to compel nonsignatory to arbitrate claims and distinguishing *Hellenic* on various grounds, including that "the misrepresentations that formed the basis of the purchaser's complaint were all contained in certifications issued under the

contract containing the arbitration clause").[13]

Similarly distinguishable is *Blaustein v. Huete*, 449 F. App'x 347, 350 (5th Cir. 2011), which held that a nonsignatory could be compelled to arbitrate because the dispute could not be resolved without reference to the services provided under the fee agreement's arbitration clause. Here, in contrast, FDIC-R's claims do not reference or rely on deficient services provided to Holding Company as a basis for liability and thus can be resolved without reference to any specific provision of the engagement letters.

*Traders' Mart, Inc. v. AOS, Inc*., 268 So. 3d 420 (La. Ct. App. 2019), is distinguishable for similar reasons. There, a commodities and securities brokerage firm sued its clearing firm for unfair and deceptive trade practices after the clearing firm terminated a contract (containing an arbitration clause) with the president of the plaintiff brokerage firm. *Id.* at 423–25. Because the plaintiff claimed that the termination of the contract was "part and parcel of the scheme through which the defendants have undertaken to steal the business of [the plaintiff]," the court held that arbitration was required. *Id.* at 429.

In this way, the *Traders' Mart* plaintiff was relying on the contract to establish its claim for unfair practices, thus putting at issue whether the contract had been properly terminated. Here, in contrast, FDIC-R is not relying on the EY engagement letters to establish a standard of performance or as predicate to its claims. The most that EY can say is that "but for" the engagement letters, it would not have performed any services related to the Bank. No authority supports estoppel based on such a weak relationship—and even if it did, the court in *Traders' Mart* did not purport to apply New York law.

---

[13] *Vloeibare Pret Ltd. v. Lloyd's Register North America, Inc*., 606 F. App'x 782 (5th Cir. 2015), also cited by EY, involves essentially the same facts as *Hellenic* and is distinguishable for all the same reasons.

**b.  The Engagement Letters Did Not Expressly Benefit the Bank.**

Nor can EY satisfy the second prong of the direct-benefits estoppel test, because the engagement letters did not "expressly provide [the Bank]" with a benefit." *Trina Solar*, 954 F.3d at 572. That some benefit flowed to the Bank from the contractual relationship between EY and the Holding Company is not enough:

> Here, Jasmin surely benefited from the contractual relationship between Trina and JRC, as it ultimately received solar panels sold by Trina to JRC. But there is no record evidence that Jasmin ever invoked the Contract to demand delivery of the solar panels, and the Contract itself does not provide Jasmin any direct benefit. Nor did Jasmin, on this record, ever invoke Trina's duties under the Contract to seek or obtain a benefit.

*Id*. at 572–73. Here, likewise, the ultimate use of the audit reports by the Bank does not show that the Bank derived a "direct benefit" from the agreements: the agreements do not "expressly" contemplate such use, and the Bank at no time demanded performance from EY under the agreements. Rather, by virtue of the affiliation between the Bank and the Holding Company, the services EY rendered to the Holding Company benefited the Bank—but that is not enough. *See Belzberg*, 999 N.E.2d at 1136 (holding a nonsignatory could not be compelled to arbitrate where the benefit to the nonsignatory was not directly traceable to the contract containing the arbitration provision); *see also Nat'l Union Fire Ins. Co. v. Beelman Truck Co.*, 203 F. Supp. 3d 312, 323 (S.D.N.Y. 2016) (holding a benefit to nonsignatory arose because of separate agreement with one signatory, not from the agreement containing the clause). The value of the audit reports arose because the Bank was the Holding Company's sole asset, hence EY's appraisal of the Holding Company's financials was sufficient to satisfy the Bank's audit obligations. The Bank's status as the Holding Company's subsidiary, not any obligation under the agreements, gave rise to the benefits EY cites, and accordingly those are indirect rather than direct benefits under New York law. *See LaRoss Partners, LLC v. Contract 911, Inc.*, 874 F. Supp. 2d 147, 156 (E.D.N.Y. 2012)

24

(benefits that are merely "incidental" to an agreement do not estop a nonsignatory).

