UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR FIRST NBC BANK,<br><br>    Plaintiff,<br><br>    v.<br><br>ERNST & YOUNG LLP and GLOUCESTER INSURANCE LTD.<br><br>    Defendants. | Case No. 2:20-cv-01259<br>Section "L" (1)<br><br>Judge Eldon E. Fallon<br>Magistrate Judge Janis van Meerveld |

**REPLY MEMORANDUM IN SUPPORT OF ERNST & YOUNG LLP'S
MOTION TO COMPEL ARBITRATION OR, IN THE ALTERNATIVE, TO DISMISS**

Steven M. Farina, *pro hac vice*
Stephen J. Fuzesi, *pro hac vice*
Adrienne E. Van Winkle, *pro hac vice*
WILLIAMS & CONNOLLY LLP
680 Maine Avenue S.W.
Washington, DC 20024
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
sfarina@wc.com
sfuzesi@wc.com
avanwinkle@wc.com

Craig Isenberg, 26903
Chloé M. Chetta, 37070
BARRASSO USDIN KUPPERMAN
FREEMAN & SARVER, L.L.C.
909 Poydras Street, Suite 2400
New Orleans, Louisiana 70112
Telephone: (504) 589-9700
Facsimile: (504) 589-9701
cisenberg@barrassousdin.com
cchetta@barrassousdin.com

*Attorneys for Ernst & Young LLP*

Far from an "extraordinary request," Opp. 1, this Motion involves the application of well-settled principles that compel arbitration under the Federal Arbitration Act. The Receiver brings this state-law malpractice action standing in the shoes of First NBC Bank. And the Receiver cannot dispute that "during the life of the contract" between EY and the Bank's parent, First NBC Bank Holding Company, the Bank "embraced the contract despite [its] nonsignatory status." *Traders' Mart, Inc. v. AOS, Inc.*, 268 So. 3d 420, 428 (La. Ct. App. 2019). Indeed, an essential premise of the Receiver's claim is that the Bank used the audit reports arising out of the parties' contractual engagements to meet the Bank's regulatory obligations. The Receiver repeats those allegations in the Opposition to argue that it satisfies Louisiana's strict "privity" requirement. The Receiver cannot have it both ways: It cannot argue that it meets the more stringent demands of the privity statute and yet deny that the Bank obtained "direct benefits" from the engagements, thus requiring application of the arbitration provision.

In an effort to avoid arbitration, the Receiver erects a smokescreen. Its purported "federal law bar" to arbitration finds no support in the law. It is an extreme position that would have sweeping consequences and turn federal law on its head. The FAA "reflects an emphatic federal policy *in favor* of arbitral dispute resolution." *See, e.g.*, *KPMG v. Cocchi*, 565 U.S. 18, 21 (2011).[1] The Receiver ignores that, unlike in *EEOC v. Waffle House*, 534 U.S. 279 (2002), this suit is not an enforcement action by a regulator; this is a civil action alleging state-law claims.

The Receiver's opposition to EY's motion to dismiss, in the alternative, fares no better. The Receiver relies on a construction of Louisiana's privity statute that would strike the law's "specified transaction" and detrimental reliance requirements to accommodate the Receiver's theory that transmittal of EY's audit reports to a regulator satisfies the statute. Apparently realizing

---

[1] All emphases are added unless noted otherwise and all internal quotation marks are omitted.

1

the deficiency of that theory, the Receiver now asserts an unpled theory based on loans made by the Bank while EY was auditor. But that new theory, too, is foreclosed by Louisiana law.

I.    **THE RECEIVER'S CLAIM MUST BE ARBITRATED.**

   A.    **There Is No "Federal Law Bar" to Arbitrating this Claim.**

No law and no doctrine prevent arbitration of the Receiver's claim. Rather, the Receiver "is bound by the rules that the bank itself would encounter in litigation," including any applicable arbitration agreements. *See FDIC v. Ernst & Young LLP*, 374 F.3d 579, 581 (7th Cir. 2004); *College Blvd. Nat'l Bank v. Credit Sys., Inc.*, 1994 WL 242670, at *1 (D. Kan. 1994) (compelling FDIC as receiver to arbitrate, holding it "bound, as [the bank] would have been, by the arbitration provision in the contract"). The Receiver's grab bag of statutes and cases is wholly inapplicable.

