UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **FEDERAL DEPOSIT INSURANCE CORP.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 20-1259** |
| **ERNST & YOUNG LLP ET AL** | **SECTION "L" (1)** |

## ORDER & REASONS

Before the Court is Defendant Ernst & Young LLP's Motion to Compel Arbitration, or in the Alternative, to Dismiss the Complaint. R. Doc. 145. Plaintiff opposes the Motion. R. Doc. 159. Ernst & Young LLP filed a reply. R. Doc. 161. Also before the Court is Gloucester Insurance Ltd.'s Motion to Stay Litigation Pending Proposed Arbitration. R. Doc. 147. Plaintiff opposed this Motion as premature and urged the Court to reset this Motion to Stay for a full briefing schedule should it grant the Motion to Compel Arbitration. R. Doc. 157. After a review of the record, briefings, applicable law, and after hearing oral argument on the motion, the Court now rules as follows.

**I.    BACKGROUND**

  **a.  Factual Background**

This case arises out of financial statement audits of First NBC Bank and First NBC Bank Holding Company, Inc. ("First NBC" or "Bank") by Ernst & Young LLP in 2014 and 2015. R. Doc. 1 ¶ 1. Plaintiff, the Federal Deposit Insurance Corporation as Receiver for First NBC Bank ("FDIC-R")[1], filed the instant suit to recover damages from Defendants Ernst & Young LLP ("EY") and Gloucester Insurance Ltd. ("Gloucester")[2], alleging that the audits of First NBC were

---

[1] The State of Louisiana closed First NBC Bank on April 28, 2017, and appointed the FDIC as Receiver. R. Doc. 1 at 4.
[2] Gloucester provided EY with professional liability insurance during the relevant period. R. Doc. 1 ¶ 11.

1

negligently performed. *Id.* ¶ 2. Specifically, FDIC-R alleges that EY failed to design audit procedures to discover material fraud, and accordingly, failed to discover fraud perpetrated by First NBC's President and Chief Executive Officer, Ashton Ryan. *Id.* 1 ¶ 2. Additionally, FDIC-R contends EY identified false statements made by Ryan but failed to investigate the falsehoods or report them to the Audit Committee. *Id.* ¶ 3. FDIC-R further alleges that EY negligently issued an unqualified opinion regarding First NBC's financial statements and internal controls processes. *Id.* FDIC-R characterizes these actions as a breach of EY's professional duties. *Id.*

FDIC-R alleges that First NBC suffered at least $125 million in losses as a result of Ryan's fraudulent conduct, which was not detected or timely reported by EY. *Id.* In recounting Ryan's allegedly fraudulent practices, FDIC-R explains that Ryan held formal roles as the Bank's founder and CEO in addition to overseeing the lending department and having unilateral authority to approve tax credit investments. *Id.* ¶ 16–19. FDIC-R argues that Ryan, acting in his own interest, "committed fraud at First NBC by repeatedly causing the Bank to advance money through loans and tax credit investments on false pretenses." *Id.* ¶ 20. He further allegedly "advance[d] hundreds of millions of dollars to promote his own financial interests and mask the deteriorating financial condition of his lending and tax credit investment portfolios." *Id.* ¶ 4. Additionally, FDIC-R contends Ryan made numerous "false statements in loan approval memoranda regarding the condition of collateral, alleged payments by borrowers, and the existence and financial condition of guarantors," which were identified in EY's work papers but not acted upon. *Id.* ¶ 20. The Complaint also identifies several other alleged actors in the scheme, including Jeffrey Dunlap, Kenneth Charity, and Gregory St. Angelo. *Id.* ¶ 21–23. FDIC-R contends that these fraudulent practices, and accordingly the $125 million loss associated with them, could have been discovered and prevented had EY conducted its audits in accordance with its professional responsibilities.

FDIC-R alleges that EY was engaged to conduct integrated audits in 2014 and 2015 as required by the Sarbanes-Oxley Act. *Id.* ¶ 28–29. An integrated audit requires an auditor to evaluate a company's financial statements and internal controls over financial reporting. *Id.* ¶ 28. During the audits, EY was allegedly given "direct and unfettered" access to the Bank's internal systems and records *Id.* ¶ 30. EY's audit for the 2014 fiscal year represented that the Bank's consolidated financial statements "were fairly stated in accordance with GAAP and free from material misstatement whether due to error or fraud." *Id.* ¶ 32. The audit also included an unqualified opinion that the Bank's internal controls over financial reporting were effective. *Id.* ¶ 32. As to the 2015 fiscal year, EY issued an unqualified opinion regarding the Bank's consolidated financial statements but finally identified several material weaknesses in internal controls and accordingly issued an adverse opinion. *Id.* ¶ 33.

