1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4  FEDERAL DEPOSIT INSURANCE      *        20-CV-1259
   CORPORATION AS RECEIVER FOR    *
5  FIRST NBC BANK                 *        Section L
                                  *
6  versus                         *        January 17, 2024
                                  *
7  ERNST & YOUNG, LLP, et al.     *
                                  *
8  * * * * * * * * * * * * * * *  *

9

10                MOTION HEARING BEFORE
          THE HONORABLE ELDON E. FALLON
11            UNITED STATES DISTRICT JUDGE

12

   Appearances:
13

14 For the Plaintiff:          Stanley Reuter Ross Thornton
                                 & Alford, LLC
15                            BY:  BRYAN C. REUTER, ESQ.
                                   RICHARD C. STANLEY, ESQ.
16                            909 Poydras Street, Suite 2500
                              New Orleans, Louisiana 70112
17

18 For the Plaintiff:          Bailey & Glasser, LLP
                              BY:  STEPHEN P. SORENSEN, ESQ.
19                                 ELIZABETH D.H. DOW, ESQ.
                              1055 Thomas Jefferson Street NW
                              Suite 540
20                            Washington, DC 20007

21 For the Defendant:          Barrasso Usdin Kupperman
                                 Freeman & Sarver, LLC
22                            BY:  CHLOE M. CHETTA, ESQ.
                              909 Poydras Street, Suite 2350
23                            New Orleans, Louisiana 70112

24

25

1   Appearances:

2

3   For the Defendant:            Williams & Connolly, LLP
                                  BY:  STEVEN M. FARINA, ESQ.
                                       STEPHEN J. FUZESI, ESQ.
4                                 680 Maine Avenue SW
                                  Washington, DC 20004
5

6   Also Present:                 Courtney Enlow, Esq.
                                  Pete Jorgensen, Esq.
7

8   Official Court Reporter:      Toni Doyle Tusa, CCR, FCRR
                                  500 Poydras Street, Room B-275
9                                 New Orleans, Louisiana 70130
                                  (504) 589-7778
10

11

12

13

14  Proceedings recorded by mechanical stenography using
    computer-aided transcription software.

15

16

17

18

19

20

21

22

23

24

25

1                            **<u>INDEX</u>**

2                                                      <u>Page</u>

3  Oral Argument

4          Steven M. Farina, Esq.                       6

5          Stephen P. Sorensen, Esq.                    29

6          Steven M. Farina, Esq.                       41

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**PROCEEDINGS**

**(January 17, 2024)**

1
2
3    (Call to Order of the Court.)

4    **THE COURT:**  Good morning, ladies and gentlemen.  Have

5 a seat, please.

6    Let's call the case, Dean.

7    **THE DEPUTY CLERK:**  Civil Action 20-1259, *Federal*

8 *Deposit Insurance Corporation as Receiver for First NBC Bank v.*

9 *Ernst & Young, LLP, et al.*

10    **THE COURT:**  Counsel make their appearance for the

11 record, please.

12    **MR. STANLEY:**  Your Honor, Rick Stanley here for

13 FDIC-R, and I would like to introduce Stephen Sorensen and

14 Lissa Dow to the Court from the Bailey & Glasser firm.

15    **MR. SORENSEN:**  Good morning, Your Honor.

16    **MS. DOW:**  Good morning, Your Honor.

17    **MR. STANLEY:**  And Courtney Enlow from the FDIC.

18    **MS. ENLOW:**  Good morning.

19    **MR. REUTER:**  Bryan Reuter on behalf of FDIC.

20    **MS. CHETTA:**  Good morning, Your Honor.  Chloe Chetta

21 on behalf of Ernst & Young here with my co-counsel from

22 Williams & Connolly.

23    **MR. FARINA:**  Good morning, Your Honor.  Steve Farina

24 from Williams & Connolly.

25    **MR. FUZESI:**  Good morning, Your Honor.  Stephen

1   Fuzesi also from Williams & Connolly.

2         **MR. JORGENSEN:**  Good morning, Your Honor.  Pete

3   Jorgensen from Williams & Connolly.

4         **THE COURT:**  As I understand it, this case arises from

5   the financial statement audits of the First NBC Bank and

6   First NBC Holding Company by Ernst & Young.  The plaintiffs,

7   the FDIC as receiver for First NBC Bank, filed the instant suit

8   to recover damages from the defendants, Ernst & Young, alleging

9   that audits of the First NBC were negligently performed.

10         Specifically, as I understand it, the FDIC

11   argues that Ernst & Young have failed to design audit

12   procedures to discover material fraud and accordingly failed to

13   discover what First NBC president and chief executive officer

14   Ashton Ryan and his colleagues were doing.  FDIC alleges that

15   First NBC suffered at least $125 million in losses as a result

16   of Ryan's fraudulent conduct.

17         There's an instant motion filed by Ernst &

18   Young.  Ernst & Young first argues that the Court should compel

19   arbitration in this matter; consistent with the agreement that

20   Ernst & Young had with the holding company, it should have

21   mandatory arbitration.  In addition, Ernst & Young says that if

22   arbitration is not granted, then the Court alternatively should

23   dismiss the complaint for failure to state a claim because

24   Louisiana's privity statute bars such an action.

25         As I understand it, FDIC opposes the motion and

09:03

1    argues that under federal law arbitration is not required.

2    They also cite, of course, the *Waffle House* case that the

3    Supreme Court seems to also say that and recognizes that

4    federal law is the superior law and it's not necessary.  FDIC

5    argues that they do have a statutory right to proceed and that

6    they also have pled enough information that it should not be

7    dismissed.

8            I would like to hear from the parties.  I don't

9    mean to catch you cold, but in addition I would like you to

10   focus and discuss with me that *Aaron* case which is in another

11   section of the Court, which in effect has analyzed the various

12   claims and who owns the claims.  As I understand, that

13   particular case says that the trustee of the First NBC Holding

14   Company owns this particular claim and not the FDIC.

15           I will hear from the parties at this time.

16        **MR. FARINA:**  Thank you, Your Honor.  Good morning.

17   Again, Steve Farina on behalf of Ernst & Young.

18           Your Honor is correct that we are seeking first

19   to compel arbitration of the receiver's claims, and then in the

20   event arbitration is not compelled, that the claim be dismissed

21   because of a failure to comply with the Louisiana privity

22   requirement, and I'm going to talk about both arguments.

23           Judge Africk has already decided in respect to

24   the trustee of the holding company, the trustee's claims, that

25   they need to go to arbitration.  His Honor has compelled those

09:05

1    claims to arbitration.  It's obviously a belated litigation.

2            As Your Honor has pointed out, there's a dispute

3    between the FDIC as receiver for the bank and the trustee, as

4    the trustee for the holding company, over who owns various

5    claims arising out of the services provided by Ernst & Young.

6    Judge Africk has decided that the trustee owns a claim.  Our

7    understanding is that that ruling is going up to the

8    Fifth Circuit.  The Fifth Circuit will decide that.  Our

9    understanding is that the FDIC, if they are determined to own

10   the trustee's claim, would dismiss the trustee's claim and

11   pursue the claims before Your Honor, which may or may not end

12   up in arbitration.

13           **THE COURT:**  Does that mean that we should hold this

14   case in abeyance until we see what the circuit says?