Another court applying New York law has explained this point. In *MAG Portfolio Consult, GMBH v. Merlin Biomed Group LLC*, the court held that benefits "flowing directly from the agreement" may estop a nonsignatory, but "where the nonsignatory exploits the contractual relation of parties to an agreement, but does not exploit (and thereby assume) the agreement itself," no estoppel arises. 268 F.3d 58, 61 (2d Cir. 2001).

Here, any benefits the Bank received by virtue of the engagement letters derive solely from "the contractual relation" between EY and the Holding Company, rather than from the engagement letters themselves. The Bank would have received those benefits under virtually any form of engagement letter between its Holding Company and an auditor. Moreover, although EY knew that the Bank intended to rely on its audits to satisfy its regulatory obligations, *see* Compl. ¶¶ 34–38, there is nothing in the engagement letters that specifically requires EY to confer these benefits on the Bank. *See Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42, 68 (2d Cir. 2021) (holding agreement that "gave the Republic no rights to purchase or receive gas" and whose consummation was not necessary for the nonsignatory to carry out its own obligations did not give rise to direct-benefits estoppel).

EY's main case, *Hellenic*, is distinguishable, even assuming it is consistent with New York law. In *Hellenic*, the whole point of the classification was to permit the boat to be sold. *See* 464 F.3d at 516. But here, in contrast, the purpose of the engagement letters was to provide the Holding Company, a public registered company with the Securities and Exchange Commission, with an audit that would satisfy its obligations under the Sarbanes-Oxley Act. *See* Compl. ¶¶ 26–29. The only reason the Holding Company's financial statements were consolidated with the Bank's financial statements was "because the Bank was the Holding Company's only material asset and

virtually all operations occurred at the Bank level." *Id*. ¶ 31. Thus, the benefits the Bank received from the Holding Company's audit were an *indirect* result of this arrangement—not its primary purpose (or benefit). That fact makes this case very different from *Hellenic* and all the other cases cited by EY, rendering direct-benefits estoppel inapplicable to FDIC-R.

## <u>LEGAL STANDARDS APPLICABLE TO MOTION TO DISMISS</u>

To defeat a Rule 12(b)(6) motion, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[F]acial plausibility" means "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When considering a motion to dismiss under Rule 12(b)(6), a district court should construe the complaint liberally in favor of the plaintiff, assuming all factual allegations to be true. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007).

## <u>ARGUMENT ON MOTION TO DISMISS</u>

The Louisiana Accountancy Act (the "Act") provides a cause of action for negligence against auditors by parties not in contractual privity with the auditor where, first, the auditor is aware that its audit would be "made available to use in connection with a specified transaction by the [Bank]" and, second, the Bank was "injured as a result of [its] justifiable reliance" in connection with that "transaction." La. Stat. Ann. § 37:91(B)(2).

EY identifies only two purported pleading deficiencies: (1) FDIC-R has not identified any "specified transactions"; and (2) the Bank suffered no detrimental reliance. *See* Mem. at 18–23. EY is wrong on both counts. As explained below, FDIC-R has alleged both that EY knew it would submit its audit opinions to satisfy the Bank's regulatory obligation *and* that EY knew about a number of specified loan transactions that it failed to properly audit. FDIC-R also alleges that the

26

Bank specifically relied on EY's audits to its detriment. EY's arguments to the contrary ignore the Complaint's actual allegations.

### A.   The Complaint Alleges "Specified Transactions" Within the Meaning of the Louisiana Accountancy Act.

#### 1.   The Submission of EY's Audits to FDIC to Satisfy the Bank's Regulatory Obligation Constitutes a "Specified Transaction."

First, FDIC-R alleges that "EY knew that First NBC would submit its audit opinions, issued at the Holding Company level, to the FDIC to satisfy the Bank's regulatory audit obligations." Compl. ¶ 35.[14] Indeed, "EY's audit reports for the 2014 and 2015 Audits specifically provided that they were performed to comply with these audit and audit-reporting requirements . . . of Section 112 of the Federal Deposit Insurance Corporation Improvement Act (FDICIA)," and EY "communicated to Bank personnel in separate correspondence that EY's audit would by submitted by FNBC to satisfy the FDIC's audit and audit-reporting requirements." *Id.* ¶¶ 35, 124.