Importantly, the FDIC acts in "separate and legally distinct" capacities. *DeCell & Assocs. v. FDIC*, 36 F.3d 464, 469 (5th Cir. 1994). First, "in its corporate capacity," the FDIC "acts as insurer, regulator and supervisor of FDIC insured banks." *Anchor Sav. Bank v. United States*, 121 Fed. Cl. 296, 323 (2015). Second, it functions "as receiver . . . for failed national banks and federal thrifts." *Id*. The FDIC brings this action *as Receiver*. And when acting as a receiver, the FDIC "is not the United States." *O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79, 85 (1994); *see also FDIC v. Flagship Auto Ctr., Inc.*, 2009 WL 484175, at *3 (N.D. Ohio Feb. 25, 2009) (FDIC as receiver "is not an agency of the United States"). In fact, the Fifth Circuit already has held *in the context of this case* that when the "FDIC was acting in its capacity as the Bank's receiver," it was "not [acting] as the Bank's regulator." *FDIC v. Belcher*, 978 F.3d 959, 963 (5th Cir. 2020).

As Receiver, the FDIC simply "steps into the shoes" of the failed bank. *O'Melveny & Myers*, 512 U.S. at 86. "[T]he FDIC *is not entitled to special protection* when it brings a tort claim against a third party on behalf of a defunct financial entity." *F.D.I.C. v. Ernst & Young*, 967 F.2d

2

166, 170 (5th Cir. 1992); *id.* at 169–70 (explaining that an FDIC receiver brings "[e]ssentially . . . a client case in which a client is suing its auditor," and "[n]o statutory justification or public policy exists to treat the FDIC differently from other assignees"). For these and the other reasons discussed below, the Receiver's attempt to avoid arbitration is meritless.

### 1. The ADR Act Is a Red Herring.

The Receiver's lead argument misconstrues the so-called "ADR Act." *See* Opp. 5–6. The ADR Act does not bar arbitration here. Not only does the Receiver fail to cite any case supporting its position, it ignores that its argument has been rejected. *See College Blvd. Nat'l Bank*, 1994 WL 242670 (compelling binding arbitration). As a threshold matter, the Act applies only to a federal "agency." 5 U.S.C. § 572(a). The Receiver here is not acting in a regulatory capacity. Moreover, the Act applies only to *administrative* disputes, which this is not. The law permits "an 'agency' to 'use a dispute resolution proceeding for the resolution of an issue in controversy *that relates to an administrative program.*'" *In re Grand Jury Subpoena Dated Dec. 17, 1996*, 148 F.3d 487, 492 (5th Cir. 1998) (quoting 5 U.S.C. § 572(a)). An "issue in controversy" must be "material to *a decision concerning an administrative program* of an agency"—*i.e.*, an agency decision that occurs "through rule making, adjudication, licensing, or investigation," 5 U.S.C.A. § 571(2), (8).[2] As one court already has held, a civil action by the FDIC as receiver of a bank like this is not "relating to 'an administrative program.'" *College Blvd. Nat'l Bank*, 1994 WL 242670, at *1.

### 2. FIRREA Does Not Bar Arbitration.

The federal FIRREA law also does not bar arbitration. It says only that most civil suits involving the FDIC "arise under the laws of the United States." 12 U.S.C. § 1819(b)(2)(A). That

---

[2] The FDIC's own General Counsel has acknowledged as much, stating that the ADR Act "authorizes the voluntary use of binding arbitration by Federal agencies in *administrative matters*." FDIC Directive 5310.1, Binding Arbitration (June 5, 2001).

3

is, "where the FDIC is a party, federal question jurisdiction exists." *Heaton v. Monogram Credit Card Bank of Georgia*, 297 F.3d 416, 425 (5th Cir. 2002). That such suits give rise to federal jurisdiction, however, says nothing about whether those suits may be resolved in arbitration.

The Receiver cites no authority supporting its position, even though it would have potentially sweeping consequences across the nation. The Receiver's cases involve removal from state court—not arbitration. The Receiver correctly cites *O'Melveny & Myers* for the proposition that it is subject to the same defenses that would be available against the Bank "except where some provision in the extensive framework of FIRREA provides otherwise." 512 U.S. at 87. But nothing in FIRREA mentions arbitration, much less says that it is forbidden.