FDIC-R identifies a number of alleged failures on EY's part that caused the fraud to remain undiscovered. In particular, FDIC-R alleges that EY failed to exercise professional skepticism while conducting the audits and failed to timely identify material weaknesses in internal controls despite knowing that Ryan exercised a dominant influence over the Bank's lending and financial statement process, including personally handling a large portfolio of loans and tax credit investments and recklessly advancing tens of millions of dollars to borrowers without meaningful controls." *Id.* ¶ 5. Additionally, FDIC-R argues that EY ignored fraud risks, failed to design audit procedures that would adequately address those risks, and failed to obtain sufficient information to support its audit opinions, relying instead—erroneously—on management's representations. *Id.* ¶ 6. FDIC-R contends these failures constitute breaches of EY's professional duties to conduct the audits in accordance with Public Company Accounting Oversight Board rules, auditing standards,

quality control standards, GAAP and Generally Accepted Auditing Standards, and other professional auditing standards. *Id.* ¶ 39.

Based on the foregoing, FDIC-R brought suit against EY in this Court on April 22, 2020, seeking damages for professional negligence from EY. *Id.* ¶ 133. FDIC-R also brings a direct action against Gloucester, an insurance entity that provided $400 million in professional liability insurance coverage to EY during the relevant period. *Id.* ¶ 138.

On June 1, 2020, the United States filed a Motion to Intervene and Stay the case under Rule 24 of the Federal Rules of Civil Procedure. R. Doc. 21. On July 13, 2020, this Court granted the government's motion to stay the case due to the overlapping facts between the instant case and the criminal cases related to the Bank's failure. *See* R. Doc. 55 at 10-15. The criminal case concluded and the stay in this matter was lifted on March 3, 2023. R. Doc. 85.

### b. The Belcher Suit & PCAOB Materials

While the matter was stayed, EY alleged that counsel for FDIC-R in this case obtained confidential and privileged information from the Public Company Accounting Oversight Board ("PCAOB") relating to PCAOB's investigation into the financial statement audits performed by EY. R. Doc. 58-1 at 2. Specifically, they alleged that counsel received and reviewed materials, including thousands of pages of testimony transcripts, in preparation for a deposition of Daniel Belcher, a former auditor with EY. *Id.* (citing *FDIC v. Belcher*, No. 19-12561). In a proceeding in another section of this Court, the FDIC-R sought to enforce an administrative subpoena requiring Belcher to appear at a deposition. *See FDIC v. Belcher*, No. 19-12561, No. 19-12561, 2019 WL 6728338 (E.D. La. Dec. 11, 2019) (Zainey, J.). In that case, the district court ruled against Belcher and enforced the subpoena after concluding that the materials the PCAOB provided to the FDIC-

R were produced pursuant to a statutory authorization,[3] and therefore the subpoena was not improper in any manner. *See id.*

On October 26, 2020, the Fifth Circuit issued an opinion concluding that the lower court erred when interpreting 15 U.S.C. § 7215(b)(5)(B) so as to authorize the PCAOB to share the materials with the FDIC-R. *FDIC v. Belcher,* 978 F.3d 959, 963-64 (5th Cir. 2020). The Fifth Circuit held that none of the confidential and privileged EY materials that the PCAOB had amassed during its investigation into EY should have been provided to the FDIC-R. *Id.* The Fifth Circuit then directed the district court to fashion "some form of meaningful relief," notwithstanding that Belcher had already been deposed, and remanded the case. *Id.* at 961 n.1.

On remand, Judge Zainey, who was handling the subpoena enforcement matter, denied the FDIC-R's renewed motion to enforce, and denied the FDIC-R's request that the Court find that Belcher's deposition was valid. In their motion to enforce, FDIC-R took the position that no further action other than the destruction of the materials was required to address the PCAOB's erroneous production of EY's confidential and privileged materials. Judge Zainey declined to address what specific remedies are now available to Belcher or EY and instead deferred to this Court for determining the appropriate remedy.