15           **MR. FARINA:**  Well, it's a little complicated, and we

16   thought about that.  We considered whether to go forward on

17   this motion until ownership is decided, because obviously no

18   one wants to proceed down the path of litigating one case and

19   then find out it's the wrong case.

20           Where it stands is intervention has been denied

21   to the trustee in Your Honor's case by the magistrate judge.  I

22   don't know whether that's going to be taken up on appeal to

23   Your Honor or up to the Fifth Circuit or not.  At this point

24   the trustee has been told they have a claim.  They are going to

25   pursue it.  The receiver is going to challenge that, and the

09:07   1   Fifth Circuit will decide who owns that claim.

2              The reason, honestly, we decided to go forward

3   is we're not sure that the trustee, now that they have been

4   told they have their own claim and they are trying to hang onto

5   it, is as concerned about what happens before Your Honor.  We

6   are not so certain they are going to vigorously pursue the

7   claim before Your Honor, especially now that intervention has

8   been denied.

9              So our view is the arguments we are making are

10   correct as to the claims that the receiver has brought.  In the

11   event that the Fifth Circuit somehow at some point addresses

12   whether or not the receiver owns claims, then that could affect

13   obviously whatever happens in this case, whether it's here or

14   in front of an arbitration panel, but it's not quite teed up

15   that way in Judge Africk's case.

16        **THE COURT:**  Is it the same claim we are dealing with?

17   As I understand it, in that particular case there was a claim,

18   but multiple theories of liability: breach of contract, breach

19   of tort, and things of that sort.

20        **MR. FARINA:**  It's very clear that both sets of claims

21   arise out of the same audits.  Both the trustee and the

22   receiver are claiming that Ernst & Young was deficient in its

23   audit work.  And it's the same audit work, and it's the same

24   audit work that was done pursuant to the same engagement

25   agreement.

09:09

1              There's an issue -- and it does relate to what
2    we are arguing here today about -- who actually is owed a duty
3    and who is in privity and who is not in privity.  So there are
4    differences that could allow one claim to proceed and another
5    claim not to proceed, but they certainly arise out of the same
6    events.  They arise out of the same work that was performed
7    pursuant to the same agreements that were actually signed by a
8    director.  The engagement agreements were actually signed on
9    behalf of the holding company by a director of the holding
10   company, the chair of the audit committee, who was also a
11   director of the bank.
12             So there's almost complete overlap as to the
13   facts.  Now, how that gets sorted out -- I guess ultimately by
14   the Fifth Circuit -- as to who owns a claim remains to be seen.
15   We, of course, are taking the position that it should be one or
16   the other, that they shouldn't both be allowed to sue us for
17   the same claim, but we have essentially stayed out of that.  We
18   don't know that anyone is interested in having us pick our
19   opponent, so we haven't taken a position as to who owns the
20   claims.  Of course, our position would be that they can't both
21   own the claims.
22        **THE COURT:**  Yes.  That's critical, it seems to me,
23   who owns the claim.  That's what concerns me about dealing with
24   it at this point when the circuit is going to decide whether
25   you own the claim or you own the claim.

09:10

1      **MR. FARINA:**  Well, the magistrate judge has denied

2  intervention, and I don't know what's going to happen with

3  that.

4      **THE COURT:**  Well, yesterday she ruled.

5      **MR. FARINA:**  We felt it important to go forward

6  because, again, we don't want our fate to be determined by some

7  other adversary who doesn't necessarily have the same interests

8  as we do, and we think it's compelling.  There already is an

9  arbitration.  Judge Africk has sent the trustee's claims to

10  arbitration.  We think Your Honor should send these claims to

11  arbitration, and the arbitration panel could also sort out

12  those issues if they are not sorted out by the Fifth Circuit.

13      **THE COURT:**  Of course, they take the position that

14  under the federal law, particularly the *Waffle House* case, that

15  they are different in the sense that they are a federal agency,

16  and a federal agency can't be forced to arbitrate.

17      **MR. FARINA:**  So, Your Honor, they have argued in this

18  case that they are different.  They have argued in connection

19  with the *Belcher* issue, on the documents that went up to the

20  Fifth Circuit, that they are different.  They have argued in

21  the Supreme Court that they are different.  They have argued in

22  the Fifth Circuit that they are different.  They keep losing.

23          The Supreme Court and the Fifth Circuit and

24  other circuit courts of appeals addressing similar arguments as

25  to the ones they are making today in front of Your Honor, those

09:11

1    courts have all rejected the notion that they are different.  I
2    will go ahead and I'll address that issue first, Your Honor,
3    since you have asked, and then I can circle back to direct
4    benefits estoppel.
5                    We do have some slides that have some excerpts
6    in some of the cases we rely upon.  If Your Honor has it in
7    front of you, Slide 8 is where we cite the Supreme Court
8    authority and the Fifth Circuit authority.
9                    The *O'Melveny & Myers* case, Your Honor -- again,
10   this is on Slide 8 -- addressed a similar issue.  The FDIC was
11   a party as a receiver, so it's important -- and this is
12   something that the Fifth Circuit recognized in our case, that
13   the FDIC can act in different capacities.  They can act in
14   their corporate capacity, which is akin to a regulator.  But
15   when they act as a receiver, they stand in the shoes of the
16   bank.
17                   Court after court after court has said unless
18   there is some express authority that grants them some special
19   status, they stand in the shoes of the bank.  They are pursuing
20   the bank's claims, not their own claim.  Whatever defenses or
21   rules would govern adjudication of the bank's claim also govern
22   adjudication of the claim when the bank's claim is being
23   pursued by the receiver.  That is black letter law.  The
24   Supreme Court has said it.  The Fifth Circuit has said it.  The
25   Fifth Circuit said it in this litigation, in the *Belcher* case.

09:13

1          We cite this in our brief and we excerpted it in
2    our brief, and I will talk about it here now, the *O'Melveny &*
3    *Myers* case.   In the *O'Melveny & Myers* case, the receiver, the
4    FDIC, was arguing that they had special protections, that they
5    were different, they were the government.

6          In that case they were arguing that they were
7    not bound by certain defenses that would be available under
8    state law, so a very similar issue, but it's not arbitration.
9    They said they are different, they are special for all the
10   reasons that they have argued they are special here, and the
11   Supreme Court, Justice Scalia, said, "No, you are the receiver.
12   You are asserting the claims of the bank, and you step into the
13   shoes of the bank."

14         In that case the Court rejected -- and it also
15   rejected an argument made under FIRREA, which the receiver also
16   argues here -- that somehow they have special status.   The
17   Supreme Court says you do not have special status when you are
18   asserting a claim as a receiver.   You are akin to the private
19   plaintiff, the bank, had the bank brought the claim unless
20   there is a specific statutory command that makes you different.