The submission of EY's audit report to the FDIC constitutes a "specified transaction" within the meaning of the Act. Of course, "the starting place in interpreting any statute is the language of the statute itself." *Moss v. State*, 925 So. 2d 1185, 1197 (La. 2006). EY argues that FDIC-R, standing in the Bank's shoes, cannot bring a professional negligence case against EY under the Act because the drafters of the Act "envisioned a specific *business* transaction" of some sort. Mem. at 18. But that is not what the statute says. While the term "transaction" certainly encompasses "business transactions," on its face, it is not so limited. Indeed, both legal and ordinary dictionaries recognize that "transaction" has a much broader definition than EY proposes.

---

[14] Without clean audited financial statements, the Bank would not have been in compliance with federal regulations. *See* Compl. ¶ 34 (citing 12 C.F.R. § 363.3(a)); *see also* 12 C.F.R. § 363.3(a) ("Each insured depository institution shall engage an independent public accountant to audit and report on its annual financial statements in accordance with generally accepted auditing standards or the PCAOB's auditing standards, if applicable, and section 37 of the Federal Deposit Insurance Act (12 U.S.C. 1831(n).")

*See Transaction*, Black's Law Dictionary (11th ed. 2019) (defining "transaction" as including "[a]ny activity involving two or more persons"); *Transaction*, Merriam-Webster, https://www.merriam-webster.com/dictionary/transaction (last visited Jan. 1, 2024) (defining "transaction" as including "a communicative action or activity involving two parties or things that reciprocally affect or influence each other").

*Overland Leasing Group, LLC v. First Financial Corporate*, No. 06–05850(SDW), 2007 WL 3349491 (D.N.J. Nov. 7, 2007), is instructive on this point. There, the district court addressed New Jersey's accountant liability statute, which—like Louisiana's—is based on the Uniform Accountancy Act and requires that there be a "specified transaction." *Id.* at *3 (citing N.J. Stat. Ann. § 2A:53A–25b(2)(a)–(c)). In explaining the meaning of that term, the *Overland* Court pointed to the New York Court of Appeals' statement in *Credit Alliance Corp. v. Arthur Andersen & Co.*, 483 N.E.2d 110 (N.Y. 1985), that, for an accountant to be liable to a noncontractual party under New York's accountant liability statute—which "substantially mirror[s]" the New Jersey statute—"the accountants must have been aware that the financial reports were to be used *for a particular purpose or purposes.*" *Overland*, 2007 WL 3349491 at *3 (quoting *Credit Alliance*, 483 N.E.2d at 118) (emphasis added). The italicized language underscores that the reference to "specified transaction" in the Act, just like the identical language in the New Jersey statute, cannot be understood exclusively to refer to a "specified *business* transaction," as EY argues, Mem. at 18; rather, it merely requires that the accountants understand, in advance, the "particular purposes" their audit will be used for. In this case, EY did, because EY knew that its audits would be used by the Bank to comply with the FDIC's regulatory requirements. *See* Compl. ¶¶ 34–38, 122–24.

EY's reading of the Act is contrary to the underlying purpose of the Act's privity requirement, which—as EY admits (*see* Mem. at 17 n.9, 20)—is grounded in the policy

considerations set forth in *Ultramares Corporation v. Touche*, 174 N.E. 441 (N.Y. 1931) (Cardozo, J.), and in *Credit Alliance*, 483 N.E.2d 110. In *Ultramares*, the New York Court of Appeals held that only those in privity or "near privity" with an accountant can sue for negligence in the conduct of an audit, lest accountants be exposed to a "*liability in an indeterminate amount for an indeterminate time to an indeterminate class*." 174 N.E. at 444 (emphasis added). There, the accountants had prepared a certified balance sheet for their client, to whom they provided 32 copies. *Id*. at 442. The client, in turn, gave a copy to the plaintiff company. *Id*. at 443. The latter, relying upon the misinformation contained in the balance sheet, made loans to the accountants' client who, only months later, was declared bankrupt. *Id*. The company then sued the accountants for negligence. *Id*.