To show a "contrary statutory command" overriding the FAA, a party opposing arbitration must establish that "Congress intended to preclude a waiver of a judicial forum" for the claims at issue. *Robertson v. Intratek Computer, Inc.*, 976 F.3d 575, 579 (5th Cir. 2020) (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991)). "[T]hat intention will be deducible from text or legislative history." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985). And "throughout this inquiry, courts should keep 'in mind that questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.'" *Robertson*, 976 F.3d at 579 (quoting *Gilmer*, 500 U.S. at 26). "Thus, the party opposing arbitration—and urging a congressional command contrary to the FAA—faces a high bar." *Id.*

The Receiver does not come close to meeting that high bar. There is no evidence that Congress intended to subvert the FAA through FIRREA. If anything, Congress's decision to include detailed jurisdictional provisions in FIRREA but *not* address arbitration suggests that Congress did *not* intend to preclude arbitration. *See U.S. Small Bus. Admin. v. Coqui Cap. Mgmt., LLC*, 2008 WL 4735234, at *3 (S.D.N.Y. Oct. 27, 2008) ("Congress passed the SBIA after the

4

passage of the FAA, and was undoubtedly well aware of the potential for receivers to arbitrate disputes attendant to their receivership responsibilities. Tellingly, Congress declined to include any provision in the SBIA to preclude such arbitrations.").

As the Supreme Court has noted, "[i]n many cases over many years, this Court has heard and rejected efforts to conjure conflicts between the Arbitration Act and other federal statutes." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1627 (2018) (collecting cases). "These cases reflect the Supreme Court's dogged insistence that Congress speak with great clarity when overriding the FAA." *Robertson*, 976 F.3d at 582 (enforcing arbitration agreement). Far from "great clarity," the Receiver points to nothing supporting its position.

### 3. *Waffle House* Is Inapplicable.

*Waffle House* is similarly irrelevant. The Receiver divines from that case a sweeping rule that the FAA "does not apply to federal agencies that have their own statutory authority to choose their forum in federal court." Opp. 1. But *Waffle House* says no such thing. Rather, the Court held that an arbitration agreement between an employer and employee does not "limit[] the remedies available to the EEOC" when it brings an *enforcement action* alleging violations of federal antidiscrimination law. 534 U.S. at 297.

Central to the Court's holding was that the case involved an EEOC enforcement action. The Court noted that Title VII "authorize[s] the EEOC to bring its own *enforcement actions*." *Id.* at 286 (citation omitted). And the Court underscored "the difference between the EEOC's enforcement role and an individual employee's private cause of action," *id.* at 287, holding that the EEOC has "independent statutory authority to pursue an enforcement action," *id.* at 285.

The Receiver ignores the Supreme Court's reasoning. It instead cherry-picks quotes that the EEOC serves a "public function" and is the "master of its case." *See* Opp. 6, 8. But this

5

language simply refers to the fact that an EEOC enforcement action is not derivative of a private claim. Lest there be any doubt about the limited reach of *Waffle House*, the Supreme Court has since made clear that the case "addresse[s] the role of an agency . . . as prosecutor, *pursuing an enforcement action in its own name*." *Preston v. Ferrer*, 552 U.S. 346, 359 (2008).

Unsurprisingly, nearly all of the Receiver's cited cases that rely on *Waffle House* involve a regulator prosecuting an enforcement action.[3] Far from being a "prosecutor" pursuing an "enforcement action," *Preston*, 552 U.S. at 359, the Receiver here is not a "regulator" at all, *Belcher*, 978 F.3d at 963. And all parties agree that its only substantive claims are those of the Bank. *See* Compl. ¶ 9. Indeed, the only court we are aware of to consider the applicability of *Waffle House* to the FDIC as a receiver concluded that it "is bound by the rules that the bank itself would encounter in litigation," including the enforcement of mandatory arbitration agreements. *FDIC*, 374 F.3d at 581. The Receiver offers no reason to depart from that conclusion here.

### 4. The Receiver's Cited "State Law" Cases Do Not Apply.

The Receiver further incorrectly asserts that under state law, there exists a doctrine that would insulate the Receiver from having to arbitrate. Opp. 16–20. There is no such doctrine.