On January 25, 2021, FDIC-R then allegedly forwarded EY's counsel a letter it sent to the PCAOB stating that in light of the Fifth Circuit ruling, it intended to destroy the documents it had obtained from the PCAOB. R. Doc. 86-1 at 11. However, FDIC-R did not commit to destroying all internal documents of FDIC-R counsel reflecting the contents of and documents provided by the PCAOB nor did it intend to recuse any counsel who had reviewed the documents. *Id.*

---

[3] The district court based its decision on the "federal functional regulator" statutory exception. 15 U.S.C. § 7215(b)(5)(B)(ii)(II)

On January 29, 2021, EY moved for a partial lifting of the stay before this Court to address the issues it perceived with the FDIC-R's unauthorized access to PCAOB documents, including a motion to disqualify FDIC-R's counsel, and FDIC-R responded by filing a "Renewed Motion to Enforce Administrative Subpoena" in the original *Belcher* matter before Judge Zainey. Judge Zainey rejected the FDIC-R's bid and explained in his ruling that the FDIC-R had "not demonstrated that Belcher's deposition is without taint." Order Denying Renewed Motion to Enforce Administrative Subpoena, *FDIC-R v. Belcher*, No. 19-12561 (E.D. La. Mar. 18, 2021), R. Doc. 134 at 13. This Court then held a hearing on March 31, 2021 regarding EY's request for a partial lift of the stay. R. Doc. 75. This Court ultimately maintained the stay in deference to the criminal proceedings which were then ongoing, denying EY's motion to disqualify counsel without prejudice to EY's ability to file it after the stay of this case was lifted. R. Doc. 76. The court ordered FDIC-R, its counsel, and consultants to preserve any relevant documents in the meantime. *Id.* Upon FDIC-R's unopposed motion following the conclusion of the criminal proceedings, the Court lifted the stay on March 3, 2023. R. Doc. 85.

EY subsequently filed its motion to disqualify counsel and for other relief. R. Doc. 86. Following the parties' briefing on the matter, the Court granted the motion to disqualify and ordered FDIC-R to substitute new counsel and to "return to EY and/or destroy all material provided by the PCAOB." Order & Reasons, R. Doc. 112 (hereinafter "June Order"). The Court gave FDIC-R until October 31, 2023 to comply with this June Order. R. Doc. 128. On September 22, 2023, FDIC-R filed a Notice of Compliance and a Motion to Confirm Scope of the June Order and on October 31, 2023, this Court held that the administrative depositions were not included in the documents to be returned or destroyed and that the proposed disqualification and destruction

6

actions complied with the June Order. Order & Reasons, R. Doc. 139 (hereinafter "October Order").

## II.   PRESENT MOTION

In the instant motion, EY urges the Court to compel arbitration in this matter pursuant to the engagement agreements (also referred to as "contracts" or "agreements") executed between EY and the Bank's Holding Company because they contain a mandatory arbitration clause which also requires threshold questions of arbitrability to be sent to arbitration. R. Doc. 145-1 at 4. While the Bank was not a signatory to those engagement agreements, EY argues that FDIC-R, as its receiver, is nonetheless bound by them and the arbitration clause by operation of direct benefits estoppel because the Bank "embraced" the contracts by both "knowingly seeking and obtaining 'direct benefits' from" them as well as by "asserting claims that must be determined by reference to" those contracts. *Id.* at 8-9 (quoting *Traders' Mart Inc. v. AOS, Inc.*, 268 So. 3d 420, 428 (La. App. 2 Cir. 2019)). The benefit sought and obtained by the Bank was that it used the audits performed under the contracts to satisfy its regulatory obligations, which EY argues is one independent ground for finding the Bank, and thus FDIC-R, is bound by the contracts and their arbitration clause. *Id.* at 9-12. As another independent ground for estoppel, EY argues that FDIC-R's claims must be determined by reference to the engagement agreements because "the Receiver would have no cause of action for professional negligence but for the underlying agreements. There would have been no audit at all without those agreements." *Id.* at 12.

EY argues that should the Court not compel arbitration, it alternatively should dismiss the complaint for failure to state a claim because Louisiana's privity statute bars this cause of action. *Id.* at 16. Citing La. R.S. § 37:91(B)(2), EY argues that the Louisiana Accountancy Act limits who may bring a negligence cause of action against an accountant and that FDIC-R does not satisfy the

privity requirement. *Id.* at 16-18. Specifically, the statute requires a non-client plaintiff to demonstrate that it both detrimentally relied upon the audit and that the auditor was aware that the audit would be used for a "specified transaction." *Id.* at 17 (quoting the statute). EY asserts that FDIC-R can show neither detrimental reliance nor a specified transaction and therefore its claim against EY must be dismissed. *Id.* at 18-23.