21         In the *O'Melveny* case, the Supreme Court looked
22   at FIRREA and searched FIRREA to see is there any special
23   statutory command in FIRREA that relieves the receiver of this
24   state law defense and they said, "It's not in there.   We don't
25   see it.   We are not going to imply that they have some special

09:15

1    right, that they are different, because they are seeking to
2    recover monies."
3                  Justice Scalia said that's not the rule.  The
4    rule isn't that the FDIC always wins.  The rule is that they
5    are bound by state law, and the Court rejected the notion that
6    they were special.  The Court rejected the notion that FIRREA
7    made them special.  The Court said you are in the shoes of the
8    bank whose claims you are pursuing.
9                  Two years earlier, the Fifth Circuit came to the
10   same conclusion in a case involving Ernst & Young.  Many of
11   these cases seem to involve the FDIC and Ernst & Young, and
12   again they all stand for the same proposition.
13                  In that case, again the FDIC as receiver -- and
14   the Fifth Circuit made that critical distinction, as
15   receiver -- was pursuing tort claims that had previously been
16   owned by the bank.  In that case -- and we quote this -- the
17   Fifth Circuit said, "The FDIC is not entitled to special
18   protection when it brings a tort claim against a third party on
19   behalf of a defunct financial entity."
20                  The court went on in multiple places and said,
21   for example, "No statutory justification or public policy
22   exists to treat the FDIC differently from other assignees," and
23   that's critical.  They are acting as an assignee of the claims,
24   and I will get to that because that's relevant to *Waffle House*.
25                  Then the Fifth Circuit said, "Essentially, this

09:16

1  is a client case in which a client is suing its auditor."  So
2  the Fifth Circuit said, "It doesn't matter, FDIC, that you are
3  now the named plaintiff because you are the receiver.  You are
4  pursuing the bank's claims, and this is no different than if
5  the bank had pursued the claim."  So that's the Fifth Circuit
6  in the FDIC against Ernst & Young case.
7     Now, again, as I have mentioned, in this
8  litigation when we were before the Fifth Circuit and the
9  Fifth Circuit ruled on whether there had been a violation of
10 Sarbanes-Oxley by the sharing of information, one of the
11 arguments that the FDIC as receiver made to the Fifth Circuit
12 was "We are a regulator."  We argued, "You are not a regulator.
13 You are an assignee of the bank's claim, and therefore you do
14 not get any of the special entitlements that a regulator would
15 have."  The Fifth Circuit agreed with us in this litigation and
16 said that when the FDIC was investigating this matter, which
17 was the precursor to these claims being brought against Ernst &
18 Young, the Fifth Circuit said the FDIC was acting in its
19 capacity as the bank's receiver, not as the bank's regulator.
20    So, again, they are not special.  They are not
21 the regulator.  They are not an agency.  They are a receiver
22 and they are pursuing claims or in that case investigating
23 claims to be brought on behalf of the bank.
24    Another case that we cite -- this is on
25 Slide 9 -- FDIC again against Ernst & Young, this was 2004,

09:18

1   this involved Superior Bank, and Superior Bank does involve

2   arbitration.  In that case, in what Judge Easterbrook

3   characterized as a litigation tactic, the FDIC decided to sue

4   Ernst & Young not in its capacity as a receiver because they

5   knew -- and Judge Easterbrook says this, that they knew that if

6   they sued as the receiver, they would have been bound by the

7   engagement agreement, and the engagement agreement included,

8   guess what, an arbitration provision, and they did not want to

9   be bound by the arbitration provision.

10          Judge Easterbrook takes as a given that they

11   would have been bound by the arbitration provision had they

12   sued as receiver, which is why in that case they tried

13   something different.  They said, "Well, okay, we are going to

14   sue in our corporate capacity, and therefore we are not going

15   to be bound by this agreement."

16          Judge Easterbrook said, "No, that doesn't work.

17   You are bound.  You cannot sue in your corporate capacity.  You

18   own these claims because you are a receiver and, therefore, as

19   receiver, you are going to be bound by the rules that the bank

20   itself would encounter in litigation, including the contractual

21   provision requiring arbitration."

22          The central premise of the opposition is again

23   that somehow they are different, that the rules that would

24   apply to the bank don't apply to them; that direct benefits

25   estoppel that would require the bank to arbitrate these claims,

09:20

1    that they don't have to follow that.  They are special.

2              The Supreme Court and the Fifth Circuit over and

3    over and over again, and other courts of appeals, have said you

4    are not special, you are pursuing the claims of the bank, and

5    you have to follow the rules that would apply in litigation

6    involving the bank, brought by the bank, unless there is

7    something very specific, a specific statutory grant that makes

8    you different.

9              All right.  FIRREA.  They argue that FIRREA

10   somehow precludes this case from being arbitrated.  Again,

11   FIRREA was the statute at issue in *O'Melveny*.  What the Court

12   did is the Court looked at FIRREA and said, okay, well, FIRREA

13   allows you to do this and allows you to do that, but it didn't

14   allow you to avoid state law defenses.  Justice Scalia said,

15   "If it's not in there, it's not in there, and we are not going

16   to somehow assume that you own special rights that are not

17   expressly granted in FIRREA," and there is nothing in FIRREA

18   that bars arbitration.  Arbitration isn't even mentioned in

19   FIRREA, so there is nothing in FIRREA that says the FDIC can

20   avoid arbitration.

21             The Fifth Circuit has made very clear that if

22   someone is seeking to avoid arbitration, which is contrary to

23   the strong federal interests in arbitration, there needs to be

24   a very express mandate that arbitration was precluded, and it

25   doesn't exist in FIRREA.  The case says:  "The party opposing

09:22

1    arbitration -- and urging a congressional command contrary to

2    the FAA -- faces a high bar."  This is the Fifth Circuit in the

3    *Robertson* case from 2020, so just 3 1/2 years ago, and it said

4    that the Supreme Court has shown "dogged insistence that

5    Congress speak with great clarity when overriding the FAA."

6    Well, Congress did not speak with great clarity in exempting

7    the FDIC when acting as a receiver from the FAA, so FIRREA does

8    not make them special with respect to arbitration.

9              *Waffle House*.  Your Honor has asked about

10   *Waffle House*.  We saw *Waffle House*.  We were somewhat surprised

11   by it because it's a 22-year-old case, and we have never

12   actually seen *Waffle House* used by the FDIC in this way, and

13   there's a reason.  *Waffle House* on its terms involved an

14   enforcement action brought by an agency.  The Supreme Court was

15   very clear in that case and in subsequent cases that the

16   EEOC -- not the FDIC, the EEOC -- was bringing an enforcement

17   action in *Waffle House*.  Not only that, it was an enforcement

18   action that they owned irrespective of the employee.

19             The Supreme Court made clear in *Waffle House*

20   that Title VII authorized the EEOC to bring its own enforcement

21   actions.  In *Waffle House*, the EEOC was not standing in the

22   shoes of the employee.  The EEOC was not bringing the

23   employee's claim.  The EEOC, obviously, was not the receiver or

24   the assignee of the employee's claim.

25             The Supreme Court said -- and we went back and

09:23

 1    we looked at the underlying briefs in *Waffle House* and the SG's

 2    brief.  Your Honor will read the case.  It all hinged on the

 3    fact that the EEOC had statutory authority to bring its own

 4    claim and its own enforcement claim.  Here, neither of those is

 5    present.