In refusing to extend the accountants' liability to their client's lender, with whom they had no contractual privity, *Ultramares* emphasized that: "Nothing was said as to the persons to whom [the balance sheet] would be shown or the extent or number of the transactions in which they would be used. *In particular there was no mention of the plaintiff*[.]" *Id*. at 442 (emphasis added). The court further noted that the accountants' report was primarily intended as a convenient instrumentality for the *client's* use in developing its business. *Id*. at 446. "[O]nly incidentally or collaterally" was it expected to assist those to whom the client "might exhibit it thereafter." *Id*. Under such circumstances, *Ultramares* held, permitting recovery by parties such as the plaintiff company would have been to impose a duty upon accountants "enforce[able] by any member of an indeterminate class of creditors, present and prospective, known and unknown." *Id*.

The exact opposite is true here. Unlike *Ultramares*, where the accountants were unaware that their report would be used by the plaintiff company, EY undisputedly knew that its audits would be used to satisfy the Bank's regulatory obligations. *See* Compl. ¶¶ 34–38, 122–24. In fact,

because the Bank was the Holding Company's only asset, *see id.* ¶ 26, both audits were based on

a review of *the Bank's* records, to which EY had complete and unfettered access, *id*. ¶ 30. Thus,

unlike *Ultramares*, this is not a case where allowing an accountant to be sued would impose a duty

"enforce[able] by any member of an indeterminate class of creditors, . . . known and unknown."

174 N.E. at 446. Indeed, it is hard to imagine a case less like *Ultramares* than this one.

      *Credit Alliance*, the leading case interpreting *Ultramares*, confirms that the near privity

requirement is satisfied here. In *Credit Alliance*, the plaintiff bank had loaned money to a company,

Majestic Electro Industries, in reliance on audit reports prepared by the company's accountants,

S&K. 483 N.E.2d at 112–13. After the company failed, the bank sued S&K for negligence. *Id.* at

113. The court held that because "the accountants knew the identity of the specific nonprivy party

who would be relying upon the audit reports," and because "the parties remained in direct

communication, both orally and in writing," throughout the course of their lending relationship,

"the relationship . . . between the parties was the practical equivalent of privity"—and thus the

claims against the accountants could go forward. *Id*. at 120. This describes exactly the near privity

relationship between the Bank and EY. *See* Compl. ¶ 124 ("EY also stated in communications to

the Bank its understanding that EY's audit reports would be used to satisfy the Bank's audit and

audit-reporting requirements.").

      In short, EY's interpretation is not just inconsistent with the Act's plain language, it also

runs afoul of the purposes underlying the Act's privity provision, which was designed to protect

accountants like EY from "indeterminate liability" to creditors "known or unknown." *Ultramares*,

174 N.E. at 446. Put simply, that is not this case. Just as with the bank and the accountants in

*Credit Alliance*, the relationship between EY and the Bank is "the practical equivalent of privity"

for purposes of the Act. *Credit Alliance*, 483 N.E.2d at 120.

The cases cited by EY are not to the contrary. In *Solow v. Heard McElroy & Vestal, L.L.P.*, 7 So. 3d 1269, 1276 (La. Ct. App. 2009), the Louisiana Court of Appeals found that shareholders who did not engage an accounting firm to provide services, or have any direct communication with the firm with regard to the firm's audit of a corporation, lacked sufficient privity with the accounting firm to sue for negligence. Likewise, in *E. Dickerson & Son, Inc. v. Ernst & Young, LLP*, 846 A.2d 1237, 1240 (N.J. 2004), the New Jersey Supreme Court held that shareholders of a company, Twin County Grocers, could not sue the company's auditors, noting that "the manifest legislative intent in adopting" the New Jersey privity statute was to "limit the impact" of a prior decision that "greatly expanded the scope of accountants' liability to all reasonably foreseeable claimants, including stockholders and public investors." The Bank, of course, is not a mere "shareholder" of an entity harmed by EY's misconduct. Moreover, unlike the shareholders in *Solow* and *E. Dickerson*, EY had direct communications with the Bank throughout the relevant time period. *See* Compl. ¶¶ 35, 36. And this case is nothing like *E. Dickerson*, where the plaintiffs failed to identify any transaction that gave rise to their damages, alleging only that they "relied on the audit services in connection with their individual decisions regarding the nature and extent of their continued participation in Twin County." 846 A.2d at 1239 (quotation and brackets omitted).