The Receiver relies on New York cases that decline to enforce arbitration agreements against government agencies. Opp. 16–18. But, as in *Waffle House*, each involved a *regulator*

---

[3] *See Cohen v. Viray*, 622 F.3d 188, 195 (2d Cir. 2010) (SEC enforcing Sarbanes-Oxley); *Walsh v. Arizona Logistics, Inc.*, 998 F.3d 393, 396–97 (9th Cir. 2021) (DOL enforcing FLSA); *Scalia v. CE Security LLC*, 2021 WL 3774198, at *3 (E.D.N.Y. Aug. 25, 2021) (same); *E.E.O.C. v. Ralphs Grocery Co.*, 300 F. Supp. 2d 637, 639 (N.D. Ill. 2004) (EEOC and state agency enforcing antidiscrimination law); *In re Uber Techs. Wage & Hour Cases*, 95 Cal. App. 5th 1297, 1302 (2023) (state agencies enforcing unfair competition and labor laws); *People v. Maplebear Inc.*, 297 Cal. Rptr. 3d 652, 660 (Cal. Ct. App. 2022) (state agencies enforcing labor code); *Commonwealth ex rel. Herring v. Net Credit Fin. Sols. of Utah, LLC*, 102 Va. Cir. 114 (Va. Cir. Ct. 2019) (state AG enforcing consumer protection law). The lone exception is *Taylor v. Ernst & Young, L.L.P.*, 958 N.E.2d 1203 (Ohio 2011), which held, under Ohio law, that an insurance liquidator "does not stand in the shoes" of an insolvent insurer. *Id.* at 1211. By contrast, the Receiver "steps into the shoes" of the Bank. *O'Melveny & Myers*, 512 U.S. at 86.

6

pursuing an *enforcement* action.  *People ex rel. Cuomo v. Coventry First LLC*, 915 N.E.2d 616, 618 (N.Y. 2009) (AG enforcing state business code); *Charter Commc'ns, Inc. v. Jewett*, 573 F. Supp. 3d 742, 749–50 (N.D.N.Y. 2021) (state agency enforcing antidiscrimination law); *Charter Commc'ns, Inc. v. Derfert*, 510 F. Supp. 3d 8, 17 (W.D.N.Y. 2021) (same).

Likewise, the Receiver misconstrues *Donelon v. Shilling*, 340 So. 3d 786 (La. 2020).  *Donelon* said nothing about the ability of a bank receiver to avoid arbitration otherwise compelled under state law principles of estoppel.  It addressed a specific state law statutory scheme for the Louisiana Commissioner of Insurance and held that statute trumped Louisiana estoppel law in that specific circumstance "[b]ecause an express grant of authority exists in favor of the Commissioner" under the statute. *Id.* at 793.  The opinion did not articulate any broader proposition.  Indeed, the court noted that even this conclusion would be "arguably inconsistent with the FAA, which favors arbitration." *Id.*  The court concluded that its holding was permissible only because of the reverse-preemption effected by the McCarran-Ferguson Act, "for the purpose of regulating the business of insurance." *Id.*

### 5. The Receiver's Promissory Estoppel Cases Are Irrelevant.

Finally, citing a series of irrelevant cases, the Receiver asserts that "equitable estoppel principles are virtually never available against the government."  Opp. 15.  Once again, the Receiver is not the government.  Moreover, none of the cited cases even involve the doctrine of direct benefits estoppel or the question whether a nonsignatory can be bound to an arbitration agreement.  Rather, all of them involve *promissory* or *equitable* estoppel, which require a "promise" or "affirmative misconduct by the government" and detrimental "reliance" on that promise or misconduct.  *E.g.*, *F.D.I.C. v. Royal Park No. 14, Ltd.*, 2 F.3d 637, 641 (5th Cir. 1993); *United States v. Bloom*, 112 F.3d 200, 205 (5th Cir. 1997).  Moreover, equitable estoppel *has been*

7

*applied against the FDIC* acting as receiver. See *FDIC v. Harrison*, 735 F.2d 408, 412 (11th Cir. 1984). The "high hurdle" of showing "affirmative misconduct" by "government agents" also is specific to the application of these *other* estoppel doctrines. See *F.D.I.C. v. Hulsey*, 22 F.3d 1472, 1489–90 (10th Cir. 1994). Direct benefits estoppel has nothing to do with a "promise" and does not require that EY show "affirmative misconduct."[4]

### B. Settled Principles of Estoppel Mandate Arbitration.

There is no dispute that the Receiver's claim falls within the scope of the applicable arbitration clause. That clause must be applied here under well-established estoppel doctrines.