FDIC-R opposes the motion on all grounds. R. Doc. 159. FDIC-R argues that federal law bars EY from compelling FDIC-R to arbitrate, citing the Administrative Dispute Resolution Act ("ADR Act"), the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), and *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279 (2002). *Id.* at 2. FDIC-R explains that the ADR Act sets forth the specific requirements as to when a federal agency can be compelled to arbitrate, which are not present in this case. *Id.* at 1. The FIRREA grants the FDIC-R a "statutory right to a federal judicial forum" of which EY cannot deprive it because the Supremacy Clause requires federal law to trump state law doctrines such as estoppel. *Id.* at 1-2. Further, the Supreme Court in Waffle House has "concluded that public agencies like FDIC-R cannot be compelled to arbitrate when they have authority to choose their forum." *Id.* at 2. FDIC-R argues additionally that should this Court find estoppel applies, state law under either New York or Louisiana requires the same result because (1) both states apply the principles of *Waffle House*, and (2) FDIC-R has neither invoked the contracts nor received a benefit expressly provided by them. *Id.*

On the motion to dismiss, FDIC-R avers that both the detrimental reliance and the specified transaction requirements of La. R.S. § 37:91(B)(2) are satisfied and pled sufficiently in the complaint and therefore dismissal is unwarranted. *Id.*

EY filed a reply brief distinguishing the case law relied upon by FDIC-R in its opposition to this motion and reiterating its central arguments in favor of arbitration. R. Doc. 161. The Court heard oral argument on this motion on Wednesday, January 17, 2024.

### III. APPLICABLE LAW

#### A. Arbitration

The Federal Arbitration Act ("FAA") governs contracts that affect interstate commerce and contain arbitration clauses. *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 55-6 (2003). The FAA states that a provision within

> a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such contract, transaction, or refusal, shall be valid, irrevocable, and enforceable.

9 U.S.C. § 2. The purpose of the FAA is to permit arbitration agreements to be "as enforceable as other contracts, but not more so." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022). Accordingly, "a court may not devise novel rules to favor arbitration over litigation." *Id.*

The FAA is not without its limits and arbitration may be disallowed if a litigant is a federal agency. The ADR Act provides that arbitration is available for a federal agency party "whenever all parties consent" and that the "arbitration agreement shall specify a maximum award that may be issued by the arbitrator and may specify other conditions limiting the range of possible outcomes." 5 U.S.C. § 575(a)(1)-(2).

The Supreme Court has also held that federal agencies may not be compelled to arbitrate when they have the statutory authority to pursue a claim in their own name. In *Waffle House*, the Supreme Court addressed whether the EEOC was limited by an arbitration agreement signed by the employee whose rights it sought to vindicate after he alleged wrongful termination due to

9

disability. 534 U.S. 279 (2002). The employee, Baker, was not a party to the suit brought by the EEOC against the employer, Waffle House. *Id.* at 283-84. The district court denied the employer's motion to compel arbitration and the Court of Appeals for the Fourth Circuit, balancing competing priorities between the FAA, Title VII, and the arbitration agreement, held that "when an employee has signed a mandatory arbitration agreement, the EEOC's remedies in an enforcement action are limited to injunctive relief" and it may not pursue victim-specific remedies. *Id.* at 285, 293.

The Supreme Court reversed, finding the EEOC may pursue both categories of relief and to hold otherwise would interfere with its statutorily authorized public function in "seeking to vindicate a public interest." *Id.* at 294-96. The Supreme Court reasoned that it has recognized other instances where the EEOC does not stand precisely in the employee's shoes, for example it is not bound by statutes of limitations, it does not need to comply with Rule 23 requirements, and that it may seek equitable relief in court on behalf of employees who have signed arbitration agreements. *Id.* at 297-98 (first citing *Occidental Life Ins. Co. of California v. E.E.O.C.*, 432 U.S. 355, 368 (1977); then citing *General Telephone of the Northwest, Inc. v. E.E.O.C.*, 446 U.S. 318, 326 (1980); then *citing Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 32 (1991)). Relying on the plain language of Title VII, the Court found that the statute "specifically grants the EEOC the exclusive authority over the choice of forum and the prayer for relief once a charge has been filed" and that "ordinary principles of res judicata, mootness, or mitigation may apply to EEOC claims does not contradict these decisions, nor does it render the EEOC a proxy for the employee." *Id.* at 298.

Under its statutory authority, the FDIC is required to take into account a number of public interest considerations, including but not limited to its impact on other insured banks and local businesses, it must both maximize its recovery and minimize its losses, it must have "due regard

10

to the conditions of credit in the locality," and it must consider housing affordability when liquidating assets. 12 U.S.C. § 1821(h)(1); *id.* at § 1821(h)(4)(A); *id.* at (d)(2)(E); *id.* at (d)(13)(E)(v). The FDIC has the right to remove most cases to federal court, it has the right to issue administrative subpoenas in the course of administering its duties, and it is unfettered by certain state and common law constraints that would otherwise apply to a regular receiver, for example it is entitled to extensions of statutes of limitations, and it may bring negligence claims against directors and officers even when state law would require a greater standard of culpability. 12 U.S.C. § 1819(b); 12 U.S.C. § 1821(d)(2)(I); *id.* at § 1821(e)(1); *id.* at § 1821(k).