 6              The receiver is not bringing its own claim.  The

 7    receiver is bringing the bank's claim.  The receiver is not

 8    bringing an enforcement action.  The receiver is bringing a

 9    state law claim for damages, damages to the bank.  It's just

10    not applicable.  It's never been found to be applicable to this

11    circumstance.  It's never been found to be applicable to the

12    FDIC.

13              In the *Superior Bank* case, Judge Easterbrook

14    actually references the *Waffle House* decision and talks about

15    how that's why the FDIC was trying to bring the claim as

16    corporate, the idea being if they are bringing the claim as

17    corporate, as a "regulator," that somehow they could sneak into

18    *Waffle House*, the *Waffle House* distinction.  The court rejected

19    that, said, "You can't do that.  You are bringing the claim, if

20    you have a right to bring the claim, as a receiver, and as a

21    receiver *Waffle House* doesn't help you."

22              So *Waffle House* involved an agency bringing an

23    enforcement action, not standing in the shoes of a private

24    party, but pursuing a cause of action that was specifically

25    granted, a new cause of action that was specifically granted to

09:25

1    the EEOC by Congress in Title VII.  *Waffle House* does not bar

2    arbitration when the FDIC is acting as a receiver pursuing

3    state law tort claims on behalf of a bank.

4         They cite to another statute, the ADR, the

5    Administrative Dispute Resolution Act, which I had never heard

6    of, but apparently it is a statute that was passed that permits

7    in certain circumstances agencies to do some of their business

8    pursuant to alternative dispute resolution procedures.  Again,

9    the receiver says, "This other federal law makes us special."

10   Your Honor, I'm on Slide 12 that talks about the ADR.

11        They say, "Well, the ADR says we can't be

12   compelled to arbitrate."  Well, that's not right either, and

13   they do not cite contrary authority from another federal court.

14   That's the *College Boulevard National Bank* case from the

15   District of Kansas, 1994, where the same arguments that the

16   FDIC as receiver is making here in front of Your Honor, the

17   FDIC as receiver for a different bank made in front of a

18   different federal judge.

19        The federal court in that case, the *College

20   Boulevard National Bank* case, rejected the argument that the

21   ADR Act somehow exempts the FDIC from arbitration.  What the

22   court said -- and the court applied the same reasoning that we

23   have in our reply brief -- that the ADR applies only to a

24   federal agency.  They are not an agency here.  It only applies

25   to "administrative disputes."

09:27

1          What the court there said was:  "We know of no
2    case holding that an action by the FDIC as receiver of a bank
3    to recover on a contract is an action relating to an
4    administrative program."  The court held the FDIC is bound as
5    CBNB, the bank, would have been by the arbitration provision in
6    the contract.  The federal court in this case compelled the
7    FDIC as receiver to binding arbitration the claims that it was
8    pursing as the assignee of the bank's claims.
9          There is nothing that the receiver can point to
10   that specifically and expressly bars arbitration here.  The
11   FDIC as receiver has been sent to arbitration before by other
12   federal courts.  *Waffle House* does not compel a contrary
13   result.  *Waffle House* applies to an agency of the United States
14   government pursuing not an assigned claim, pursuing their own
15   independent enforcement action that is conveyed expressly by
16   statute.
17          So unless they can point to something very
18   specific that expressly says that they don't need to
19   arbitrate -- that's their burden because the Supreme Court has
20   said if you can't point to something express like that that
21   makes you special, then you are not special.  You stand in the
22   shoes of the bank on whose claims you are bringing.
23          Again, it's critical that the receiver here is
24   bringing the bank's claim.  They are claiming that the bank was
25   injured.  They are seeking damages on behalf of the bank

09:29

1    because of services that were provided that allegedly the bank

2    relied upon.  In that circumstance, they have to take the good

3    and the bad.  Whatever it is that they get because they stand

4    in the shoes of the bank, they also get what comes with it.

5    They have to take the bitter with the sweet, and that includes

6    arbitration.  There's nothing that they have pointed to,

7    there's nothing that any other federal court has ever accepted

8    with respect to the FDIC as receiver that makes them special

9    with respect to arbitration.

10                    Now, we do have two other points that I would

11    like to at least address, Your Honor, although there really is

12    very little that's in their opposition brief on direct benefits

13    estoppel.  We think that's telling that they have to argue that

14    they are special because if they are in the shoes of the bank,

15    then they are going to lose because the bank would be compelled

16    to arbitrate under settled Fifth Circuit and Louisiana law, and

17    that is direct benefits estoppel.  They have argued, "Well, we

18    didn't actually sign the engagement agreement, so we are not

19    bound by it," and they argue, "The bank didn't sign the

20    engagement agreement, so the bank isn't bound by it."

21                    Settled principles of law articulated repeatedly

22    by the Fifth Circuit and also by the Louisiana Supreme Court,

23    the doctrine of direct benefits estoppel, says that where you,

24    the plaintiff, have embraced the contract during the life of

25    the agreement and received benefits under that agreement, you

09:31

1   cannot then in litigation disclaim other provisions of the

2   agreement.

3          It's well-settled authority.  We cite a number

4   of cases.  There's the *Noble Drilling Services* case that's a

5   Fifth Circuit case from 2010.  There's also the *Hellenic*

6   *Investment Services* case.  That is also from the Fifth Circuit,

7   and that is from 2006.  Then from the Louisiana Supreme Court,

8   there's the *Traders' Mart* case.  All those cases are cited in

9   our brief.

10         Essentially, what direct benefits estoppel

11  says -- and we have a slide on this, which is Slide 3, and this

12  is from the Fifth Circuit:  "Courts have applied direct

13  benefits estoppel to bind a nonsignatory to an arbitration

14  agreement when the nonsignatory knowingly exploits the contract

15  containing the arbitration clause and obtains a direct benefit

16  from the contract."  Again, that's *Noble Drilling* and also

17  *Traders' Mart*.

18         The Fifth Circuit has explained how a party can

19  embrace the contract, and it says:  "A nonsignatory can embrace

20  a contract containing an arbitration clause in two ways:

21  (1) by knowingly seeking and obtaining direct benefits from

22  that contract; or (2) by seeking to enforce the terms of that

23  contract or asserting claims that must be determined by

24  reference to that contract."

25         So how is that doctrine applied here?  Well, the

09:32

1   receiver has a problem, and the problem that the receiver has

2   is that they need to comply with the very strict privity

3   requirements that are not unique to Louisiana, but it is

4   certainly a minority position.

5            What Louisiana law requires is that if you are

6   going to bring a claim against an auditor, you either have to

7   be the client, the party who signed the agreement, or you have

8   to meet very, very specific requirements that are akin to

9   privity to allow you to have a claim.  It's much different than

10  most other jurisdictions, but that is Louisiana law, and they

11  know that.

12           So in order to attempt to meet the Louisiana

13  privity statute, their own complaint alleges that they are a

14  beneficiary under the agreement.  Their own complaint -- and

15  this is on Slides 5 and 6 we quote from their complaint.  Their

16  own complaint says that when the holding company and Ernst &

17  Young entered into the engagement agreement to perform the

18  audits that they were specifically contemplated as a

19  beneficiary, that the bank -- not the holding company, but the

20  bank -- would use those reports and submit them to the

21  regulators.  They say that, therefore, they have satisfied the

22  privity requirement, and we will get to that.  We don't think

23  that that satisfies it because there's other language in the

24  Louisiana statute that they ignore and that they don't satisfy.

25           But they are in this spot that in order to even

09:34    1    try to allege a claim, they have to say that they were

2    benefited; and not only that, they have to say that the parties

3    intended that the work that was done pursuant to the contract

4    would benefit them.  Otherwise, they have no claim.