EY's knowledge that the Bank would be using its audit reports for a particular purpose— to satisfy its regulatory obligations so that it could continue to operate—thus constitutes the kind of near privity relationship recognized by *Ultramares*, *Credit Alliance*, and the Louisiana Accountancy Act as giving rise to potential liability. *See Overland*, 2007 WL 3349491 at *3.

### 2. FDIC-R Has Alleged that EY Committed Malpractice with Regard to a Series of Specified Loan Transactions.

But even assuming *arguendo* that "specified transaction" under La. Stat. Ann § 37:91(B)(2) could be interpreted to mean only "business transaction"—and there is no basis for concluding that

it does—FDIC-R has more than sufficiently pled numerous loan transactions that gave rise to the damages FDIC-R seeks to recover here.[15]

FDIC-R alleges that EY committed malpractice by "fail[ing] to test all of [CEO Ashton] Ryan's material loans and tax credit investments during the 2014 Audit" and failing to do so *again* in 2015, despite having by then "recognized Ryan's dominance and certain loan impairments." Compl. ¶¶ 48, 50.

FDIC-R identifies by name a host of specific, material loan transactions (the "Loan Transactions") that EY was aware of but failed to properly audit:

1. Fraudulent loans made by Ryan to Phoenix Civil Contractors to obtain construction services for Ryan's personal projects, *id*. ¶ 25; *see also id*. ¶ 81 (alleging that EY failed to audit **"millions in loans" to Phoenix Civil** to cover certain overdrafts);

2. The loan and tax credit investment portfolios of FNBC General Counsel Gregory St. Angelo, *see id*. ¶ 64; *see also id.* ¶ 79 (alleging that "the Bank had **over $30 million in loans to St. Angelo** and his personal limited liability companies as of the end of 2014");

3. "More than **$16 million in loans**" **granted from FNBC to Charity**, a real estate developer, which EY failed to audit having known, "from its 2013 audit[,] that the property had been cited for blight and that no construction had begun at the time of that audit," *id*. ¶¶ 90, 93.

4. "**Loans to [commercial real estate developer] GG** and his related businesses totaled approximately $123 million at the Bank's closure," *id*. ¶ 105; and

5. "[A]lmost $50 million in **oil-and-gas loans to borrowers affiliated with RL**," *id*. ¶ 114.

EY not only was aware of these Loan Transactions during each audit engagement; because these were material transactions, the auditing standards required EY to perform audit procedures on these Loan Transactions that, had they been done, would have uncovered the fraud. *See, e.g.*, *id*. ¶ 90 (alleging that, at the time of the 2014 audit, EY was aware of the Bank's transactions with

---

[15] EY cannot contend that it did not know about these loan relationships at the time it agreed to conduct the 2104 and 2015 audits for the Holding Company, because EY was the Holding Company's independent external auditor from its inception in 2006 until August 2016. *See* Compl. ¶ 27.

Charity, a real estate developer with more than $16 million in outstanding loans); *id*. ¶ 91 (alleging that EY selected the Charity relationship for a full-scope loan review but failed to perform such review); *id*. ¶ 81 (alleging that EY was aware of the loans to Phoenix Civil during the 2014 and 2015 audits but failed to audit them); *id*. ¶ 108 (alleging EY knew that CEO Ryan had extended $44 million in loans to GG yet failed to properly test these loans). EY knew that the Loan Transactions were ongoing transactions that would not be complete until interest and principal was paid in full to the Bank. *See Conway v. CitiMortgage, Inc*., 438 S.W.3d 410, 416 (Mo. 2014) ("a loan is an ongoing transaction"). In fact, EY's job as an auditor included, among other things, assessing the ability of the borrowers in the Loan Transactions to repay the loans and the collateral underlying the Loan Transactions.