#### 1. Louisiana Law Governs and Mandates Arbitration Here.

To begin, the Receiver's bid to apply New York law is misguided. If anything, it amounts to a concession that the arbitration clause applies, as the Receiver is affirmatively invoking the engagement agreement in order to apply its choice of law clause. Yet again, the Receiver cannot have it both ways. Unless the Receiver wishes to concede that the engagement agreement governs, Louisiana law applies to the threshold question of whether the Receiver is bound by the agreement. Indeed, courts that have considered the question generally apply the contractual choice of law provision only when a nonsignatory seeks to enforce an arbitration clause *against a signatory*, but not when (like here) the signatory seeks to enforce it against a nonsignatory. *See, e.g.*, *Story v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 427 F. Supp. 3d 822, 828 (E.D. La. 2019) (applying New York law choice of law clause "[i]n determining whether a *nonsignatory* to an agreement can compel a *signatory* to arbitrate"); *Republic of Ecuador v. ChevronTexaco Corp.*, 376 F. Supp. 2d 334, 355 (S.D.N.Y. 2005) (abrogated on other grounds) ("[T]he nonsignatory party opposing arbitration is in essence contending that it is not subject to the contract at all; thus, applying the

---

[4] The "equitable defense" cases cited by the Receiver are likewise irrelevant. *See* Opp. 15 n.9.

8

choice-of-law clause from that contract to determine the issue would beg the question in a manner potentially unfair to the nonsignatory."); *Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 257–59 (5th Cir. 2014) (applying Arizona choice of law clause to nonsignatory's motion to arbitrate *against signatory*); *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 211 (2d Cir. 2005) (calling the signatory/nonsignatory distinction "an important indicator"). This distinction makes sense, as the signatory already has agreed to the provision.[5] In this case, the Complaint applies Louisiana law, and the Receiver expressly "does not concede that New York law applies to the substance of its tort claims," asserting that "[c]ontract nonsignatories are not generally bound by contractual choice-of-law clauses." Opp. 17 n.10.

Strikingly, the Receiver does not genuinely contest that estoppel would mandate arbitration under the standards of Louisiana estoppel law set out in EY's opening brief. *See* EY Br. 8–9 (explaining the two ways estoppel can be established, both "direct benefits" and "asserting claims that must be determined by reference to the agreement"). The Receiver argues only under what it characterizes as "New York law" and includes just one conclusory assertion that "[t]he result is the same under Louisiana law," citing a case that does not even address direct benefits estoppel or the enforcement of an arbitration clause. *See* Opp. 20–21 (citing *Howard Trucking Co. v. Stassi*, 485 So. 2d 915, 918 (La. 1986)).

### 2. Arbitration Is Required Regardless of Which Law Applies.

Choice of law does not matter, though, because direct benefits estoppel compels arbitration here under either state's law. The essence of the doctrine is the same and well-established: "a

---

[5] The only case cited by the Receiver that does not apply this rule, *Todd v. Steamship Mut. Underwriting Ass'n, Ltd.*, 2011 WL 1226464 (E.D. La. Mar. 28, 2011), applied the choice-of-law rules of the jurisdiction selected in the contract. *Id.* at *5–6. And under those rules, the court held that Louisiana law of direct benefits estoppel applied anyway and bound a nonsignatory to arbitrate. *Id.* at *8.

9

nonsignatory may be compelled to arbitrate where the nonsignatory knowingly exploits the benefits of an agreement containing an arbitration clause, and receives benefits flowing directly from the agreement." *Belzberg v. Verus Investments Holdings Inc.*, 999 N.E.2d 1130, 1134 (N.Y. 2013); *Traders' Mart*, 268 So. 3d at 428 (same); *see also Noble Drilling Servs., Inc. v. Certex USA, Inc.*, 620 F.3d 469, 473 (5th Cir. 2010). That is precisely what occurred here.