Federal courts recognize that in some instances the FDIC has statutory responsibilities that distinguish it from an ordinary receiver. *See, e.g.*, *U.S. v. Sweeney*, 226 F.3d 43, 45-46 (1st Cir. 2000) (holding that when the FDIC acts a receiver for a failed bank, it "fosters important public policies relating to the avoidance of a national banking crisis"); *Niemuller v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. 92 Civ. 0070 (SS), 1993 WL 546678, at *4 (S.D.N.Y. Dec. 30, 1993) (Sotomayor, J.) ("[R]egulatory banking agencies have greater standing than ordinary successors-in-interest because they, empowered by statute, represent the bank as well as the creditors, depositors and shareholders of the bank.").

Nevertheless, courts also recognize that the FDIC wears many hats, and courts treat it differently depending on whether it is acting in its corporate capacity or as a receiver. *See, e.g.*, *FDIC v. Ernst & Young, LLP*, 374 F.3d 579, 581 (7th Cir. 2004). One case out of the Seventh Circuit, *FDIC v. Ernst & Young, LLP*, is particularly illuminating on the relationship between the FDIC's various roles and arbitration. There, Judge Easterbrook explained as follows:

> FDIC-Receiver acquires the assets and legal interests of the failed bank and proceeds much as a trustee in bankruptcy; FDIC-Corporate acts as a guardian of the public fisc, disburses proceeds from the insurance fund, and having paid insurance claims is subrogated to rights of the bank's depositors against the failed institution.

11

*Id.* In that case, the FDIC in its corporate capacity had supplied credit to make depositors whole after the failure of Superior Bank FSB ("Superior"). It alleged that as a result, the insurance fund suffered losses near $500 million and it sued EY, Superior's accounting firm, for those damages. *Id.* at 580. The court described FDIC's theory as "FDIC-Corporate suffered an injury when it disbursed money from the insurance fund; it asserts that Ernst & Young caused (part of) this loss." *Id.* at 582 (explaining why FDIC-Corporate had standing to bring the suit).

However, the court found that, despite having standing, FDIC-Corporate could not pursue this malpractice cause of action because it belonged to the client, Superior, and accordingly now belonged to FDIC acting in its receiver capacity. *Id.* at 581 ("Other claims held by the failed bank (as opposed to its depositors) come within the control of FDIC-Receiver. Accounting misconduct, like legal malpractice, may entitle the client (and FDIC-Receiver as its proxy) to recover damages."). The court, and EY, believed FDIC-*Corporate* brought the suit, rather than FDIC-Receiver, because "FDIC believes that this maneuver allows it to avoid two terms of the contract by which Superior Bank engaged Ernst & Young. Superior Bank promised to arbitrate any disputes with the accounting firm, and it also waived any claim to punitive damages." *Id.* The court further explained that Illinois state law authorized suits by third parties against accountants for fraud, and that FDIC-Corporate was hoping to "take advantage of state law's beneficial aspects while avoiding those it does not like – particularly rules enforcing waivers of punitive damages and agreements to arbitrate." *Id.* at 580-81, 583.

The court ultimately found against FDIC on this basis. *Id.* at 584. The court also agreed in theory with the district court's rejection of a repudiation argument under 12 U.S.C. § 1821(e). Below, the FDIC had argued that § 1821(e), which authorizes the FDIC as receiver to repudiate contracts it finds burdensome to the administration of the failed institution's affairs, permitted it

to repudiate the arbitration clause. *Id.* In so rejecting, the district judge found a piecemeal repudiation power to result in absurd consequences, such as repudiating a decimal in a percentage or the word "not" in various clauses, and concluded repudiation would apply to the entire contract, not parts of it. *See id.* The Seventh Circuit did not resolve this question but found it "hard to escape the logic of the district judge's position," reasoning that "[i]f the FDIC really thought that FDIC-Receiver could ignore these promises, then why did FDIC-Corporate pursue this litigation? It makes sense only if FDIC-Receiver is bound" by the agreement to arbitrate and waive punitive damages. *Id.*