5              That's what they did, they pleaded it, but by

6    pleading that they were an intended beneficiary -- that the

7    parties all understood that because Ernst & Young was

8    performing these audits that they could use these reports and

9    they wouldn't have to go out and hire their own auditor, that's

10   a benefit that they have specifically pleaded that was intended

11   at the time the agreement was signed.  That is the prototypical

12   case for direct benefits estoppel.

13             So having pleaded that they received benefits --

14   not only that they received benefits, that it was the parties'

15   intentions that they receive benefits -- they have embraced the

16   contract during the life of the contract, and they are bound

17   under settled principles of law as articulated by both the

18   Louisiana Supreme Court and the Fifth Circuit to arbitrate if

19   the contract includes an arbitration provision, and it does

20   here.

21             I mentioned that there was a case directly on

22   point.  It's the *Hellenic Investment Fund* case, 464 F.3d 514.

23   We discuss it on Slide 5.  It's also discussed in our briefs.

24   What's interesting about that case is there was a similar

25   conundrum that the plaintiff faced.  That case involved a

09:36

1    classification society that performed inspections on a big
2    ship.  The ship was sold, and the plaintiff who bought the ship
3    said that the inspections -- like the FDIC is alleging here the
4    audits, the inspections were not done properly, and what was
5    represented in the classification reports about the ship was
6    wrong.

7              So they say in order for them to allege a claim,
8    they had a requirement under the controlling law to allege that
9    they were part of a limited group of people who were entitled
10   to rely upon the work that was performed by the defendant, the
11   classification society.  Here's what the Fifth Circuit said.
12   Under applicable law, the plaintiff was required to "be a
13   person, or a member of a limited group of persons, for whose
14   benefit and guidance the defendant either intends to supply the
15   information or knows that the recipient intends to supply it."

16             So just like here, in order to even try to state
17   a claim, the plaintiff in the *Hellenic Investment Fund* case had
18   to somehow plead that they were contemplated by the agreement
19   as some sort of beneficiary.  So they pleaded that, and what
20   the Fifth Circuit said, equally applicable here:  "Having
21   stated a claim that expressly requires that DNV's performance
22   be for Hellenic's benefit, Hellenic cannot avoid the estoppel
23   implications of its position."

24             So it's exactly like this case, that in order to
25   try to state a claim, they have to plead that they were

09:37

1  intended as a beneficiary.  Having pleaded that they were

2  intended as a beneficiary, they have walked right into direct

3  benefits estoppel.  They can't have it both ways.

4          So that's the situation they are in.  They chose

5  to try to meet the statute.  They pleaded very specifically

6  that they had some benefit that they obtained, that they could

7  use these audit reports; and having done so, they walked right

8  into direct benefits estoppel, which requires arbitration

9  absent, again, some special privilege they have to avoid it,

10  and none here exists.

11          Now, if I could just lastly address the privity

12  issue because the privity issue would require dismissal of

13  their claim.  If Your Honor were to reach that issue, the

14  receiver does not satisfy the privity statute.  They certainly

15  have attempted to do that by citing the fact that they were

16  going to use Ernst & Young's audit reports that were done

17  pursuant to the contractual engagement and they were going to

18  provide those audit reports, and that doesn't satisfy the

19  statute.

20          What the statute requires -- it requires

21  actually a number of things, and we set out an excerpt from the

22  statute on Slide 13 from the Louisiana statutes.  It says that

23  the defendant has to know at the time of the engagement that

24  their work would be made available to the plaintiff in

25  connection with a specified transaction.  That is the language

09:39

1   from the statute.  It has to be in connection with a specified
2   transaction.
3                So, for example, in the *Hellenic Investment* case
4   the transaction there was the purchase of a boat.  They relied
5   upon the commissioning reports to go buy a boat, so that's a
6   transaction.  Other types of transactions one could imagine,
7   but there's no such transaction here.
8                What the receiver pleaded in their complaint was
9   that they were going to rely on the reports to provide them to
10  a regulator, and that is not a specified transaction.  It may
11  be a purpose.  They may have had a reason why they wanted to
12  use the work, but it is not in connection with a specified
13  transaction, which is what the Louisiana statute requires.  The
14  statute says twice that it has to be in connection with a
15  specified transaction.
16               The complaint makes very clear how it was that
17  the bank was going to use the reports, and it pleads that in
18  paragraph 122.  We cite that.  It's on Slide 14.  Again,
19  federal law required that the bank have its own annual audits,
20  and it was required that the FDIC receive a copy of the report.
21  Again, this is the FDIC in its corporate capacity, where it is
22  a regulator, and not in its capacity as a receiver.  That's the
23  use of the reports.  That's what's pleaded in the complaint,
24  and that is not a specified transaction.  It is not a
25  transaction at all.

09:41

1          In their opposition brief, what the receiver

2    says is that EY had knowledge that the bank would be using its

3    audit reports for a particular purpose.  That's what they say

4    in their opposition.  They can't even use the words that are in

5    the statute.  Our point, Your Honor, is that a particular

6    purpose is not a specified transaction.

7          Everyone who brings a claim against an auditor

8    is going to be able to argue that they had a purpose for that

9    report and they were somehow harmed by reliance upon that

10   report.  That's easy to argue.  That's not what the Louisiana

11   statute says.  The Louisiana statute says you have to identify

12   a specified transaction, and a purpose is not a transaction.

13        **THE COURT:**  Of course, if they were in a

14   representative capacity, then they would have that.

15        **MR. FARINA:**  Well, the bank was not using the report

16   for a specified transaction, so the receiver standing in the

17   shoes of the bank still doesn't satisfy the privity

18   requirement.

19        **THE COURT:**  All right.

20        **MR. FARINA:**  The problem they have is they can't have

21   it both ways.  They can't simultaneously claim that they were

22   an intended beneficiary under the agreement and then seek to

23   avoid the agreement, which is why they try to make themselves

24   special, and they are not.

25          But if you get to the issue of whether or not

09:42

1  they have even met the privity requirement, the privity
2  requirement has some very, very specific items that they need
3  to satisfy, and our position is they don't satisfy any of them.
4  They don't plead any of them.  What they do plead doesn't work
5  because it's not a specified transaction.
6         They make a new argument that's not pleaded in
7  the complaint.  I can address that in reply if that comes up in
8  their opposition.
9         **THE COURT:**  Yes.  I'll let you.  Let me hear from
10  your opponent.
11         **MR. FARINA:**  Thank you, Your Honor.
12         **THE COURT:**  Thank you.
13         **MR. SORENSEN:**  Good morning, Your Honor.
14         My colleague here used the term "special" over
15  and over again, claiming that the FDIC here is claiming that
16  it's special.  Actually, it's Ernst & Young that is asking for
17  special treatment here because what they are asking Your Honor
18  to do is truly extraordinary.  They want Your Honor to use your
19  equitable powers here to force the FDIC to arbitrate under an
20  arbitration agreement that the failed bank never entered into.
21  No court has ever ordered the FDIC to arbitrate where there was
22  no agreement.  This is something that you have to use equitable
23  powers to say, "It's only fair that I enforce this agreement
24  against the FDIC."  That really turns the equities on its head.
25         I think the issue before Your Honor is here we