There can be no doubt that an auditor's failure to adequately audit material loan transactions satisfies the "specified transaction" requirement of the Act; indeed, EY admits as much in its brief. *See* Mem. at 18 (citing *In re FoodServiceWarehouse.com, LLC*, 601 B.R. 396, 402 (E.D. La. 2019), for proposition that "company's reliance on audit in deciding to increase its guarantee of a loan by $5 million" satisfies the Act's privity requirement). Thus, even if this Court reads the Act as requiring a noncontractual party to allege specific business transactions, that requirement has been amply met here.

### B.    The Complaint Adequately Alleges Detrimental Reliance Within the Meaning of the Louisiana Accountancy Act.

EY's contention that FDIC-R has not alleged that the Bank detrimentally relied on EY's audit reports simply ignores the Complaint's well-pled allegations. *See, e.g.*, Compl. ¶ 38 (alleging that "EY also knew that the Bank relied on EY to alert it to material weaknesses in internal controls and any concerns over management integrity, including, but not limited to, potential fraud involving senior management"); *id*. ¶ 124 (alleging that "EY knew that the Bank was relying on

33

EY's audit reports to satisfy its regulatory requirements"); *id.* ¶ 3 ("Because EY failed to do its job, Ryan's misconduct continued, causing at least $125 million in damages.").

FDIC-R clearly alleges that the Bank relied on EY's audit opinions to meet its regulatory obligation: "EY knew that First NBC would submit its audit opinions, issued at the Holding Company level, to the FDIC to satisfy the Bank's regulatory audit obligations." *Id.* ¶ 35. Had EY told the Bank's Audit Committee that the financial statements were materially misstated due to fraud, the Bank would have been required to notify FDIC that the financial statements previously submitted could not be relied upon. *See id.* ¶ 122; 12 U.S.C. § 1831(m); 12 C.F.R. § 363.1(b). This also would have led to the removal of Ryan as CEO and the avoidance of any further losses. *See* Compl. ¶ 129.

FDIC-R further alleges that had EY done its job, Ryan's fraud would have been exposed and reported to the Bank's Audit Committee. *Id.* ¶¶ 117, 129. The Bank, acting through its Board's Audit Committee, detrimentally relied on EY's audit reports in allowing Ryan to continue to run the Bank and engage in the Loan Transactions that led directly to more than $125 million of losses that FDIC-R seeks to recover here. *Id.* ¶ 128. Had EY told the Bank's Audit Committee that the financial statements were materially misstated due to fraud, the Board would have removed Ryan and the Bank's General Counsel, Gregory St. Angelo, and so avoided the losses from the Loan Transactions. *Id.* ¶ 129.

In sum, FDIC-R has sufficiently pled all the elements of a claim for professional negligence under the Louisiana Accountancy Act. EY's motion to dismiss therefore should be denied.

## <u>CONCLUSION</u>

For the foregoing reasons, EY's Motion to Compel Arbitration or, in the Alternative, to Dismiss should be denied.

Dated: January 9, 2024                    Respectfully submitted,

                                          /s/ Bryan C. Reuter
                                          Richard C. Stanley, 8487
                                          Bryan C. Reuter, 23910
                                          Stanley Reuter Thornton Alford LLC
                                          909 Poydras Street, Suite 2500
                                          New Orleans, Louisiana 70112
                                          Telephone: 504-523-1580
                                          Facsimile: 504-524-0069
                                          rcs@stanleyreuter.com
                                          bcr@stanleyreuter.com

                                          Stephen Sorensen (admitted *pro hac vice*)
                                          Elizabeth Dow (admitted *pro hac vice*)
                                          Brian Glasser (admitted *pro hac vice*)
                                          Leslie Brueckner (admitted *pro hac vice*)
                                          Bailey & Glasser LLP
                                          1055 Thomas Jefferson Street NW
                                          Suite 540
                                          Washington, DC 20007
                                          Telephone: (202) 463-2101
                                          ssorensen@baileyglasser.com
                                          ldow@baileyglasser.com
                                          lbrueckner@baileyglasser.com

                                          *Attorneys for the Federal Deposit Insurance*
                                          *Corporation as Receiver for First NBC Bank*

## CERTIFICATE OF SERVICE

I certify that on January 9, 2024 the foregoing was filed using the Court's ECF System, which constitutes services on all counsel having appeared of record in this proceeding.

                                          /s/ Bryan C. Reuter