The Receiver cites cases with facts that are far afield,[6] cherry-picks quotes, and—most fundamentally—ignores its own allegations. The Receiver cannot escape that it alleges that the Bank obtained specific benefits flowing directly from the engagement agreement between the Holding Company and EY and that those benefits were specifically contemplated by the parties. The Receiver expressly alleges that "EY knew that First NBC would submit its audit opinions . . . to the FDIC to satisfy the Bank's regulatory audit obligations," and that the EY reports arising out of the engagements "specifically provided that they were performed to comply with these audit and audit-reporting requirements." Compl. ¶ 35. And the Receiver goes so far as to argue that the benefits obtained were so intentional and direct that they satisfy Louisiana's uniquely strict "privity" standard. *Id.* ¶ 122 ("At all relevant times, the Bank met the criteria of La. Rev. Stat. § 37:91(B)(2)"). The case cries out for the application of estoppel.

The Receiver's attempts to distinguish the cases cited in EY's opening brief are unavailing. In an effort to address *Blaustein v. Huete*, 449 F. App'x 347 (5th Cir. 2011), for example, the Receiver maintains that its claims "do not reference or rely on deficient services provided to [the]

---

[6] The Receiver cites two cases involving auditors. As explained in EY's opening brief, *Jones v. Singing River Health Services Foundation*, 674 F. App'x 382, 385–86 (5th Cir. 2017), considered only the "reference to [the] contract" avenue of estoppel and not "direct benefits." It applied Mississippi law and considered a claim based on a knowing breach of fiduciary duty, brought by a pension plan participant who "had no knowledge of the engagement letters" between the plan and KPMG. *Id. Colonial Bancgroup Inc. v. PricewaterhouseCoopers LLP*, 2018 WL 6430827 (M.D. Ala. 2018), involved Alabama law; did not consider direct benefits estoppel; and involved a damages provision in a contract, not arbitration.

10

Holding Company as a basis for liability." Opp. 23. If that is the case, it is hard to see how the Receiver has any claim at all. The Receiver also simply ignores New York cases that apply direct benefits estoppel to compel arbitration, including in the audit context. *E.g.*, *2004 Parker Family LP v. BDO USA LLP*, 127 N.Y.S.3d 705, at *5 (N.Y. Sup. Ct. 2020) (compelling arbitration of contract, negligence, and fiduciary duty claims where "all three causes of action rely on the same duty of the Auditors created in the first instance by the Engagement Agreements"); *see also, e.g.*, *Kamin Health LLC v. Halperin*, 2021 WL 964949, at *7 (E.D.N.Y. Mar. 15, 2021) (ordering trademark dispute to arbitration where agreement mandating arbitration gave nonsignatory "benefits from activity strengthening or otherwise enhancing its brand").[7]

The Receiver cites several cases for the notion that the benefit to the nonsignatory must be "traced" to the agreement containing the arbitration clause. *Belzberg*, 999 N.E.2d at 1136 (cited at Opp. 24). For example, in *Trina Solar US, Inc. v. Jasmin Solar Pty Ltd*, 954 F.3d 567 (2d Cir. 2020), a sales contract between a solar panel manufacturer and an American purchaser did not bind an Australian company to which the American purchaser ultimately furnished the panels. *Id.* at 572–73. Here, by contrast, EY's contractually agreed audits far more directly benefited the Bank.

Ultimately, the Receiver's argument rests on a manifestly incorrect premise: that "[b]ecause FDIC-R is not suing for breach of any contractual obligation imposed by the engagement letters, it cannot be compelled to arbitrate." Opp. 21. That is not the law. Nor does the case that the Receiver cites for this proposition support it, as it merely notes that "[n]umerous

---

[7] *See also Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999) (nonsignatory ship owners bound by estoppel to arbitration agreement that enabled them to secure lower insurance rates and to sail under French flag; nonsignatory ship insurance underwriters were estopped for "stand[ing] in the shoes" of the nonsignatory owners); *Matter of Long Island Power Auth. Hurricane Sandy Litig.*, 87 N.Y.S.3d 576, 582 (N.Y. Sup. Ct. App. Div. 2018) (nonsignatory customers of electrical utility alleging service interruptions were bound by direct benefit estoppel to arbitration clause in agreement between utility and management-services provider).

courts have found that non-signatory parties are estopped from denying arbitration when they rely on or seek direct benefits under an agreement by, for example, bringing suit under that agreement." *See Mobile Real Est., LLC v. NewPoint Media Grp., LLC*, 460 F. Supp. 3d 457, 479-80 (S.D.N.Y. 2020). Courts in New York and elsewhere routinely compel arbitration when the nonsignatory does not bring a contract claim. *E.g.*, *WTA Tour, Inc. v. Super Slam Ltd.*, 339 F. Supp. 3d 390, 397, 400–01 (S.D.N.Y. 2018) (defamation); *Kamin Health LLC*, 2021 WL 964949, at *1, *7 (trademark); EY Br. 12–14.