Federal courts have compelled the FDIC as a receiver to arbitrate on behalf of the institution it succeeded when that institution would have itself been required to arbitrate. In *College Boulevard National Bank v. Credit Systems, Inc.*, the District Court of Kansas held that the FDIC as receiver for College Boulevard National Bank ("CBNB") was bound by the arbitration clause in the contract between CBNB and Credit Systems Inc., just "as CBNB would have been." No. 92-2051-EEO, 1994 WL 242670, at * 1 (D. Kan. May 18, 1994). In that case, the FDIC had argued it could only be compelled into nonbinding arbitration, relying on 5 U.S.C. § 580 which, at the time, had authorized the head of an agency that is a party to terminate an arbitration proceeding or vacate an arbitration award.[4] *See id.* The court disagreed, finding no statutory or precedential support for limiting FDIC's authority to only participate in *nonbinding* arbitration. *Id.* (first citing *FDIC v. Air Florida System, Inc.*, 822 F.2d 833 (9th Cir. 1987); then citing *Chemical Futures & Options, Inc. v. RTC*, 832 F. Supp. 1188 (N.D. Ill. 1993)). The court compelled the parties, including the FDIC as receiver, to arbitrate the claims. *Id.* at *1-*2.

**B. Estoppel**

---

[4] That language was later struck from the statute in an amendment passed in 1996.

Arbitration agreements are generally enforceable only against the agreement's signatories. *See Kubala v. Supreme Production Services, Inc.*, 830 F.3d 199, 201-02 (5th Cir. 2016). Nevertheless, courts may compel a nonsignatory to arbitrate pursuant to an agreement if certain conditions are met. *See Bridas S.A.P.O.C. v. Government of Turkmenistan*, 345 F.3d 347, 355-56 (5th Cir. 2003) (recognizing the six theories under which a nonsignatory to an arbitration agreement may be bound under ordinary principles of contract and agency law). One such theory is estoppel. *Hellenic Investment Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514, 417 (5th Cir. 2006). In Louisiana, "[d]irect benefits estoppel involves nonsignatories who, during the life of the contract, have embraced the contract despite their nonsignatory status but then, during litigation, attempt to repudiate the arbitration clause in the contract." *Traders' Mart, Inc. v. AOS, Inc.*, 268 So. 3d 420, 428 (La. App. 2 Cir. 2019). One can "embrace" the contract "(1) by knowingly seeking and obtaining 'direct benefits' from that contract; or (2) by seeking to enforce the terms of that contract or asserting claims that must be determined by reference to that contract." *Id.* (citing *Noble Drilling Servs. Inc. v. Certex USA, Inc.*, 620 F.3d 469 (5th Cir. 2010)).

Courts find a nonsignatory knowingly sought and obtained a direct benefit when it can be shown that the nonsignatory "had actual knowledge of the contract containing the arbitration clause" and proceeded with the arrangement in order to obtain some sort of benefit. *Noble Drilling*, 620 F.3d at 473; *Hellenic*, 464 F.3d at 519. For example, in *Hellenic*, Hellenic Investment Fund ("Hellenic") purchased a ship from Inlet Navigation Company ("Inlet"), knowing that Inlet had contracted with a ship classification society, Det Norske Veritas ("DNV"), to provide "class related inspections and certifications." *Hellenic*, 464 F.3d at 515-16. When Hellenic sued DNV for issues relating to its classification services, the Fifth Circuit held that Hellenic was bound by the arbitration clause in the contract between Inlet and DNV because it knew of the agreement and

14

"specifically admitted before the district court that 'without … that condition of class [certificate], we wouldn't have done the deal." *Id.* at 519. The court rejected the argument that those services "ultimately proved of little benefit to Hellenic" because "at the critical moment of sale, DNV's performance was essential to Hellenic's decision to purchase the MARIANNA." *Id.* The court thus affirmed the lower court's enforcement of the arbitration clause in the Inlet-DNV agreement. *Id.* at 520.

Courts have also found that that a nonsignatory obtained a direct benefit when they receive "the same sort of benefits from the [] agreement that a client would have received" such as "research, reasoning, drafting, and filing" services. *Blaustein v. Huete*, 449 F. App'x 347, 350 (5th Cir. 2011). In *Blaustein v. Huete*, the Fifth Circuit again rejected an argument that the services were of no actual benefit because they turned out to be "poorly rendered," noting that Huete had received all of the same services he would have received if he had hired the firm himself, and "[t]he only way this benefit could have been any more direct were if Huete had been an actual party to the fee agreement" in question. *Id.*

A separate way a nonsignatory may embrace a contract and thus be bound by the arbitration clause contained therein is when they assert a claim that must be determined by reference to the contract. In *Hellenic*, the court explained that Hellenic's claim was "based upon DNV's failure to follow its own Rules in classing the MARIANNA," rules which contained the arbitration clause. *Hellenic*, 464 F.3d at 519-20. The court estopped Hellenic from denying the contract on this ground, reasoning that "Hellenic cannot embrace the Rules by bringing a claim under *Otto Candies* alleging, in essence, a violation of the DNV Rules without accepting the consequences of those Rule**s**," that is, by disavowing the arbitration clause. *Id.* at 520.