09:44

1    have the FDIC, they are not even a party to the contract and EY
2    is trying to enforce it.  So that raises the question, well,
3    what if the First NBC Bank had been a party to the agreement.
4    Then, of course, you know, EY would argue of course they can
5    enforce it.
6              Well, Your Honor, we have a case on point, which
7    we have cited in our brief.  It's called the *National Credit*
8    *Union Administration Board* case from the Second Circuit, 2014,
9    where the Second Circuit addressed the issue for what was the
10   FDIC equivalent.  The FDIC is the insurance institution for
11   banks.  The National Credit Union Administration Board is for
12   savings and loans.  They are both covered by FIRREA, and they
13   have nearly identical rights.  When the FDIC steps in as the
14   receiver -- when the NCUA steps in, it's more like a
15   liquidator, but they have the same kinds of rights.
16             In that case in the Second Circuit, which,
17   Your Honor, if I could hand up a copy of it.
18             **THE COURT:**  Yes.
19             **MR. SORENSEN:**  I have a copy for my colleague here.
20             Your Honor, this case really, really matters
21   here and I think is persuasive authority for this case, if I
22   could just go through the facts of that because it's very
23   similar.  In that case there was a failed savings and loan.
24   The NCUA, just like the FDIC, got appointed as liquidator.  It
25   stepped in and it brought claims against Goldman Sachs because

09:46

1    Goldman Sachs had done some work for the failed savings and
2    loan.
3            Goldman Sachs pulled out an arbitration
4    agreement that the savings and loan had actually signed, and
5    Goldman Sachs said to the court you just stand in the shoes;
6    you have to arbitrate this.  At the district court level, the
7    district court found, no, that the NCUA did not have to
8    arbitrate because it had the right to repudiate any arbitration
9    agreement under the statute.
10            This went up to the Second Circuit.  The Second
11   Circuit found the same held here, and if I could just point
12   Your Honor to the language --
13           **THE COURT:**  Under what statute that they couldn't
14   force them to arbitrate?
15           **MR. SORENSEN:**  Correct.
16           **THE COURT:**  Which statute?
17           **MR. SORENSEN:**  If you look on page 5 at the bottom of
18   the page, this is the Second Circuit talking about § 1787(c).
19           It says here:  "Section 1787(c) explicitly
20   authorizes NCUA, in its role as the liquidating agent, to
21   repudiate any contract."
22           Then it goes on to say:  "We conclude that
23   § 1787(c)'s grant of authority to NCUA in its role as
24   liquidating agent to repudiate contracts includes authority to
25   repudiate arbitration agreements."

09:47

1          Lest there be any doubt whether the same thing
2    holds for the FDIC, if you look at page 7, there's a footnote.
3    In Footnote 3, the Second Circuit helpfully points out that
4    § 1821(e), which was also enacted as part of FIRREA, granted
5    essentially identical powers to the FDIC and Resolution Trust
6    Corporation to repudiate contracts of financial institutions
7    for which those entities were appointed conservator or
8    receiver.
9          So, Your Honor, this case says that -- this is
10   NCUA, but it says it's just like the FDIC, that they can't be
11   forced to arbitrate even where the failed institution signed
12   the contract.  In this case, they didn't even sign the
13   contract.  It can't be the case -- clearly, Congress could not
14   have intended that if the FDIC was a party -- I'm sorry, the
15   failed bank was a party to the agreement, the FDIC has explicit
16   authority under FIRREA to repudiate it and say, "No, I want to
17   stay in federal court."  It simply can't be the case, where the
18   FDIC is not a party to the contract, that somehow they could be
19   forced to arbitrate.
20         I think the *Waffle House* case and the fact that
21   the only appeal here is to the equitable powers of the Court
22   speaks to why the FDIC has the right to be in federal court
23   here.
24         If I can point to the language in *NCUA* because
25   the court, the Second Circuit, highlighted why they reached

09:49

1  this conclusion, and again it was a question of statutory

2  interpretation.  If you look on page 6, they went through the

3  reasons why the NCUA decided to repudiate the contract.

4      They say:  "As NCUA in its role of liquidating

5  agent of failed institutions represents the public interest,

6  the statute gives it wide discretion in deciding whether to

7  repudiate those institutions' contracts."

8      Up above they say that the NCUA determined that

9  arbitration would be burdensome and disadvantageous to the

10  resolution of the S&L, and that's the same situation here.  If

11  the FDIC makes a determination that arbitration would be

12  burdensome, it has discretion to repudiate an arbitration

13  agreement, even one that was signed by the bank.  So here we

14  are, we have a situation where the bank has not signed an

15  agreement.

16      **THE COURT:**  How do you deal with the *Belcher* case and

17  with that Seventh Circuit case that they cite?

18      **MR. SORENSEN:**  Yes, Your Honor.  They keep saying

19  that the FDIC is not special, not special.  It is special.

20  Under FIRREA, as receiver, it has superpowers.  It has the

21  right to issue subpoenas, take administrative depositions, it

22  gets a special statute of limitations, so it does have special

23  powers.  It has the right to be in federal court.  But to

24  distinguish those cases --

25      **THE COURT:**  When it acts by itself, but when it acts

09:51

1    as a receiver -- *Belcher* says the FDIC was acting in its

2    capacity as a bank receiver, which is different, that

3    situation, and that *Ernst & Young* case out of the Seventh

4    Circuit says the same thing.  How do you square that with the

5    Second Circuit?

6         **MR. SORENSEN:**  *Belcher* just said the question was --

7    the FDIC can be corporate, it can be as a receiver, or it can

8    be as a regulator.  In each case, it's always a federal agency;

9    it's just what hat is it wearing at that time.  In *Belcher* the

10   issue was were you wearing a regulator cap, and the court said,

11   no, you are a receiver here.

12        **THE COURT:**  Isn't that the case here, though, they

13   are the receiver?

14        **MR. SORENSEN:**  It doesn't answer the ultimate

15   question because *O'Melveny* basically says, "Look, we are not

16   going to create federal common law.  If the question is

17   substantive state law, you the FDIC as the receiver, you are

18   subject to state law unless there is something in FIRREA that

19   gives you additional powers."

20             What we are saying here is we don't disagree.

21   *O'Melveny* is correct.  It was a question of state law.  In this

22   case, if there are questions of state law as opposed to things

23   that come out of FIRREA -- which is here the right for the FDIC

24   to be in federal court.  So where FIRREA speaks, *O'Melveny* is

25   irrelevant.

09:52

1      You only get to *O'Melveny* in state law if you
2  are talking about substantive state law.  What we are talking
3  about here is what are the FDIC's rights under FIRREA.  It's
4  clear from the Second Circuit case that the FDIC can't be
5  forced to arbitrate even when the failed institution signed the
6  agreement.  The reason is -- because we have cited the ADA Act
7  and the FAA -- there are very specific requirements that have
8  to be met before a government agency can be forced to
9  arbitrate.  There's a whole list of things.

10      What we are talking about here is when the FDIC
11  took over the bank, what was the state of affairs, and now
12  going forward the FDIC could agree to arbitrate.  If they
13  failed to do so, they could be compelled, but what we are
14  talking about is what happened in the past.  So the ADA Act and
15  the FAA do not allow the agencies to enter into arbitration
16  agreements unless they meet certain requirements.