In sum, for all of these reasons and those explained at greater length in EY's opening brief, arbitration is required here.

## II. IN THE ALTERNATIVE, THE RECEIVER'S CLAIM SHOULD BE DISMISSED.

If arbitration is not compelled, the Complaint must be dismissed under Rule 12(b)(6) because the Receiver fails to meet Louisiana's strict statutory privity standard. That standard demands far more from the plaintiff than demonstrating "direct benefits."

### A. The Receiver's Original Theory Fails To Establish Privity.

As pleaded in the Complaint, the Receiver's attempt to meet Louisiana's privity requirement is based on the Bank's transmission of EY's audit reports to its regulator. *See* Compl. ¶¶ 121–25. But, for all of the reasons explained in EY's opening brief, such general use of audit opinions for regulatory purposes is not a "specified transaction" within the meaning of Louisiana's statute, nor has the Receiver demonstrated detrimental reliance in connection with that "transaction," as further required. La. Stat. Ann. § 37:91(B).

The Receiver's response is to effectively read the "specified transaction" requirement out of the statute and rewrite the statute to permit suit anytime a third party uses an audit report "for a particular purpose." Opp. 31. But this, of course, is not what the statute provides. Louisiana law narrowly permits suit only when there is "specified transaction." La. Stat. Ann. § 37:91(B). To

instead allow suit whenever an audit report is used merely for a given "purpose" would eviscerate the requirement mandated by the statute. After all, there is always some alleged "purpose" for which an audit report may be used. Had the Louisiana legislature wished to provide for such an expansive standard to encompass any "purpose," it could have. But that is *not* the law that Louisiana adopted. Instead, the statute reflects a "restrictive" standard. *Barrie v. V.P. Exterminators, Inc.*, 625 So. 2d 1007, 1013 (La. 1993). And "[i]t is not the proper role of the courts to rewrite the law[]." *Nasrallah v. Barr*, 140 S. Ct. 1683, 1692 (2020).

As multiple dictionary definitions cited in EY's opening brief show, a "transaction" is commonly understood to involve "[t]he act or an instance of conducting business or other dealings; esp., the formation, performance, or discharge of a contract" or "[s]omething performed or carried out; a business agreement or exchange." *Transaction*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see also* EY Br. 18–19 & n.10. Forwarding an audit report to a regulator is simply not such a "transaction," let alone a "*specified* transaction." The Receiver elides, for example, the holding of the New Jersey Supreme Court (interpreting a similar statute) that even reliance on an audit in connection with "individual store operations" and "continued participation" in a cooperative "fail[ed] to allege any specific transaction" within the meaning of the statute. *See E. Dickerson & Son, Inc. v. Ernst & Young LLP*, 846 A.2d 1237, 1239–41 (N.J. 2004).

The Receiver's cases do not help its cause. None involved something akin to a regulatory transmission, let alone endorsed the expansive reading of "specified transaction" demanded by the Receiver's interpretation. *Overland Leasing Group, LLC v. First Financial Corporate*, 2007 WL 3349491, *1 (D.N.J. Nov. 7, 2007), for instance, concerned equipment leasing. And *Credit Alliance Corp. v. Arthur Andersen & Co.*, 483 N.E.2d 110, 112–13 (N.Y. 1985), considered the use of an accounting firm's report to induce specific financial transactions. Finally, is it baseless

13

for the Receiver to attempt recasting *Ultramares Corp. v. Touche*, 174 N.E. 441 (N.Y. 1931), as permitting liability for negligence whenever an accounting firm "knew that its audits would be used" by a third party. Opp. 29. *Ultramares* is well known for its strict privity requirement: "liability for negligence is one that is bounded by the contract, and is to be enforced between the parties by whom the contract has been made." 174 N.E. at 448. In short, the Receiver cites no authority supporting its construction of the statute.