Courts applying New York law, the choice of law selected in the agreement, employ a similar direct benefits estoppel doctrine. "Under New York law, the 'guiding principle' of the theory 'is whether the benefit gained by the nonsignatory is one that be traced directly to the agreement containing the arbitration clause.'" *Trina Solar US, Inc. v. Jasmin Solar Pty Ltd*, 954 F.3d 567, 572 (2d Cir. 2020) (quoting *Belzberg v. Verus Invs. Holdings Inc.*, 999 N.E.2d 1130 (2013)). "The nonsignatory beneficiary must actually invoke the contract to obtain its benefit, or the contract must expressly provide the beneficiary with a benefit." *Id.*

### c. Privity

Under Louisiana's privity of contract statute, the right to bring a negligence suit against an accountant is limited to only those who can demonstrate an injury "as a result of their justifiable reliance upon financial statements or other information" prepared pursuant to an engagement relationship and either (1) the plaintiff "is the issuer or successor of the issuer of the financial statements or other information," or (2) the defendant accountant "was aware at the time the engagement was undertaken that the financial statements or other information were to be made available for use in connection with a specified transaction by the plaintiff who was specifically identified to the defendant." La. R.S. § 37:91(B). For the second condition, defendant must have "had direct contact and communication with the plaintiff and expressed by words and conduct" their understanding of the plaintiff's reliance. Id.

The principle set forth in *Ultramares Corp. v. Touche* underpins the privity statute's requirements. *See* 174 N.E. 441 (N.Y. 1931). *Ultramares* made clear that liability for negligence in the accountant context, without parameters, could "expose accountants to a liability in an indeterminate amount for an indeterminate time to an indeterminate class." *Id.* at 444. The court recounted the extreme ramifications should liability for negligence become so unbounded and

unpredictable. *Id.* at 448 (explaining that lawyers could become liable to the public to investors if they overlook one statute in the course of their representation to a client, or that title companies could become liable to future unknown purchasers). Reluctant to permit such a parade of horribles, the court connected liability with privity and statutes like Louisiana's codify this principle. See id.

## IV. DISCUSSION

As a threshold matter, the Court applies Louisiana law and not New York law, as neither party urges the applicability of New York law, both parties argue Louisiana law, and the FDIC-R alleges causes of action pursuant to Louisiana law.

EY's argument is essentially as follows: (1) the agreement between EY and the Holding Company contained a mandatory arbitration agreement; (2) the Bank (and thus FDIC-R as its successor) although not a signatory to the agreement is nevertheless bound by the agreement under direct benefits estoppel; (3) FDIC-R is acting as a receiver of the First NBC Bank and thus assumes the rights and obligations of that institution; and (4) if arbitration is not compelled, the complaint must be dismissed for lack of privity. The FDIC-R's argument is essentially as follows: (1) as a federal agency with authority to select its forum, it cannot be compelled to arbitrate; (2) even if it can be compelled to arbitrate, it is not bound by the agreement under estoppel theories; and (3) its complaint must not be dismissed because it satisfies the privity requirements of La. R.S. § 37:91. For the following reasons, the Court will compel arbitration and therefore will not address the parties arguments for or against dismissal.

First, the Court must address whether the FDIC-R, as a federal agency, can be compelled to arbitrate a claim it brings on behalf of a failed institution it has succeeded, and the Court answers this question in the affirmative. As Judge Easterbrook explained, the FDIC can act in its corporate capacity, which is how it acts when it serves in its regulatory and enforcement role, or it can serve

as a receiver, whereupon it assumes the rights of the institution into whose shoes it steps. *See FDIC v. EY*, 374 F.3d at 581. In this case, there is no question that the FDIC-R has its receiver hat on and that it acts on behalf of the now defunct First NBC Bank. Therefore, the rights it has are only those rights that the Bank would have had. The Court thus distinguishes *Waffle House* from the instant suit and finds it unhelpful to the FDIC-R.