17      The Seventh Circuit case which my colleague
18  talked about, Judge Easterbrook, the only issue in that case
19  was did the FDIC in its corporate capacity have a claim against
20  Ernst & Young, and the holding in that case was, no, they
21  don't.

22      Now, he did discuss other things.  He talked
23  about *Waffle House*, but he talked about *Waffle House* and he
24  said *Waffle House* did not apply to the FDIC in its corporate
25  capacity.  Then there was some other discussion, but that case

09:53   1    did not address the issue before Your Honor.

2         **THE COURT:**  There's no question that the FDIC is

3    acting in this case as a receiver, though.  They are not acting

4    as a regulator.  They are acting as a receiver.

5         **MR. SORENSEN:**  Correct.

6         **THE COURT:**  You say even when they are acting as a

7    receiver that they are not required to arbitrate.  He says, as

8    acting as a receiver, they are required to arbitrate.  What do

9    I do with that?

10        **MR. SORENSEN:**  Well, Your Honor, I think it's clear

11   if you -- and I wish I had spent more time on the *NCUA* case in

12   our brief, but it's clear from that case that the FDIC, if the

13   bank had signed the agreement, we wouldn't be having this

14   discussion.  Under *NCUA v. Goldman Sachs*, you couldn't force

15   the FDIC to arbitrate.

16             Here we are in a position where they are asking

17   you to reach into your equitable bag of tricks and force the

18   FDIC under some equitable theory into arbitration, so it's even

19   further afield.  Under *Waffle House*, even if you look at the

20   *Donelon* case from Louisiana where it talks about receivers, you

21   can't use equitable doctrines against receivers.

22             The equities here clearly lie with the FDIC.

23   The FDIC stepped into a failed bank and is essentially wearing

24   the white hat here.  So what they are asking is for you to use

25   equitable powers, but in light of *NCUA* and *Waffle House* and the

09:55

1    FDIC's right to be in federal court, it would violate the
2    FDIC's rights under FIRREA and be inconsistent with the whole
3    statutory framework to force the FDIC out of federal court and
4    into a private arbitration.
5          THE COURT:  The problem I have is that you are both
6    arguing -- there's no question that they are acting as a
7    receiver as opposed to acting as a regulator.  You say that the
8    law allows the FDIC acting as a receiver to decline to
9    arbitrate.  He takes the position that when they are acting as
10   a receiver, they don't have that right.  You say the law allows
11   it.  He says the law doesn't allow it.  What is it?
12         MR. SORENSEN:  Well, Your Honor, he has no cases to
13   support him.  I think I heard him say that courts send the FDIC
14   to arbitration.  That is not correct.  The one case they cite,
15   *College Boulevard*, that was a case where the FDIC inherited a
16   case that was already pending, completely different situation.
17               There's no case that we have seen where a court
18   has ordered the FDIC to arbitrate, whether they signed the
19   agreement or not.  The only case on point here, Your Honor, is
20   the *NCUA* case, and that case clearly says that the -- well, it
21   doesn't say the FDIC, but basically the FDIC equivalent has the
22   absolute right or has discretion to repudiate an arbitration
23   agreement.  So it simply cannot be the case that if the bank
24   were a signatory here, we wouldn't have to arbitrate, but if we
25   are not a signatory, somehow equitable principles apply here.

09:57

1          I think, Your Honor, when you look at

2   *Waffle House* and all of the doctrines about equitable

3   principles against receivers in light of the *NCUA* case, it's

4   clear that the FDIC -- it would violate FIRREA to force the

5   FDIC into arbitration here.

6          **THE COURT:**  How do you deal with the estoppel

7   argument?

8          **MR. SORENSEN:**  Well, I would say, Your Honor, you

9   don't even have to get to equitable estoppel because if you

10  look at actually the *Donelon* case, this is a case where the

11  commissioner of insurance took over a failed insurance company.

12  In that case the court said:  "We find it unnecessary to

13  address the doctrine of direct benefits estoppel and its effect

14  on the commissioner as a nonsignatory to the agreement."

15          The facts were very similar there.  Someone was

16  trying to enforce an arbitration agreement against the

17  insurance commissioner, and the court said:  "Equitable

18  remedies are only available in the absence of legislation and

19  custom.  Because an express grant of authority exists in favor

20  of the commissioner, resort to equity is unwarranted."

21          That's exactly the case here, Your Honor.  You

22  don't have to go to equity because FIRREA gives the FDIC the

23  right to be in federal court and to stay here in your court.

24  There's no need to even get to equitable remedies, which is

25  what they are asking for.

09:58

1          **THE COURT:**  How about the privity issue that he --

2          **MR. SORENSEN:**  Sure.  On the privity issue, the

3    statute does say privity, but it's a little bit confusing

4    because when people think of privity, they mean was there any

5    contact between the parties.  Privity is not really the issue

6    here.  It's undisputed that there was contact between EY and

7    the bank.  They were auditing the bank, so there's lots of

8    contact.

9          What we are focused here on are transactions,

10   are there specific transactions, and we have identified in the

11   complaint two different ways.  One is the bank, to continue to

12   operate, had to have audited financial statements and had to

13   submit them to the FDIC.  We allege in there that is a

14   transaction, and there's nothing in the statute that says it

15   has to be a financial transaction, but we go beyond that.  We

16   actually specify out, as Your Honor noted, $125 million of

17   losses here.  We list out at least five or six transactions,

18   specific transactions that in the complaint we say were subject

19   to EY audit, that is, EY knew about these transactions.

20         So even if you read the statute to say you have

21   to have specific business or financial transactions, we have

22   done that.  But when you take the two together, submission to

23   the FDIC to continue to operate as a bank and the very specific

24   transactions, we have clearly met the statute.

25         There's only one case really that has looked at

1    what's called Section 2, where you have a third party suing.

2    It's the *FoodServiceWarehouse* case.  In that case it went up to

3    Judge Zainey, and in a very similar factual situation you had a

4    third party who was relying on the audited financial statements

5    of a different party enter into a guarantee with the bank.  In

6    that case Judge Zainey upheld the bankruptcy court finding,

7    which was it did satisfy the privity requirement for third

8    parties.

9              Your Honor, that's the only case that really

10   considers that section and whether a loan transaction of some

11   kind might qualify and came out and said, yes, it would.

12   That's exactly what we have alleged here, that the bank would

13   not have continued to make these loans.

14        **THE COURT:**  How do you feel about the significance,

15   if any, of the other case in another section?

16        **MR. SORENSEN:**  I don't think it has any significance

17   for this case, Your Honor, because the issue on appeal, the

18   FDIC argued that it owns the trustee's claim.

19        **THE COURT:**  Right.

20        **MR. SORENSEN:**  I think it's clear there are two

21   separate claims, and this is very common.  The *Colonial Bank*

22   case, which we cited to Your Honor, had a similar situation.

23   You had a bank holding company and a bank, and both of those

24   cases went forward.  In fact, I was trial counsel for the FDIC

25   in that case, and the FDIC was side by side with the holding

company.