Further, the Receiver all but ignores its independent obligation to additionally demonstrate detrimental reliance in connection with the "specified transaction"—that the plaintiff was "injured as a result of their justifiable reliance." La. Stat. Ann. 37:91(B); *see* EY Br. 21-23. The Receiver does not dispute that any detrimental reliance must have been on the part of "*the plaintiff*," La. Stat. Ann. 37:91(B) (emphasis added), not some third party. The Receiver thus cannot meet this requirement by arguing that *a regulator* relied upon the audit report after transmission. Instead, the Receiver must show that *the Bank* itself detrimentally relied in connection with the asserted "specified transaction." But, as the Receiver pleads, providing the audit report to the regulator allowed the Bank to *meet* its regulatory obligations, *see* Compl. ¶ 35, thus *benefiting* the Bank. To the extent that transmittal to satisfy regulatory requirements was a "transaction," the Bank was not injured by it. The Receiver has no answer to this ground for dismissal, either.

### B. The Receiver's New Theory Fails to Establish Privity.

The Receiver now posits a new theory in an attempt to meet the statutory privity standard, asserting that EY's alleged audit failures with respect to particular Bank loans meet the test. But this theory is unsupported by the Complaint and fails as a matter of law.

The Receiver argues that EY "was aware of these Loan Transactions during each audit engagement." Opp. 32. But that ignores what the statute requires. The privity standard demands

14

that the auditor (1) "was aware at the time the engagement was undertaken" that the audited financial statements "were to be made available for use in connection with a specified transaction by the plaintiff"; (2) "was aware that the plaintiff intended to rely upon such financial statements or other information in connection with the specified transaction"; and (3) "had direct contact and communication with the plaintiff and expressed by word and conduct the [defendant's] understanding of the reliance on such financial statements." La. Stat. Ann. 37:91(B)(2); *see Solow v. Heard McElroy & Vestal, L.L.P.*, 7 So. 3d 1269, 1276–77 (La. Ct. App. 2009) (affirming dismissal of claim based on these requirements).

The Receiver does not acknowledge any of these requirements, let alone demonstrate how they would be satisfied. And, critically, the Complaint lacks allegations substantiating them. The most that the Receiver does is assert more generally in its Opposition that "had EY done its job, Ryan's fraud would have been exposed and reported to the Bank's Audit Committee." Opp. 34. But that does not even show detrimental reliance by the Bank on any EY audit reports in connection with any specific lending decision—let alone establish EY's awareness of such specific reliance and its expression of understanding. And it would be wholly implausible, in any event, to allege that Ashton Ryan was relying on EY in connection with any lending decision—he was just convicted of a scheme to deceive EY.

In sum, even if the Receiver can point to "transactions" or even "specified transactions" under its new theory in the form of loans, that is not sufficient to satisfy the multiple additional requirements of Louisiana's exacting privity standard. *See Solow*, 7 So. 3d at 1276–77.

## CONCLUSION

For the foregoing reasons and those set forth in EY's opening brief, arbitration should be compelled and, in the alternative, the Complaint should be dismissed.

15

| | |
|---|---|
| January 12, 2024 | Respectfully submitted, |
| | */s/ Craig Isenberg* |
| Steven M. Farina, *pro hac vice* | Craig Isenberg, 26903 |
| Stephen J. Fuzesi, *pro hac vice* | Chloé M. Chetta, 37070 |
| Adrienne Van Winkle, *pro hac vice* | BARRASSO USDIN KUPPERMAN |
| WILLIAMS & CONNOLLY LLP | FREEMAN & SARVER, L.L.C. |
| 680 Maine Ave S.W. | 909 Poydras Street, Suite 2400 |
| Washington, DC 20024 | New Orleans, Louisiana 70112 |
| Telephone: (202) 434-5000 | Telephone: (504) 589-9700 |
| Facsimile: (202) 434-5029 | Facsimile: (504) 589-9701 |
| sfarina@wc.com | cisenberg@barrassousdin.com |
| sfuzesi@wc.com | cchetta@barrassousdin.com |
| avanwinkle@wc.com | |

*Attorneys for Ernst & Young LLP*

16

## CERTIFICATE OF SERVICE

I certify that on January 12, 2024, the foregoing memorandum was filed using the Court's ECF System, which constitutes services on all parties that have appeared of record in this proceeding.

*/s/ Craig Isenberg*
Craig Isenberg