*Waffle House* involved the EEOC bringing a claim of its own enforcement volition. *See Waffle House*, 534 U.S. at 282. The question presented surrounded the nature of relief the agency could obtain in such a context. *Id.* Central to the Court's reasoning was the public function of EEOC's enforcement actions in discrimination suits, and the Court found it critical that that EEOC was bringing its *own* enforcement claim, and not a "claim only with Baker's consent." *Id.* at 291. While the EEOC bringing its own charge may in fact be "in command of the process," this is not determinative here and the Court finds no reason to reach as broad a holding as to touch on every federal agency bringing its own enforcement action, as different organic statutes may grant agencies different rights and responsibilities. *See id.* (interpreting Title VII to find that EEOC was in command of the suit once it decides to bring an enforcement charge).

Here, the FDIC-R is not bringing an enforcement claim in its corporate capacity against EY. It is asserting a claim which belonged to the Bank, and thus now belongs to it. The Fifth Circuit has held in the course of this same litigation that the FDIC-R is not acting in a regulatory or enforcement capacity. *Belcher,* 978 F.3d at 963-64 (holding that the FDIC in this suit was not "the appropriate Federal functional regulator" but rather was "acting in its capacity as the Bank's receiver" and therefore was not entitled to documents the regulator could receive). The Court acknowledges that the FDIC-R has statutory rights, in its receiver capacity, that distinguish it from regular receivers. However, absent express Congressional authorization to the contrary, this Court

will not read into the FIRREA an exemption from the FAA. That other federal courts have either compelled the FDIC-R to arbitration or contemplated its permissibility lends support to this finding. *See FDIC v. EY*, 374 F.3d at 584 (contemplating that the FDIC brought suit in its corporate capacity to specifically avoid being bound by an arbitration clause it would have been otherwise required to respect had it brought suit in its receiver capacity); *College Blvd. Nat'l Bank*, 1994 WL 242670, at *1-*2 (compelling the FDIC as receiver to arbitrate a claim that the bank would have been required to arbitrate).

Second, since the FDIC-R *can* be compelled to arbitrate, the next question is whether it *should* be in this case. That is, whether the FDIC-R is bound by the agreement between EY and the Holding Company. Applying Louisiana law, the Court finds that, because the Bank knowingly sought and obtained a direct benefit from the agreement, direct benefits estoppel operates to bind the FDIC-R acting in its place. Neither party disputes that the Bank had actual knowledge of the agreement. Indeed, in the FDIC-R's complaint, it alleges specifically that all parties knew that the audits conducted by EY for the Holding Company would be used by the Bank to satisfy its regulatory obligations. R. Doc. 1 at 10-11. The Court likewise has no trouble concluding that the Bank sought and obtained a direct benefit from this agreement. "EY's audit reports for the 2014 and 2015 Audits specifically provided that they were performed to comply with these audit and audit-reporting requirements" *Id.* at 11. Like in *Blaustein*, the Bank obtained a direct benefit when they received "the same sort of benefits from the [] agreement that a client would have received." *See* 449 F. App'x at 350.

During oral argument on this motion, EY observed that the FDIC-R functionally concedes that it obtained a direct benefit when it argues that it satisfies Louisiana's privity statute. In arguing that it relied on EY's audits and was injured as a result of this detrimental reliance, the FDIC-R

19

claimed that "EY knew that the FDIC, as the Bank's federal regulator, would review and rely upon EY's audit reports in evaluating the safety and soundness of the Bank's operations." R. Doc. 1 at 11. EY noted that the statute requires the plaintiff, here the FDIC-R, to be the one who relied to its detriment, not a third-party regulator. *See* R. Doc. 145-1 at 22. That the Bank obtained a direct benefit is thus clear: absent this agreement and relationship between EY and the Holding Company, the Bank would have had to hire its own accounting firm in order to comply with its regulatory requirements. That it did not have to do so and that it could use the audits performed pursuant to the agreement is clearly a benefit that the Bank both sought and obtained.

For the foregoing reasons, the Court finds that the Bank would have been bound to the agreement between EY and the Holding Company under direct benefits estoppel and, therefore, FDIC-R standing in the Bank's shoes as its receiver is bound as well. Finding no statutory instruction to the contrary, the FDIC-R is required to arbitrate this claim, as the Bank would have been. In so finding, the Court need not reach the question of whether a reliance on the contract theory of estoppel would bind the FDIC-R, nor does it reach the question privity and whether the complaint can survive a 12(b)(6) motion.

Accordingly, it is ordered that EY's Motion to Compel Arbitration be GRANTED and this matter be REFERRED to arbitration. It is further ordered that Gloucester's Motion to Stay be GRANTED and that this matter be STAYED AND ADMINISTRATIVELY CLOSED pending the outcome of that arbitration.

New Orleans, Louisiana, this 23rd day of January, 2024

_____
United States District Judge