So it's clear that in a situation where you have a bank holding company, you can have two claims.  The only question that's going to go up to the Fifth Circuit is whether that claim belongs to the FDIC, but the claim here belongs to us.  Intervention has been denied.  I really don't believe that has any bearing on this.

THE COURT:  Well, suppose the circuit says that you don't own this claim?

MR. SORENSEN:  That question is not before the circuit.  The only thing is do we own their claim.  If the Fifth Circuit reverses and says, yes, the FDIC owns that claim, then the FDIC can choose to do what it wants with it.  It could dismiss it.  It could go to arbitration.  It will have no effect on this case, Your Honor.

THE COURT:  I see.  Okay.

Any response?

MR. FARINA:  Yes, Your Honor.  I think it's telling that the case they are now relying upon, which really wasn't very prominent in their overlength opposition, is a Second Circuit case that doesn't involve the FDIC.  So the *NCUA* case is not the FDIC.  It's the National Credit Union Administration board.

The other critical fact that is dispositive in that case that is not present here is that the NCUA repudiated

10:03

1    the contract.  They exercised their right to repudiate.
2    There's no right to avoid arbitration.  There's a right to
3    repudiate contracts.  The statutory provision that allows for
4    the repudiation of contracts specifically requires that the
5    repudiation be done in a timely manner.
6              There is no dispute here that the FDIC, as the
7    receiver for the bank, has never repudiated the agreement.
8    They don't say that they did.  All they are saying is that,
9    "Well, gee, we could have," but they have been the receiver for
10   seven years.  There's no repudiation.
11             In the *NCUA* case, the *NCUA* case repudiated the
12   agreement nine days after it was presented to them by Goldman
13   Sachs.  The statute that he is relying upon is not an
14   arbitration statute.  It allows for the repudiation of
15   agreements.  That right needs to be exercised in a timely
16   manner.  That's what the statute specifically requires.  In
17   *NCUA* they did it nine days after finding out that there was an
18   arbitration agreement.  Here it's been seven years, and there's
19   never been a repudiation.
20             He is asking you to rule on the basis of a case
21   from a different circuit that doesn't involve the FDIC where
22   there was a repudiation, but there wasn't repudiation here; and
23   if there were repudiation here now, it would not be timely.  It
24   doesn't provide any support for their position.
25             I will say, on this Judge Zainey case, I don't

10:04

1    think counsel is correct.  I think what happened in that
2    case -- and that's the food services case -- the auditor was
3    actually the auditor for both parties, the borrower and the
4    guarantor.  What the holding was in that case is that the
5    borrower had its own claims based on the audit work done
6    pursuant to its agreement with the audit firm, and the
7    guarantor had its own claims based on the work that was done
8    for it pursuant to its own agreement, but that they don't own
9    each other's claims.
10            It's actually the opposite of, I think, what he
11   has represented to the Court the holding was.  Yes, they each
12   had a claim, but they each had a claim based on their own
13   contractual privity with the audit firm, but they didn't own
14   each other's claims.  The guarantor could not rely on the audit
15   of the bank of the borrower to state a claim.  They had to rely
16   on the work that was performed for them.  Likewise, the
17   borrower could not rely upon the work done for the guarantor.
18   They had to rely on the work done for the bank.  I don't think
19   it's critical to the disposition of this case, but I don't
20   think he got the holding correct in that case.
21            This is the last point I will make.  On the
22   privity issue, I mentioned that they had an unpleaded argument.
23   Now they have made it, so I will respond to it, this notion
24   that Ashton Ryan was out making loans to Mr. Gibbs and others
25   and that somehow that satisfies the transaction requirement of

10:06

1    the statute.  Well, it's interesting.  That is a transaction,

2    but it doesn't satisfy the other requirements of the statute.

3              So among the other requirements of the statute

4    are that there be a specified transaction, yes, okay, but there

5    has to be an acknowledgment in connection with that specified

6    transaction by the auditor "expressed by words and conduct the

7    defendant licensee's understanding of the reliance on such

8    financial statements."

9              So, in other words, one of the requirements in

10   order to satisfy the privity statute is not just that the party

11   rely on the audits, but it has to be acknowledged by the

12   auditor that the party is relying.  There's no

13   acknowledgment -- and they don't plead it because they can't

14   plead it.  Your Honor sat through a criminal trial of Mr. Ryan,

15   so you know the facts.  There's no acknowledgment by Ernst &

16   Young that the bank is going to rely on Ernst & Young's audit

17   opinions on the financial statements taken as a whole in order

18   to decide whether to lend Gary Gibbs money.

19             Ashton Ryan was not waiting for EY to tell him

20   whether to lend Gary Gibbs money.  They can't plead the

21   requirement of an acknowledgment expressed by words that Ashton

22   Ryan and his cohorts were going to be relying on EY's audits to

23   decide whether to lend money to Gary Gibbs or any of the other

24   cast of characters.

25             It may be a specified transaction, and that's

10:07

1   what they have pivoted to because they can't identify a

2   specified transaction in what they have actually included in

3   their complaint, but it fails the other requirements of the

4   privity statute.  The privity statute by design, by the intent

5   of the legislature, is hard to meet.

6               Their alternative theory may identify a

7   specified transaction, which their original theory doesn't, but

8   it doesn't meet the other criteria, namely, that there has to

9   be an express written acknowledgment by EY that they are going

10  to rely on it for that purpose.  That is not pleaded and it

11  doesn't exist.  Thank you, Your Honor.

12              **THE COURT:**  Let me ask you before you leave --

13              **MR. FARINA:**  Sure.

14              **THE COURT:**  He takes the position that the bank

15  didn't sign the agreement.  What's the significance of that as

16  you see it?

17              **MR. FARINA:**  Well, the significance is we go to

18  direct benefits estoppel, and direct benefits estoppel exists

19  for this very circumstance.  It has been applied by the

20  Louisiana Supreme Court and the Fifth Circuit to compel a

21  nonsignatory to arbitration.  It is black letter law.  We cite

22  many, many cases -- recent cases, older cases, cases involving

23  arbitration, cases not involving arbitration -- you can be

24  bound by an agreement if you embrace the agreement even though

25  you are not a signatory, and that is what happened here.  That

10:09

1  is black letter law.  There's nothing sort of extraordinary

2  about that.

3           It is called direct benefits estoppel, but it's

4  not requiring you to weigh the equities like there are express

5  requirements that are laid out by the Fifth Circuit and the

6  Louisiana Supreme Court in the cases that we cite in our brief

7  and those are present here, and they really don't have an

8  argument that they are not.  Thank you, Your Honor.

9           **THE COURT:**  Thank you very much, both of you-all.  I

10  appreciate your argument.  It's been very helpful.  The Court

11  will stand in recess.

12           **THE DEPUTY CLERK:**  All rise.

13           (Proceedings adjourned.)

14                              * * *

15                        <u>**CERTIFICATE**</u>

16           I, Toni Doyle Tusa, CCR, FCRR, Official Court

17  Reporter for the United States District Court, Eastern District

18  of Louisiana, certify that the foregoing is a true and correct

19  transcript, to the best of my ability and understanding, from

20  the record of proceedings in the above-entitled matter.

21

22

23                    <u>*/s/ Toni Doyle Tusa*</u>
                     Toni Doyle Tusa, CCR, FCRR
24                    Official Court Reporter

25